## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| NAACP SOUTH CAROLINA STATE CONFERENCE; ROBERT CALDWELL; JONATHAN BELL; SHERRY JENKINS, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALAN WILSON, in his official capacity as the South Carolina Attorney General; JENNY WOOTEN, in her official capacity as Interim Executive Director of the State Election Commission; DENNIS W. SHEDD, in his official capacity as Chairman of the State Election Commission; JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the State Election Commission, <br><br> *Defendants*. | Civil Action No.: 3:25-cv-13754-MGL <br><br> **MOTION TO DISMISS** |

Alan Wilson, in his official capacity as the South Carolina Attorney General, moves to dismiss Plaintiffs' Complaint (ECF No. 1) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

## BACKGROUND

### I.    South Carolina Law

Several provisions of South Carolina law are relevant to Plaintiffs' lawsuit: (1) S.C. Code Ann. § 7-13-780 (characterized by Plaintiffs as "Limits on Voting Assistance Eligibility"); (2) S.C Code Ann. §§ 7-15-310, 7-15-330, and 7-15-385 (characterized by Plaintiffs as "Limits on Possible

---

[1] Under Local Civil Rule 7.04 (D.S.C.), a full explanation of the motion is provided in this document, so a separate memorandum would serve no useful purpose.

Assistance"); and (3) S.C. Code Ann. §§ 7-15-330(B)(4), 7-15-385(G) (characterized by Plaintiffs as "Five-Voter Limits").

The first challenged provision, S.C. Code Ann. § 7-13-780, dates to the 1950s and applies to all elections. That section provides the following: "Only those persons who are unable to read or write or who are physically unable or incapacitated from preparing a ballot or voting shall be entitled to receive assistance of any kind in voting." S.C. Code Ann. § 7-13-780. Although this section specifies who is eligible for assistance in voting, it does not specify who may serve as an assistor. And as further explained below, the South Carolina Election Commission has interpreted S.C. Code Ann. § 7-13-780 to be coterminous with federal law.

The remaining challenged provisions govern the absentee voting process in South Carolina. Those provisions generally provide that only a qualified elector, a member of his immediate family, or an authorized representative may request an application to vote by absentee ballot depending on the circumstances of the voter. *See* S.C Code Ann. §§ 7-15-330(A)(1) and 7-15-330(A)(2).

Those provisions also limit the number of ballots that a person may request or return during an election cycle. S.C. Code Ann. §§ 7-15-330(B)(4), 7-15-385(G).

## II.     Section 208 of the Voting Rights Act

Section 208 of the Voting Rights Act provides the following: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

This provision was enacted in 1982 as an amendment to Section 2 of the Voting Rights Act of 1965. 1982 Amendments to the Voting Rights Act, Pub. L. 97-205, § 5, 96 Stat. 131, 134 (1982).

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), a federal court may dismiss a complaint when it lacks subject matter jurisdiction. A federal court's subject matter jurisdiction is "created—and limited by—Article III and federal statutes." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005). A court has an "independent obligation to assess its subject-matter jurisdiction" and may do so on its own initiative. *Id*.

Article III limits a federal court's subject matter jurisdiction to "Cases" and "Controversies." For there to be a true case or controversy under Article III, a plaintiff must have a "'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

If a plaintiff's complaint fails to sufficiently allege standing, the complaint must be dismissed for lack of standing. *See Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) ("[T]he party invoking the jurisdiction of the court must include the necessary factual allegations in the pleading, or else the case must be dismissed for lack of standing.").

Although some courts have occasionally treated sovereign immunity as matters of subject matter jurisdiction, it generally represents an independent basis for dismissal that has "attributes of both subject-matter jurisdiction and personal jurisdiction." *Constantine.*, 411 F.3d at 481–83. (discussing dismissal on sovereign immunity grounds).

Under Federal Rule of Civil Procedure 12(b)(6), a federal court may dismiss complaint when it fails to state a claim on which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As part of the plausibility requirement, a court is required to

take all factual allegations in the complaint as true but is not required to accept legal conclusion characterized as facts. *Id*. To be plausible, a complaint must infer more than "the mere possibility of misconduct." *Id*. at 679.

Dismissal under Rule 12(b)(6) may also be appropriate when a plaintiff impermissibly attempts to invoke a federal law with no express or implied cause of action.

## ARGUMENT

### I.    Plaintiffs lack standing.

This Court should dismiss Plaintiffs' Complaint because Plaintiffs lack standing. The Supreme Court's "standing decisions" make a few basic points "clear." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). For one, standing isn't dispensed in "gross." *Id* (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 72, 734 (2008)). By this, the Supreme Court means that a plaintiff is required to demonstrate standing for each claim and form of relief sought. *Id.* For another, when there are multiple plaintiffs, each plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000).

Here, the allegations in Plaintiffs' Complaint are insufficient to demonstrate standing for either Plaintiff NAACP South Carolina State Conference ("South Carolina NAACP") or the individual Plaintiffs.

### 1.    Plaintiff South Carolina NAACP lacks standing.

Turning to the Plaintiffs in this case, Plaintiff South Carolina NAACP could establish standing in two ways. First, in what is sometimes called organizational standing, Plaintiff South Carolina NAACP could allege that the conference has "suffered an injury in its own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*., 600 U.S. 181, 199

(2023). Second, in what is often called representative or associational standing, Plaintiff South Carolina NAACP could allege "standing solely as the representative of its members." *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Both theories of standing fail in this case.

With respect to organizational standing, Plaintiff South Carolina NAACP does not appear to allege that the conference itself, as an organization, has standing. To establish organizational standing, Plaintiff South Carolina NAACP would have to allege that the conference itself has suffered a "concrete and demonstrable injury" beyond a mere "setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In the context of the statute at issue in this case, such a showing is made all the more difficult by the simple fact that people—not organizations—vote. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("The plaintiffs are organizations and cannot vote; instead they assert the right to vote of individuals not even presently identifiable.").

And while some Courts have held that an organization may have organizational standing when it diverts resources in response to a challenge law, Plaintiff South Carolina NAACP has made no such allegations here.

Plaintiff South Carolina NAACP also lacks representative or associational standing. To establish associational standing, Plaintiff South Carolina NAACP must allege that: (1) the conference's members would otherwise have standing to sue in their own right; (2) the interests the conference seeks to protect are germane to the conference's purpose; and (3) neither the claim asserted nor the relief request requires the participation of individual members of the conference in the lawsuit. *Students for Fair Admissions, Inc.*, 600 U.S. at 199.

In making this showing, an organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). An organization may not rely on "a statistical probability that some of [its] members are threatened with concrete injury." *Id*. at 497.

And conclusory and generic allegations about unidentified members of an organization are plainly insufficient to establish standing. *See Summers*, 555 U.S.at 498 (collecting cases for the proposition that an organization must name specific members who are injured); *see also Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974) ("[S]tanding to sue may not be predicated upon an interest of the kind allege here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share.").

Here, Plaintiff South Carolina NAACP's associational theory of standing fails on two fronts. First, Plaintiff South Carolina NAACP fails to sufficiently identify its members who have standing to sue.

Although the Complaint contains allegations about members with disabilities who are denied voting assistance under South Carolina law, those generic allegations regarding unidentified members are insufficient to establish standing. *See Summers*, 555 U.S.at 498.[2]

A district court rejected a similar argument made by organizational plaintiffs in a voting rights case in *Priorities USA v. Nessel*, 628 F.Supp.3d 716, 731 (E.D. Mich. 2022). In concluding that the organization failed to allege a concrete injury, the district court rejected plaintiffs' argument that they had standing "merely because they represent the interests of voters who may be affected

---

[2] The Complaint also references unidentified, disabled individuals who are not members of the South Carolina NAACP. The conference can, of course, not rely on their alleged injuries to establish standing. *See Summers*, 555 U.S.at 498; *see also Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344 (1977) (holding that a state agency can sue on behalf of an industry if the industry participants possess the "indicia of membership in an organization").

by" the challenged state law. *Id*. at 731. Instead, the court correctly insisted that the organizational plaintiffs must offer allegations of a concrete injury beyond "claimed injuries to individuals not even presently identifiable." *Id*.

And to the extent Plaintiff South Carolina NAACP seeks to rely on statistical evidence to bolster its standing argument, such a strategy is plainly insufficient for Article III purposes. *Summers*, 555 U.S. at 498.

True, Plaintiff South Carolina NAACP alleges that at least one named Plaintiff is a member of the conference, but that allegation is insufficient to establish standing because, as explained below, that member lacks "standing to sue in [his] own right." *Students for Fair Admissions, Inc.*, 600 U.S. at 199.

Plaintiff South Carolina NAACP's associational standing theory fails on another front as well because the lawsuit necessarily depends on the participation of individual members of the conference. As explained below, members whose requested assistance can comply with both federal and state law lack standing to assert a preemption claim.

### 2. The individual Plaintiffs lack standing.

Turning to the individual Plaintiffs, each of the Plaintiffs has failed to sufficiently allege injury, causation, and redressability. *TransUnion LLC*, 594 U.S. at 423 ("[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.").

An individual plaintiff's injury must be "concrete," meaning that it is a "real" injury and not an "abstract" one. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). In the context of a preemption claim, the concrete injury requirement typically requires a plaintiff to show that he has

violated or will violate the allegedly preempted state law. *See*, *e.g.*, *California Trucking Association v. Bonta*, 996 F.3d 644, 652 (9th Cir. 2021) (describing standing in the context of a preemption challenge); *see also DeLorean 88 LLC v. District of Columbia*, No. 1:25-CV-2458 (TNM), 2025 WL 2851597, at *5 (D.D.C. Oct. 8, 2025) (requiring a plaintiff in a preemption case to show that the challenge law burdened it). Also implicit in this requirement is the need to show that the state law and the federal law conflict.

After all, absent an actual violation or threatened actual violation of a state law, a claim that state law is preempted amounts to an abstract dispute, akin to an impermissible advisory opinion. *See Carney v. Adams*, 592 U.S. 53, 58 (2020) ("We have long understood [the cases or controversies requirement under Article III] to require that a case embody a genuine, live dispute between adverse parties, thereby preventing federal courts from issuing advisory opinions.").

Additionally, a concrete injury is not present when a claim relies on nothing more than speculation. *See Clapper v. Amnesty International USA*, 568 U.S. 398, 415 (2013) ("In sum, respondents' speculative chain of possibilities does not establish that injury based on potential future surveillance is certainly impending . . . ."). And plaintiffs may not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

These principles indicate that the individual Plaintiffs lack standing in this case for multiple reasons. Starting with the injury prong of standing, all three individual Plaintiffs have failed to allege a sufficiently concrete injury in the context of their preemption claims. To sufficiently allege an injury in this context, Plaintiffs would need to show that they are eligible for assistance under federal and state law and that their requests for assistance actually conflict with state law. *See Bonta*, 996 F.3d at 652.

A.  *Voting Assistance Eligibility*

With respect to their first claim for relief regarding limits on voting assistance eligibility, all three individual Plaintiffs have failed to make this showing. Plaintiffs' Complaint appears to advance two theories on this point, alleging that South Carolina law is preempted to the extent it does not allegedly provide assistance to: (1) voters with mental impairments but no physical disabilities; and (2) voters with certain physical disabilities who are not "incapacitated" from voting. ECF No. 1 at 17, ¶ 83.

Starting with the first category, individual Plaintiffs argue that non-physical disabilities entitle voters to assistance under the VRA and they thus challenge South Carolina law's requirement that a disabled voter be "physically unable or incapacitated" in order to receive assistance. ECF No. 1 at 16-17, ¶¶ 81-83. However, even assuming the VRA covers non-physical disabilities, no individual Plaintiff alleges any non-physical disabilities that cause them to require assistance under the VRA.[3] Put another way, Plaintiffs fail to allege that South Carolina's physical inability or incapacity requirement injures them in any way, so they don't have standing to challenge that requirement.

Turning to the second category, and perhaps in an attempt to allege an injury for Article III purposes, the Complaint references Plaintiffs Bell and Caldwell's subjective beliefs that they are not incapacitated from voting under South Carolina law. *See* ECF No. 1 ("Under S.C. Code Section 7-13-780, voters including Mr. Bell and Mr. Caldwell who have physical disabilities but who do

---

[3] While the Complaint alleges that Plaintiff Jenkins "has both physical and nonphysical disabilities," it goes on to list those disabilities and none of them appear to be non-physical (listing "osteoporosis, scoliosis, an optic nerve impairment, and macular degeneration."). ECF No. 1 at 6, ¶ 28. Additionally, when Count One discusses the alleged injury caused by South Carolina law to voters with non-physical disabilities, it does not identify any named Plaintiff but refers generically to "voters with non-physical disabilities[], including members of the South Carolina NAACP." ECF No.1 at 17, ¶ 83.

not believe they are 'incapacitated' from voting are prohibited from receiving assistance of any kind."). However, their subjective beliefs regarding their ineligibility are irrelevant as a matter of law. *See Clapper*, 568 U.S. at 416. After all, most standing inquiries have an objective component. *See Laird v. Tatum*, 408 U.S. 1, 14–15 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.") (quoting *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).

Equally problematic, Plaintiffs Bell and Caldwell have not alleged that anyone has sought to deprive them of assistance in voting under state law. Nor could they. The South Carolina Election Commission has consistently interpreted the state assistance provision to be coterminous with Section 208. *See* South Carolina Election Commission, *Poll Managers Handbook* (Sept. 2024) ("[A] ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officers or agent of the voter's union.").Thus, Plaintiffs Bell and Caldwell have failed to allege an injury sufficient for Article III purposes.

What's more, and as an alternative argument, Plaintiffs Caldwell and Bell may have an even more foundational deficiency with respect to their asserted injuries. While Plaintiffs Caldwell and Bell conclusorily allege that they are entitled to an assistor of their choice under Section 208 of the VRA, they fail to include specific factual allegations that explain why they are entitled to assistance under the VRA.

The VRA ensures the availability of assistance to "*any voter who requires assistance to vote by reason of* blindness, disability, or inability to read or write." 52 U.S.C. § 10508 (emphasis

added). Which is to say, the VRA guarantees assistance only to those who are "*unable* to exercise their rights to vote *without obtaining assistance* in voting." S. Rep. 97-417, at 62 (1982) (emphasis added); *cf.* ECF No. 1 at 2, ¶ 6 ("Section 208 of the VRA guarantees voting assistance to '[a]ny voter' with a 'disability' or 'inability to read or write.'"). Thus, to successfully allege that they are covered under the VRA, Plaintiffs Caldwell and Bell would need to show some connection between their disability and their need for assistance. While the Complaint alleges that Plaintiffs Caldwell and Bell are confined to wheelchairs (ECF No. 1 at 5, ¶¶ 22 and 25), no allegations are made that Plaintiffs Caldwell and Bell's confinement to a wheelchair prevents them from being able to vote, whether by absentee ballot or in person. *Cf.* (ECF No. 1 at 6, ¶ 28) (explaining that Plaintiff Jenkins "requires assistance with reading and filling out paperwork" because of her "vision impairment."). Without more, Plaintiffs Caldwell and Bell fail to demonstrate that they are the sort of voter contemplated by the VRA's assistance guarantees.

Plaintiff Jenkins freely admits to her disabilities and does not appear to allege that she is ineligible to receive voting assistance under state law. The absence of alleged injuries should foreclose Plaintiffs' first claim for relief.

### B. *Limits on Possible Assistors*

Plaintiffs' second claim for relief regarding the limits on assistors fares no better and suffers from a similar injury-related shortcoming. This is true for a few reasons. First, none of the three individual Plaintiffs actually allege that South Carolina law precludes them from selecting their preferred assistor.[4] Instead, the Complaint merely recites generic allegations about unidentified

---

[4] For example, there is no allegation that the assistors the individual Plaintiffs have requested are not registered to vote in South Carolina. *Cf.* ECF No. 1 at 13, ¶ 65.

voters. *See* ECF No. 1 at ¶¶ 86–92. These generic allegations are generally insufficient to establish injury under Article III.

More fatal to Plaintiffs' claim is their confusion over the requirements of South Carolina law itself. While South Carolina law does impose some limits on who may request absentee ballots for voters, it does not necessarily impose the same limitations on assistors themselves. *See* S.C Code Ann. §§ 7-15-330(A)(1) and 7-15-330(A)(2) (describing who may request an absentee ballot). Thus, Plaintiffs have also failed to allege a true conflict between state and federal law in this regard.[5]

### C. Five-Voter Limits

Finally, Plaintiffs' third claim for relief regarding the five-voter limit on requesting and returning absentee ballots fails to allege injury, causation, and redressability. Starting with injury, the individual Plaintiffs have failed to sufficiently allege that they will be denied the assistor of their choice because their allegations rest upon the assumption that more than five individuals at their respective facilities will request relief. Their allegations rely on an "attenuated chain of possibilities," which does not reflect a concrete or particularized injury and does not satisfy Article III's injury requirement. *See Clapper*, 568 U.S. at 410; *see also Summers*, 555 U.S. at 496 (rejecting standing based on a speculative chain of possibilities).

Plaintiffs' Complaint also has an even more serious traceability problem. This is largely because the alleged injuries are not caused by South Carolina law itself but rather by the actions of third parties—specifically, the requested assistors. As the Supreme Court has explained,

---

[5] And even if one reads the Complaint and the law as charitably as possible towards the Plaintiffs, the Plaintiffs still have not alleged that their requested assistors could not serve as "Authorized representatives" under South Carolina law. Simply put, to assert a concrete injury in this case, Plaintiffs must allege that South Carolina law has denied them assistance in voting. They simply have not done so.

standing is "substantially more difficult to establish" in situations in which any "causal relation between injury and challenged action depends upon the decision of an independent third party." *California v. Texas*, 593 U.S. 659, 675 (2021).

As alleged in Plaintiffs' Complaint, the requested assistors interpret South Carolina law to mean that they may not "help[] more than five residents per election" with voting. ECF No. 1 at ¶ 72. But that is not what South Carolina law requires. Instead, the law only restricts the requesting and returning of ballots. *See* S.C. Code Ann. §§ 7-15-330(B)(4) ("A person must not request absentee applications for more than five qualified electors per election, in addition to himself."); 7-15-385(G) ("It is unlawful for a person to return more than five return-addressed envelopes in an election, in addition to his own."). The laws do not purport to address assistance with filling out or completing a ballot as a part of the voting process. *See DSCC v. Simon*, 950 N.W.2d 280, 290 (Minn. 2020) (distinguishing between state law that limited assistance in marking a ballot and state law that limited assistance in delivering a ballot).

Here, independent third parties—the requested assistors—have voluntarily determined that they may no longer assist residents with the actual act of voting itself. These "decision[s]" of "independent third part[ies]" are fatal to Plaintiffs' ability to demonstrate traceability. *California*, 593 U.S. at 675. And there is no reason to suggest that the requested assistors are acting in "a predictable way[]" because of the clarity of the statutory language and the apparent absence of any threatened enforcement against them as individual assistors. *See Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024) (describing standing requirements in cases involving the actions of independent decisionmakers).[6]

---

[6] Plaintiffs have not—and indeed, cannot—allege claims on behalf of the assistors themselves.

For similar reasons, Plaintiffs face a redressability problem. *See Food & Drug Admin. v. All. for Hippocratic Med*., 602 U.S. 367, 380 (2024) (describing causation and redressability as flip sides of the same coin).

And even if the individual Plaintiffs get the relief they seek in this case, that relief would necessarily be limited to the parties to the case. *See Trump v. CASA*, 606 U.S. 831, 837 (2025) ("These injunctions—known as 'universal injunctions'—likely exceed the equitable authority that Congress has granted to federal courts."). Given the limited scope of relief, there is no guarantee that the requested assistors would actually choose to provide the requested assistance. *See Citizens for Resp. & Ethics in Washington v. U.S. Dep't of the Treasury, Internal Revenue Serv.*, 21 F. Supp. 3d 25, 36 (D.D.C. 2014) (collecting authorities for the proposition that there is no redressability where the court order would not bind the decisions of third parties necessary for the requested relief).

As a final point, it is worth noting that Plaintiffs cannot cure these jurisdictional defects by resort to the concept of a "chill" to their protected rights. *See Abott*, 151 F.4th at 286 (rejecting a "chill" argument in the context of a preemption challenge).

## II.     Plaintiffs lack a cause of action.

If this Court concludes that one or more Plaintiffs have sufficiently alleged standing at this stage of the litigation, this Court should dismiss Plaintiffs' Complaint because Plaintiffs lack a viable cause of action.

As the Eighth Circuit recently explained, Section 208 of the Voting Rights Act does not "create a private right of action." *Arkansas United v. Thurston*, 146 F.4th 673, 676 (8th Cir. 2025). Both the "text and structure" of Section 208 support this conclusion. *Id*.

Starting with the text, the text of Section 208 "itself contains no private enforcement mechanism." *Id*. at 677 (quoting *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204, 1210 (8th Cir. 2023). The text of Section 208 merely provides the following: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

As the Eighth Circuit recognized, the sections surrounding Section 208 only contemplate enforcement actions by the United States Attorney General. *See Arkansas United*, 146 F.4th at 677–78 (discussing various provisions of the VRA). And Section 3 of the VRA cannot provide a private right of action for those sections that do not provide one. *See Arkansas United*, 146 F.4th at 679 (rejecting the view that Section 3 of the VRA implicitly created a new private right of action for statutes that did not previously have one); *see also Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th1204, 1212 (8th Cir. 2023) (rejecting the argument that Section 3 of the VRA created new private rights of action).

Plaintiffs may be trying to avoid this result by labeling their claims as being brought under the Constitution's Supremacy Clause or Section 1983. (ECF No. 1 at 16–19). But those labels don't provide Plaintiffs with an escape hatch.

Building on the logic of *Arkansas United*, the Eighth Circuit has also rejected the argument that Section 1983 may be used to enforce rights under Section 2 of the VRA. *See Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 721 (8th Cir. 2025) ("Because § 2 does not unambiguously confer an individual right, the plaintiffs do not have a cause of action under 42 U.S.C. § 183 to enforce § 2 of the Act.").

And to the extent Plaintiffs seek to vindicate their purported rights under the Supremacy Clause via a Section 1983 action, the Fourth Circuit has expressly rejected the argument that Section 1983, a mechanism for enforcing substantive individual rights, may be used to enforce the Supremacy Clause, a structural limitation on the a "state's power to interfere with matters of national concern." *See Maryland Pest Control Ass'n v. Montgomery Cnty., Md.*, 884 F.2d 160, 163 (4th Cir. 1989) (holding "that federal preemption of local ordinances pursuant to the Supremacy Clause is not actionable under Section 1983).

Turning to the claims brought purportedly under the Constitution, the Supreme Court has rejected the notion that the Supremacy Clause itself contains an implied right of action. *See Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 325 (2015) (holding that the Supremacy Clause "instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal law in court, and in what circumstances they may do so."). And in the context of removal, the Fourth Circuit has explained that ordinary or conflict preemption "constitutes a defense to a cause of action" and does not normally appear "on the face of a well-pleaded complaint." *Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 371 (4th Cir. 2003).

### III.    The Eleventh Amendment bars Plaintiffs' suit.

Any suggestion that Plaintiffs may have a cause of action is further undermined by the Eleventh Amendment's guarantee of state sovereign immunity, which provides an additional basis for dismissing the Complaint. [7]

---

[7] To avoid these constitutional questions, this Court could dismiss Plaintiffs' complaint for lack of a cause of action. *See U.S. S.E.C. v. Pirate Inv. LLC*, 580 F.3d 233, 253 (4th Cir. 2009) ("The canon of constitutional avoidance is a 'tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intent the alternative which raises serious constitutional doubts.") (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)).

It is well established that the Eleventh Amendment bars suit against a State and state officials when the State is the real party in interest. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984).

Congress may abrogate this immunity when two conditions are satisfied: (1) Congress must "unequivocally express[] its intent" to abrogate the immunity; and (2) in doing so, Congress must act "pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.") (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989)).

Both conditions are arguably lacking here. With respect to the first condition, as noted above, there is simply no language in the text of Section 208 itself that authorizes private lawsuits of any kind—much less a private lawsuit against a State.

And with respect to the second condition, it is not clear that Congress has the authority to abrogate sovereign immunity under the Fifteenth Amendment. *See Alabama State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Alabama*, 949 F.3d 647, 654 (11th Cir. 2020), *cert. granted, judgment vacated sub nom. Alabama v. Alabama State Conf. of NAACP*, 141 S. Ct. 2618 (2021) ("The Supreme Court has never considered whether Congress may abrogate state sovereign immunity using its Fifteenth Amendment enforcement powers.").

Given that these conditions are not satisfied, this Court should dismiss Plaintiffs' Complaint on sovereign immunity grounds.[8]

---

[8] Plaintiffs may point to *Ex Parte Young*, 209 U.S. 123 (1908) to argue that they have properly sued state officials in this instance. But there are real reasons to think *Ex Parte Young*'s exception to sovereign immunity may be inapplicable here. For one, Plaintiffs have seemingly failed to point

IV.    **Plaintiffs fail to state a claim.**

Alternatively, and to the extent this Court concludes that Plaintiffs do have a viable cause of action, this Court should dismiss Plaintiffs' Complaint for failure to state a claim because Plaintiffs have not sufficiently alleged a true conflict between federal and state law. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) ("[S]tate laws are preempted when they conflict with federal law. This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

Courts from around the country have rejected similar preemption claims. *See La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 295 (5th Cir. 2025) (rejecting a preemption claim regarding a state law that prohibited individuals who receive compensation from serving as assistors); *DSCC*, 950 N.W.2d at 291 (concluding that Section 208 of the VRA does not preempt a three-voter limit on delivering a marked ballot).

And some have done so early in the litigation. As one district court in Michigan explained, "Section 208's natural effect allows some wiggle room: a voter may select 'a person' to assist them, but not *the* person of their choice." *Priorities USA v. Nessel*, 628 F. Supp. 3d 716, 733 (E.D. Mich. 2022). And because the challenged law allowed a voter some choice in assistance, the court concluded that the state law and Section 208 were "harmonious," that Section 208 did not preempt the absentee-ballot law, and that the preemption challenge should be dismissed as "lack[ing] merit." *Id*.   Indeed, a contrary interpretation of Section 208 could very well raise serious constitutional problems under the anti-commandeering doctrine. *See Murphy v. NCAA*, 584 U.S.

---

to any ongoing violations of federal law. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) (noting the need to allege "an ongoing violation of federal law.").

453, 480 (2018) (characterizing the anti-commandeering doctrine as a prohibition on issuing "a direct command to the States.")

Additionally, Plaintiffs' failure to state a claim is particularly evident in the context of their apparent facial challenge, which requires a plaintiff to show "no set of circumstances exists under which the [state statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (applying the *Salerno* standard in a preemption case). And although Plaintiffs have not specifically alleged a facial challenge, the Complaint's requested relief suggests that they do. ECF No. 1 at 20 (requesting that the Court enter a judgment declaring that "the Limits on Voting Assistance Eligibility, S.C. Code Ann. § 7-13-780, and Five-Voter Limits, *id.* §§ 7-15-330(B)(4), 7-15- 385(G), violate Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, and are null and void under the Supremacy Clause, U.S. Const. art. VI, cl. 2").

Plaintiffs have failed to meet this facial challenge standard for multiple reasons. For one, their own allegations undercut the notion that the challenged state laws and Section 208 actually conflict. As explained above, Plaintiffs have failed to sufficiently allege a conflict between state and federal law. Although characterized as a standing problem above, these pleading deficiencies could also be thought of as a failure to state a claim. *See Arizona v. United States*, 567 U.S. at 399.

For another, some of the limitations contained in the challenged statutes apply to all South Carolina citizens—irrespective of any disability or literacy level. *See*, *e.g.*, S.C. Code Ann. § 7-15-385(G) ("It is unlawful for a person to return more than five return-addressed envelopes in an election, in addition to his own.")  By its express language, Section 208 does not purport to apply to portions of the general population that are not otherwise disabled or illiterate. It necessarily follows that Plaintiffs cannot show "no set of circumstances" in which the state laws would be valid.

Finally, Plaintiffs fail to allege entitlement to legally cognizable declaratory relief. In the Complaint, Plaintiffs ask the Court to declare that various provisions of South Carolina law are "null and void." ECF No. 1 at 17, ¶ 84; 18, ¶ 91; 19, ¶ 100. But "the federal judiciary has no authority to alter or annul a statute." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018); *see also United States v. Sineneng-Smith*, 590 U.S. 371, 387 (2020) (Thomas, J., concurring) ("'[F]ederal courts have no authority to erase a duly enacted law from the statute books.'") (quoting 104 Va. L. Rev. at 936). Indeed, "[j]udicial review is not a power to suspend or 'strike down' legislation; it is a judicially imposed non-enforcement policy that lasts only as long as the courts adhere to the constitutional objections that persuaded them to thwart the statute's enforcement." 104 Va. L. Rev. at 933. Plaintiffs' request for declaratory relief evaporates under the rays of Rule 12(b)(6).

## <u>CONCLUSION</u>

In a final analysis, Plaintiffs' Complaint suffers from real and meaningful defects, ranging from insufficient standing allegations to a failure to sufficiently allege its various causes of action. This Court should closely examine these shortcomings and dismiss Plaintiffs' Complaint. In doing so, it will help "prevent[] the federal courts from becoming 'roving commission[s] to publicly opine on every legal question.'" *Sheppheard v. Morrisey*, 143 F.4th 232, 242 (4th Cir. 2025) (quoting *TransUnion LLC*, 594 U.S. at 423–24).

*Signature Block on Following Page*

20

Respectfully submitted,

 s/Thomas T. Hydrick

Alan Wilson
*Attorney General*
Thomas T. Hydrick
*Solicitor General*
Federal Bar No. 13322
Joseph D. Spate
*Deputy Solicitor General*
Federal Bar No. 13100

OFFICE OF THE SOUTH CAROLINA
ATTORNEY GENERAL
1000 Assembly St
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov
josephspate@scag.gov

January 20, 2026