**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| NAACP SOUTH CAROLINA STATE CONFERENCE; ROBERT CALDWELL; JONATHAN BELL; SHERRY JENKINS,<br><br>     *Plaintiffs*,<br><br>    v.<br><br>ALAN WILSON, in his official capacity as the South Carolina Attorney General; JENNY WOOTEN, in her official capacity as Interim Executive Director of the State Election Commission; DENNIS W. SHEDD, in his official capacity as Chairman of the State Election Commission; JOANNE DAY, CLIFFORD J. ELDER, LINDA MCCALL, and SCOTT MOSELEY, in their official capacities as members of the State Election Commission,<br><br>    *Defendants*. | Civil Action No.: 3:25-cv-13754-MGL<br><br>**ATTORNEY GENERAL WILSON'S MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

BACKGROUND ......................................................................................................................... 2

    I.    South Carolina Law ........................................................................................................ 2

    II.    Section 208 of the Voting Rights Act ............................................................................ 3

    III.    Plaintiffs to This Proceeding ......................................................................................... 3

LEGAL STANDARD ................................................................................................................. 5

ARGUMENT .............................................................................................................................. 6

    I.    Plaintiffs Lack Standing. ................................................................................................ 6

        A.    Limits on Voting Assistance Eligibility ............................................................. 8

        B.    Limits on Possible Assistors ............................................................................. 13

        C.    Five-Voter Limits .............................................................................................. 15

        D.    NAACP-SC Lacks Standing ............................................................................. 17

        E.    Redressability as to All Plaintiffs ..................................................................... 20

    II.    Plaintiffs' Claims Are Not Ripe .................................................................................. 21

    III.    Plaintiffs' Preemption Claims Fail as a Matter of Law. .............................................. 22

        A.    Conflict Preemption Generally ......................................................................... 22

        B.    Section 208 Does Not Preempt the South Carolina Laws at Issue .................. 24

        C.    South Carolina's Election Laws Advance Vital Government Interests ............ 32

CONCLUSION .......................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alexander v. S.C. State Conf. of the NAACP,*
    602 U.S. 1 (2024) ........................................................................................................... 1

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ....................................................................................................... 5

*Arkansas United v. Thurston,*
    146 F.4th 673 (8th Cir. 2025) ...................................................................................... 21

*Asherman v. Rowland,* No. 2:24-CV-1,
    732-RMG, 2025 WL 976494 (D.S.C. Mar. 31, 2025) .............................................. 5, 6

*Ass'n for Accessible Medicines v. Bonta,*
    766 F. Supp. 3d 1020 (E.D. Cal. 2025) .................................................................. 19, 20

*Ayotte v. Planned Parenthood of N. New Eng.,*
    546 U.S. 320 (2006) ..................................................................................................... 19

*Babbit v. United Farm Workers Nat. Union,*
    442 U.S. 289 (1979) ....................................................................................................... 7

*Bates v. Dow Agrosciences LLC,*
    544 U.S. 431 (2005) ..................................................................................................... 27

*Bell Atl. Md., Inc. v. Prince George's Cnty.,*
    212 F.3d 863 (4th Cir. 2000) ....................................................................................... 24

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ........................................................................................... 2, 32, 34

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ..................................................................................................... 32

*California v. Texas,*
    593 U.S. 659 (2021) ..................................................................................................... 17

*Carey v. Wis. Elections Comm'n,*
    624 F. Supp. 3d 1020 (W.D. Wis. 2022) ..................................................................... 31

*Casillas v. Madison Ave. Assocs., Inc.,*
    926 F.3d 329 (7th Cir. 2019) ......................................................................................... 7

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ....................................................................................................... 6

*Chamber of Com. of U.S. v. Whiting,*
    563 U.S. 582 (2011) ..................................................................................................... 24

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of the Treasury, Internal Revenue Serv.,*
    21 F. Supp. 3d 25 (D.D.C. 2014) ................................................................................ 17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................................... 6, 16

*Clingman v. Beaver,*
    544 U.S. 581 (2005) ................................................................................................... 2, 33

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ........................................................................................ 1, 2, 33, 34

*Democracy N. Carolina v. N. Carolina State Bd. of Elections,*
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ........................................................................ 32

*Democratic Nat'l Comm. v. Wisconsin State Legislature*,
   141 S. Ct. 28 (2020)..................................................................................................... 33
*DiPietrae v. City of Philadelphia*,
   666 A.2d 1132 (Pa. Commw. Ct. 1995).................................................................. 31
*Dunn v. Blumstein*,
   405 U.S. 330 (1972)..................................................................................................... 33
*Dunton v. S.C. Bd. of Exam'rs In Optometry*,
   291 S.C. 221, 353 S.E.2d 132 (1987) ...................................................................... 28
*Fair Elections Ohio v. Husted*,
   770 F.3d 456 (6th Cir. 2014)..................................................................................... 18
*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)............................................................................................... 8, 17
*Gonzales v. Carhart*,
   550 U.S. 124 (2007)..................................................................................................... 24
*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..................................................................................................... 18
*HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*,
   101 F.3d 1005 (4th Cir. 1996) ................................................................................... 6
*Hillman v. Maretta*,
   569 U.S. 483 (2013)............................................................................................... 22, 23
*Indem. Ins. of N. Am. v. United States*,
   569 F.3d 175 (4th Cir. 2009)..................................................................................... 26
*La Union Del Pueblo Entero v. Abbott*,
   151 F.4th 273 (5th Cir. 2025).............................................................................. passim
*Lassiter v. Northampton Cnty. Bd. of Elections*,
   360 U.S. 45 (1959)....................................................................................................... 33
*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024)..................................................................................................... 28
*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)........................................................................................... 6, 8, 19
*McDonald v. Bd. of Election Comm'rs of Chicago*,
   394 U.S. 802 (1969)..................................................................................................... 32
*McFadden v. United States*,
   576 U.S. 186 (2015)..................................................................................................... 25
*Minn. Voters All. v. Mansky*,
   585 U.S. 1 (2018)......................................................................................................... 33
*Murthy v. Missouri*,
   603 U.S. 43 (2024)....................................................................................................... 17
*N. Va. Hemp & Agric., LLC v. Virginia*,
   125 F.4th 472 (4th Cir. 2025)................................................................................... 23
*N.Y. State Club Ass'n, Inc. v. City of New York*,
   487 U.S. 1 (1988)......................................................................................................... 19
*Priorities USA v. Nessel*,
   487 F. Supp. 3d 599 (E.D. Mich. 2020)................................................................. 25
*Priorities USA v. Nessel*,
   628 F. Supp. 3d 716 (E.D. Mich. 2022)..................................................... 13, 30, 31

*Pulliam Inv. Co. v. Cameo Props.*,
  810 F.2d 1282 (4th Cir. 1987) ................................................................................. 6

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) .................................................................................................. 35

*Qualkinbush v. Skubisz*,
  357 Ill. App. 3d 594, 826 N.E.2d 1181 (2004) ....................................................... 31

*Ray v. Texas*,
  No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) ..................... 26, 31

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
  589 U.S. 423 (2020) ............................................................................................... 35

*Rice v. Norman Williams Co.*,
  458 U.S. 654 (1982) ............................................................................................... 27

*Ritter v. Migliori*,
  142 S. Ct. 1824 (2022) ........................................................................................... 34

*Rodriguez v. Popular Democratic Party*,
  457 U.S. 1 (1982) .................................................................................................. 32

*Rucho v. Common Cause*,
  588 U.S. 684 (2019) ............................................................................................... 33

*S. Blasting Servs., Inc. v. Wilkes Cnty., NC*,
  288 F.3d 584 (4th Cir. 2002) .................................................................................. 23

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................................. 7

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ............................................................................................... 18

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .......................................................................................... 16, 19

*Thompson v. Potomac Elec. Power Co.*,
  312 F.3d 645 (4th Cir. 2002) .................................................................................... 6

*Torcasio v. Murray*,
  57 F.3d 1340 (4th Cir. 1995) .................................................................................. 24

*Torres v. Precision Indus.*,
  938 F.3d 752 (6th Cir. 2019) .................................................................................. 24

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................................. 7

*Trump v. CASA*,
  606 U.S. 831 (2025) ............................................................................................... 17

*U.S. Smokeless Tobacco Mfg. LLC v. City of New York*,
  708 F.3d 428 (2d Cir. 2013) ................................................................................... 23

*United States v. McCauley*,
  983 F.3d 690 (4th Cir. 2020) .................................................................................. 26

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
  83 F.3d 660 (4th Cir. 1996) .................................................................................... 27

*United States v. Simms*,
  914 F.3d 229 (4th Cir. 2019) .................................................................................. 24

*United States v. Texas*,
  599 U.S. 670 (2023) .......................................................................................... 20, 21

iv

*Warth v. Seldin*,
   422 U.S. 490 (1975)..................................................................................... 18
*Wild Virginia v. Council on Env't Quality*,
   56 F.4th 281 (4th Cir. 2022)................................................................... 21, 22

## Statutes

42 U.S.C. § 1983............................................................................................. 3
52 U.S.C. § 10508..................................................................................... passim
Pub. L. 97-205, § 5, 96 Stat. 131, 134 (1982)............................................... 3
S.C. Code Ann. § 7-13-780................................................................. 2, 12, 27
S.C. Code Ann. § 7-15-310..................................................................... 28, 29
S.C. Code Ann. § 7-15-310(7) ......................................................... 14, 16, 28
S.C. Code Ann. § 7-15-330........................................................................ 28
S.C. Code Ann. § 7-15-330(A) .......................................................... 2, 13, 28
S.C. Code Ann. § 7-15-330(A)(2)............................................................... 14
S.C. Code Ann. § 7-15-330(B)(4)....................................................... 3, 4, 5, 29
S.C. Code Ann. § 7-15-330(C)................................................................ 2, 28
S.C. Code Ann. § 7-15-385(G) .......................................................... 3, 4, 5, 29
U.S. Const. art. I, § 4, cl. 1......................................................................... 32

## Rules

Fed. R. Civ. P. 56(a) .................................................................................... 5
Fed. R. Civ. P. 56(e) .................................................................................... 6
Federal Rule of Civil Procedure 12(b)(1) .................................................. 7
Federal Rule of Civil Procedure 56 ............................................................ 1

## Other Authorities

S. Rep. 97-417................................................................................... 9, 26

v

Alan Wilson, in his official capacity as the South Carolina Attorney General, moves for summary judgment as to all of Plaintiffs' claims against him under Federal Rule of Civil Procedure 56. [1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the U.S. Supreme Court recently warned in an ill-fated challenge to South Carolina election law by Plaintiff South Carolina State Conference of the NAACP ("NAACP-SC"), "we must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (citation modified)). The same is true here.

Plaintiffs argue that Section 208 of the Voting Rights Act preempts multiple provisions of South Carolina election law designed to prevent fraud in absentee voting. But there are many reasons why this Court should be wary of serving as a weapon for Plaintiffs' political warfare.

As an initial matter, Plaintiffs' claims suffer from justiciability deficiencies: Plaintiffs lack standing and their claims are not ripe for adjudication. But even if those deficiencies could evaporate, Plaintiffs' claims are without merit. As courts across the country have concluded, Section 208 allows qualifying voters to receive assistance in voting from "a" voter of their choice, not "the" voter of their choice. Which is to say, States have great legal authority to regulate elections within the margins of Section 208.

And South Carolina's voting laws promote the legitimate state interest of aiding the "orderly administration" of elections. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op.). South Carolina also has an interest in "deterring and detecting voter fraud"

---

[1] Under Local Civil Rule 7.04 (D.S.C.), a full explanation of the motion is provided in this document, so a separate memorandum would serve no useful purpose.

1

and "protecting the integrity and reliability of the electoral process." *Id.* at 191 (plurality op.). Indeed, states are not required to tolerate fraud before acting to prevent and combat it. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

Plaintiffs would have this Court punish South Carolina's representatives for engaging in their legal authority to regulate elections. Should Plaintiffs succeed, that will "hamper the ability of [South Carolina] to run efficient and equitable elections" and "compel federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). The Court should reject that invitation.

**BACKGROUND**

### I.    South Carolina Law

Plaintiffs challenge multiple provisions of South Carolina law. The first challenged provision, S.C. Code Ann. § 7-13-780 (characterized by Plaintiffs as "Limits on Voting Assistance Eligibility"), dates to the 1950s and applies to all elections. That section provides the following: "Only those persons who are unable to read or write or who are physically unable or incapacitated from preparing a ballot or voting shall be entitled to receive assistance of any kind in voting." S.C. Code Ann. § 7-13-780. Although this section specifies who is eligible for assistance in voting, it does not specify who may serve as an assistor. And as explained below, the South Carolina Election Commission has interpreted S.C. Code Ann. § 7-13-780 to be coterminous with federal law.

The remaining challenged provisions govern the absentee voting process in South Carolina. They generally provide that only a qualified elector, member of his immediate family, or authorized representative may request and return an application to vote by absentee ballot depending on the circumstances of the voter. *See* S.C. Code Ann. §§ 7-15-330(A) and (C); *see also id.* at §§ 7-15-310(7) and -385(A)(3) (collectively referred to by Plaintiffs as "Limits on Possible Assistors").

2

Those provisions also limit the number of ballots that a person may request or return during an election cycle. S.C. Code Ann. §§ 7-15-330(B)(4), 7-15-385(G) (referred to by Plaintiffs as "Five-Voter Limits").

## II.    Section 208 of the Voting Rights Act

Section 208 of the Voting Rights Act provides the following: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. This provision was enacted in 1982 as an amendment to Section 2 of the Voting Rights Act of 1965. 1982 Amendments to the Voting Rights Act, Pub. L. 97-205, § 5, 96 Stat. 131, 134 (1982).

## III.    Plaintiffs to This Proceeding

The Plaintiffs in this case are a non-profit organization (NAACP-SC) and three individual plaintiffs (Robert Caldwell, Jonathan Bell, and Sherry Jenkins). (ECF No. 1 at 4–6). Plaintiffs raise three claims against Attorney General Wilson, all pursuant to 42 U.S.C. § 1983, arguing that the following provisions of South Carolina law are preempted by Section 208: (1) South Carolina's "Limits on Voting Assistance Eligibility;" (2) South Carolina's "Limits on Possible Assistors;" and (3) South Carolina's "Five-Voter Limits." (ECF No. 1 at 16–19). In their Complaint, Plaintiffs seek declaratory, injunctive, and other equitable relief. (ECF No. 1 at 20–21).

Plaintiff Caldwell alleges that he resides at the MUSC Health Chester Nursing Center ("MUSC Chester") in Chester, South Carolina, and he is a member of NAACP-SC. (ECF No. 1 at 5, ¶ 21). He alleges that he "lost use of his legs" and "now relies on a wheelchair to get around." (ECF No. 1 at 5, ¶ 22). He further alleges that "[b]ecause of his disability, Mr. Caldwell is afforded an assistor of his choice throughout the voting process under Section 208 of the VRA." *Id.*

3

However, he alleges that people like him, "who do not believe they are 'incapacitated' from voting," are "prohibited from receiving assistance of any kind" under South Carolina's limits on voting assistance eligibility in violation of Section 208. (ECF No. 1 at 17, ¶ 83). Plaintiff Caldwell also alleges that he "intends to vote by mail in the 2026 primary and general elections" and "wants assistance with requesting and returning his absentee ballot." (ECF No. 1 at 5, ¶ 24). He further alleges that he "would choose to receive that assistance from Barvette Gaither, a social worker at MUSC Chester" but [b]ecause many residents at MUSC Chester seek to rely on Ms. Gaither for voting assistance, the Five-Voter Limits impede Mr. Caldwell's ability to rely on the assistor of his choice to vote in the 2026 elections." *Id.* (citing S.C. Code Ann. §§ 7-15-330(B)(4), 7-15-385(G)).

Plaintiff Bell alleges that he resides at Union Post Acute in Union, South Carolina. (ECF No. 1 at 5, ¶ 25). He alleges that because he "uses a wheelchair," he is "entitled to vote with assistance" under Section 208. (ECF No. 1 at 5, ¶¶ 25–26). However, he alleges that people like him, "who do not believe they are 'incapacitated' from voting," are "prohibited from receiving assistance of any kind" under South Carolina's limits on voting assistance eligibility in violation of Section 208. (ECF No. 1 at 17, ¶ 83). He further alleges that he "intends to vote by mail in the 2026 primary and general elections" and "wants to rely on assistance from Deborah Allen, the Activities Director at Union Post Acute," (ECF No. 1 at 5, ¶ 26), but that his "right to obtain assistance from the person he trusts is impeded by South Carolina's Five-Voter Limits on providing assistance" because "more than five other residents will likely rely on Ms. Allen for help voting in the 2026 elections." (ECF No. 1 at 5–6, ¶ 26) (citing S.C. Code Ann. §§ 7-15-330(B)(4), 7-15-385(G)).

Plaintiff Jenkins alleges that she resides at Union Post Acute in Union, South Carolina. (ECF No. 1 at 6, ¶ 27). She alleges that "because of her vision impairment," she "requires

4

assistance with reading and filling out paperwork" and therefore "requires assistance to vote and is afforded an assistor of her choice throughout the voting process under Section 208 of the VRA." (ECF No. 1 at 6, ¶¶ 28–29). She further alleges that she "intends to vote by mail in the 2026 primary and general elections and wants assistance with requesting, filling out, and returning her absentee ballot." (ECF No. 1 at ¶ 30). She alleges that she "would like to receive that assistance from Ms. Allen" but that "the Five-Voter Limits impede Ms. Jenkins' ability to rely on Ms. Allen (the assistor of her choice) to vote in the 2026 elections." *Id.* (citing S.C. Code Ann. §§ 7-15-330(B)(4), 7-15-385(G)).

Plaintiff NAACP-SC asserts claims on the alleged basis that its "members include individuals with disabilities who plan to rely on assistance to vote absentee, and who are therefore afforded an assistor of their choice by Section 208 of the VRA but are denied that assistance by South Carolina law." (ECF No. 1 at 5, ¶ 20).

Plaintiffs' lack standing to bring claims against Defendant Wilson, and those claims are also not ripe. But even further, the claims fail on the merits because the challenged provisions of South Carolina law are not preempted by Section 208. This Court should grant summary judgment in Defendant Wilson's favor.

**LEGAL STANDARD**

"Summary judgment is appropriate if a party 'shows that there is no genuine dispute as to any material fact' and the movant is entitled to judgment as a matter of law. *Asherman v. Rowland*, No. 2:24-CV-1732-RMG, 2025 WL 976494, at *1 (D.S.C. Mar. 31, 2025) (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is 'material' if proof of its existence or non-existence would affect the disposition of the

5

case under applicable law." *Id.* "Therefore, summary judgment should be granted 'only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts.'" *Id.* (quoting *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).

"'In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party.'" *Id.* (quoting *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996)). "The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). However, "[o]nce the moving party has made this threshold demonstration, the non-moving part must demonstrate specific, material facts exist that give rise to a genuine issue to survive the motion for summary judgment." *Id.* (citing *Celotex Corp.*, 477 U.S. at 324). "Under this standard, '[c]onclusory or speculative allegations do not suffice, nor does a "mere scintilla of evidence"' in support of the non-moving party's case." *Id.* (quoting *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002)).

## ARGUMENT

### I.     Plaintiffs Lack Standing.

Because Plaintiffs invoke this Court's jurisdiction, they "bear[] the burden of establishing standing" under Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may" be enough to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). But at the summary judgment stage, more is required. A "plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to establish standing. *Id.* (quoting Fed. R. Civ. P. 56(e)). Plaintiffs have failed to meet their burden at both stages.

6

As the state defendants explained in their separate motions to dismiss, the Plaintiffs here did not meet their burden to establish standing at the pleading stage. Consequently, this Court can—and should—dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1).

But even if this Court thinks differently and concludes that Plaintiffs met their burden to establish standing at the pleading stage, they have failed to meet their additional burden at the summary judgment stage. To establish standing in this context, the individual Plaintiffs would need to establish injury in fact, causation, and redressability. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) ("[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.").

"As then-Judge Barrett succinctly summarized, 'Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions.'" *Id.* at 427 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019)). And "standing doctrine keeps courts out of political disputes by denying private litigants the right to test the abstract legality of government action." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 347 (2016), *as revised* (May 24, 2016) (Thomas, J., concurring).

In the context of Plaintiffs' pre-enforcement preemption challenge, the injury component of standing requires a plaintiff to show that he violated or will violate the challenged state law and that the state law and federal law actually conflict. *See Babbit v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) (requiring a plaintiff to show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute"). As part of this showing, a plaintiff must show a "credible threat of prosecution" under the state statute. *Id*.

The causation or traceability component requires a plaintiff to show that any injury is

7

"fairly traceable" to the "challenged action of the defendant" and not the result of "independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation modified).

Redressability and causation are often "flip sides of the same coin," meaning that if injury and causation are established, redressability will typically redress that injury. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). But "[r]edressability can still pose an independent bar in some cases;" for example, "a plaintiff who suffers injuries caused by the government still may not be able to sue because the case may not be of the kind traditionally redressable in federal court." *Id.* at 381 n.1 (citation modified).

Plaintiffs' discovery responses demonstrate that Plaintiffs fail to "set forth" facts sufficient to establish standing.

### A. Limits on Voting Assistance Eligibility

To have standing to assert their Limits on Voting Assistance Eligibility claim, Individual Plaintiffs would need to show that: (1) they are entitled to assistance under Section 208 of the VRA and (2) South Carolina law otherwise denies them that assistance.

Plaintiffs' Complaint appears to advance two theories on this point, alleging that South Carolina law is preempted to the extent it does not allegedly provide assistance to: (1) voters with mental impairments but no physical disabilities; and (2) voters with certain physical disabilities who are not "incapacitated" from voting. (ECF No. 1 at 17, ¶ 83).

Starting with the first category, individual Plaintiffs argue that non-physical disabilities entitle voters to assistance under the VRA and they thus challenge South Carolina law's requirement that a disabled voter be "physically unable or incapacitated" in order to receive assistance. (ECF No. 1 at 16-17, ¶¶ 81–83). However, even assuming the VRA covers non-physical disabilities, no individual Plaintiff has shown they have any non-physical disabilities that cause them to

require assistance under the VRA.[2] Put another way, Plaintiffs fail to show that South Carolina's physical inability or incapacity requirement injures them in any way, so they don't have standing to challenge that requirement.

On the second category, Plaintiffs Bell and Caldwell fail to demonstrate that their physical disabilities are of the kind that would entitle them to assistance under Section 208, and even if they were entitled to assistance, they have not produced facts showing they have been denied assistance under South Carolina law. Plaintiff Jenkins fails to demonstrate that South Carolina law prohibits her from receiving assistance.

### a. Plaintiffs Bell and Caldwell

The plaint text of Section 208 imposes a nexus requirement between a voter's disability and a need for assistance to vote. *See* 52 U.S.C. § 10508 ("Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."). That is, Section 208 guarantees assistance only to those who are "*unable* to exercise their rights to vote *without obtaining assistance* in voting." S. Rep. 97-417, at 62 (1982) (emphasis added). Plaintiffs Bell and Caldwell fail to demonstrate such a nexus.

Start with Plaintiff Bell. He fails to show he has the kind of disability that would prevent

---

[2] While the Complaint alleges that Plaintiff Jenkins "has both physical and nonphysical disabilities," it goes on to list those disabilities and none of them appear to be non-physical (listing "osteoporosis, scoliosis, an optic nerve impairment, and macular degeneration."). (ECF No. 1 at 6, ¶ 28); *see also* Pl. Jenkins Resp. to Def. Wilson's First Requests for Admission, at 6–7 (attached as Exhibit A). Additionally, when Count One discusses the alleged injury caused by South Carolina law to voters with non-physical disabilities, it does not identify any named Plaintiff but refers generically to "voters with non-physical disabilities[], including members of the South Carolina NAACP." (ECF No.1 at 17, ¶ 83). Plaintiffs Caldwell and Bell indicated in their discovery responses that they "do not have any mental or cognitive disabilities." Pl. Amend. Resp. to State Election Commission Defendants' First Set of Int. at 6–7 (attached as Exhibit B). They also indicated that they "do not have any non-physical impairments." *Id.* at 9.

9

him from voting in an election, and thus that he "requires assistance to vote." *Id.* Most glaringly, he admits that his disability does not prevent him from reading, understanding, and completing a ballot. *See* Pl. Bell Resp. to Def. Wilson's First Requests for Admission, at 6–7 (attached as Exhibit C); *see also* (ECF No. 1 at 17, ¶ 83) (admitting in the Complaint that he is not "'incapacitated' from voting."). While Plaintiff Bell asserts that he "ha[s] never requested an absentee ballot by phone," he does not claim that his disability renders him incapable of using a phone to request a ballot. *Id.* at 6. And though he claims that the mailbox at his nursing home "is not accessible" to him and that he "need[s] someone else to return my absentee ballot by mail," Plaintiff Bell admits that he uses "a wheelchair or a walker" to move around his nursing home, that he regularly leaves his nursing home to receive dialysis treatments, and that his brother took him "to Chester for Christmas last year." *Id.* at 6–7. Plaintiff Bell's admission that he can move around—and even leave—his nursing facility undercuts his claim that he is unable to request a ballot by phone or place a completed ballot in a mailbox without assistance. And to the extent the mailbox at his nursing facility is "not accessible" to Plaintiff Bell for reasons unrelated to a disability, that would not entitle him to assistance under Section 208.

Plaintiff Caldwell fares no better. As with Plaintiff Bell, Plaintiff Caldwell openly admits that his disability does not prevent him from reading, understanding, and completing a ballot. *See* Pl. Caldwell Resp. to Def. Wilson's First Requests for Admission, at 7 (attached as Exhibit D); *see also* (ECF No. 1 at 17, ¶ 83) (admitting in the Complaint that he is not "'incapacitated' from voting."). While Plaintiff Caldwell relies on "a wheelchair and an oxygen tank," his niece "is able to drive [him] to various places" and there is also a "Chester Connect shuttle service" available to him at his nursing facility. *Id.* at 7. Plaintiff Caldwell appears to assert that his disability prevents him from requesting or returning an absentee ballot, but his only basis for such a claim is that he

10

has "never attempted" to request an absentee ballot by phone or mail without assistance and has "never attempted" to return an absentee ballot by mail without assistance. *Id.* at 6. While Plaintiff Caldwell appears to assert he cannot vote in person, his basis for such a claim is that he has "not attempted to vote in person in about ten years because of [his] disabilities." *Id.* at 7. Plaintiff Caldwell's lack of any attempt to vote without assistance, either by absentee or in person, undercuts his claim that he requires such assistance.

Plaintiffs Bell and Caldwell have failed to demonstrate that their use of a wheelchair renders them unable to request, complete, and return an absentee ballot without assistance, or that they are unable vote in person. They cannot simply rest on pure conjecture; they must provide evidence that they require assistance, and they have failed to do so. Because they are not entitled to assistance in voting under Section 208, they cannot demonstrate any injury to that right.

But even if Plaintiffs Bell and Caldwell were entitled to voting assistance under Section 208, they've failed to show that they've been denied voting assistance by South Carolina law. Both Plaintiffs have admitted that they've previously received assistance with requesting and returning absentee ballots in South Carolina. Pl. Caldwell Resp. to Def. Wilson's First Requests for Admission, at 4; Pl. Bell Resp. to Def. Wilson's First Requests for Admission, at 4. And neither one has been denied assistance to vote in any 2026 election either by a member of a nursing center or by an election official in South Carolina. Pl. Caldwell Resp. to Def. Wilson's First Requests for Admission, at 5–6; Pl. Bell Resp. to Def. Wilson's First Requests for Admission, at 5. In fact, neither has even requested assistance to vote this year. Pl. Amend. Resp. to State Election Commission Defendants' First Set of Int. at 3.

Bottom line: Plaintiffs Bell and Caldwell fail to demonstrate any injury in fact or traceability, so there can be no redressability. As a result, Plaintiffs Bell and Caldwell don't have standing

11

to challenge South Carolina's voting assistance eligibility law.

### b.  Plaintiff Jenkins

It's not clear whether Plaintiff Jenkins even alleges claims against South Carolina's limits on voting assistance eligibility. But even if the Court concludes that she does, Plaintiff Jenkins lacks standing to challenge those provisions.

Unlike Plaintiffs Bell and Caldwell, Plaintiff Jenkins appears to support her contention that she has a disability that would entitle her to assistance under Section 208. *See* Pl. Jenkins Resp. to Def. Wilson's First Requests for Admission, at 7 ("I have optic nerve impairment and macular degeneration. I am legally blind in my right eye, and I cannot see straight out of my left eye. Because of my visual impairments I need assistance reading, understanding, and completing a ballot."). However, like Plaintiffs Bell and Caldwell, Plaintiff Jenkins fails to demonstrate that her access to voting assistance has been injured in any way.

As an initial matter, Plaintiff Jenkins has never voted using an absentee ballot in South Carolina, nor has she even requested or returned such a ballot.[3] Pl. Jenkins Resp. to Def. Wilson's First Requests for Admission, at 4. To be clear, she has also never received assistance in voting using an absentee ballot, nor has she received assistance with requesting or receiving an absentee ballot in South Carolina. *Id.* And she has not been denied assistance to vote in any 2026 election either by a member of a nursing center or by an election official in South Carolina. *Id.* at 5. Plaintiff Jenkins' failure to vote does not appear to be attributable to any injury to her right to vote.

But even if Plaintiff could show injury, she has a traceability problem. South Carolina law doesn't bar Plaintiff Jenkins from receiving assistance to vote. S.C. Code Ann. § 7-13-780 ("Only

---

[3] Plaintiff Jenkins has also not voted in person in an election in South Carolina in at least the past 12 years, nor has she received assistance in voting in a South Carolina election in that same timeframe. Pl. Jenkins Resp. to Def. Wilson's First Requests for Admission, at 3.

12

those persons who are *unable to read or write* or who are *physically unable or incapacitated from preparing a ballot or voting* shall be entitled to receive assistance of any kind in voting.") (emphasis added). Because South Carolina doesn't bar assistance for Plaintiff Jenkins, injunctive relief wouldn't impact her access to it. That means she has a redressability problem too. Plaintiff Jenkins simply does not have standing to challenge South Carolina's voting assistance eligibility law.

### B. Limits on Possible Assistors

To have standing to assert their Limits on Possible Assistors claim, Individual Plaintiffs would need to show that (1) Section 208 of the VRA entitles them to the assistor of their choice and (2) South Carolina law otherwise denies them this assistor.

It's unclear whether any Plaintiffs have even alleged claims against South Carolina's limits on possible assistors. None of their names, or facts about them, appear in allegations discussing those provisions. (ECF No. 1 at 12–14, 17–18). But even so, Plaintiffs fail to establish standing.

Section 208 doesn't guarantee a voter "the" person of their choice; it merely guarantees a voter "a" person their choice. *See Priorities USA v. Nessel*, 628 F. Supp. 3d 716, 733 (E.D. Mich. 2022) ("Section 208's natural effect allows some wiggle room: a voter may select 'a person' to assist them, but not *the* person of their choice.") (citation modified) (emphasis in original). But even if this Court credits Plaintiffs' view of Section 208, Plaintiffs have again failed to show that South Carolina law denies them the ability to seek assistance from the assistor of their choice.

### a. Plaintiffs Bell and Caldwell

Even if Plaintiff Bell was entitled to voting assistance under Section 208, he can't point to anything in the challenged provisions of South Carolina law that would bar him from receiving it.

South Carolina law does not prevent immediate family members from serving as assistors. S.C. Code Ann. § 7-15-330(A). Plaintiff Bell admits that he received assistance in voting from a

13

family member using an absentee ballot in an election in South Carolina as recently as 2024. *See* Pl. Bell Resp. to Def. Wilson's First Requests for Admission, at 4.

South Carolina law also doesn't bar authorized representatives from providing voting assistance, S.C. Code Ann. § 7-15-330(A)(2), provided they are registered to vote in South Carolina and are not "a candidate, a member of a candidate's paid campaign staff, or a campaign volunteer." S.C. Code Ann. § 7-15-310(7). Yet Plaintiff Bell evidently has never received assistance in voting using an absentee ballot from a person other than a family member in an election in South Carolina. *See* Pl. Bell Resp. to Def. Wilson's First Requests for Admission, at 5. And he denied that any staff member at his nursing center or any election official has expressly refused to provide assistance in voting in a 2026 election in South Carolina. *Id.* at 5. In fact, he has not even *asked* for assistance to vote in any 2026 election. *Id.* at 5. When asked to admit that staff members at his nursing center other than his person of choice is available to provide assistance to nursing center residents to vote in an election in South Carolina, he responded: "I do not know. I hope to get help from Ms. Deborah Allen to vote by mail in 2026, but I have not asked her yet." *Id.* at 5–6.

Turn to Plaintiff Caldwell. He admitted that he has received assistance in voting using an absentee ballot from multiple staff members at his nursing center. Pl. Caldwell Resp. to Def. Wilson's First Requests for Admission, at 5. And he admitted that there is at least one staff member at his nursing center other than his person of choice who is available to provide assistance to nursing center residents to vote in an election in South Carolina. *Id.* at 6. He also has not been denied assistance in voting in the 2026 election, either by any staff member of his nursing center or by any election official. *Id.* at 5. Indeed, he has not even asked. Pl. Amend. Resp. to State Election Commission Defendants' First Set of Int. at 3.

Even if Plaintiffs Bell and Caldwell were entitled to receive voting assistance, they have

14

not demonstrated that South Carolina's limits on possible assistors prevents them from receiving voting assistance.

### b. Plaintiff Jenkins

Like Plaintiffs Bell and Caldwell, Plaintiff Jenkins has not been denied assistance to vote in any 2026 election either by a member of a nursing center or by an election official in South Carolina. Pl. Jenkins Resp. to Def. Wilson's First Requests for Admission, at 5. And like Plaintiffs Bell and Caldwell, Plaintiff Jenkins has not even asked for assistance to vote this year. Pl. Amend. Resp. to State Election Commission Defendants' First Set of Int. at 3. But unlike Plaintiffs Bell and Caldwell, Plaintiff Jenkins has never voted absentee, let alone received assistance to vote absentee. *Id.* at 4. Plaintiff Jenkins hasn't demonstrated that she is unable to receive voting assistance from an immediate family member or an authorized representative let alone that South Carolina is somehow preventing her from receiving that assistance. Without an injury that's traceable to the Attorney General or a showing of redressability, Plaintiff Jenkins does not have standing to challenge South Carolina's limits on possible assistors.

### C. Five-Voter Limits

Individual Plaintiffs also fail to show that they will be denied the assistor of their choice. Their claims rest upon the assumption that only one staff member is available to provide voting assistance to all nursing facility residents and that more than five individuals at their respective facilities will request assistance from that one assistor. Plaintiffs have not presented evidence that there is a hard cap on the number of available assistors at their facilities, that more than five individuals at their respective facilities will request voting assistance, and that Plaintiffs will somehow not be chosen as one of those five individuals.

When asked whether staff members at their respective nursing centers other than their

person of choice are available to provide assistance to nursing center residents to vote in an election in South Carolina, Plaintiff Jenkins responded, "I do not know." Pl. Jenkins Resp. to Def. Wilson's First Requests for Admission, at 6. Plaintiff Bell also responded, "I do not know." *See* Pl. Bell Resp. to Def. Wilson's First Requests for Admission, at 6. And Plaintiff Caldwell outright admitted that more than one staff member at his nursing facility is available to assist residents with voting. Pl. Caldwell Resp. to Def. Wilson's First Requests for Admission, at 6.

While Plaintiff Caldwell alleges that his preferred assistor (Ms. Gaither) has previously assisted approximately 10 to 25 voters per election, he revealed in discovery that his basis for that claim is simply that "I know Ms. Gaither has assisted many other residents to vote in previous elections." Pl. Amend. Resp. to State Election Commission Defendants' First Set of Int. at 10. And his entire basis for believing that he will not be able to receive assistance from her in light of South Carolina's five-voter limit is this: "I am concerned that five or more other residents will request assistance from Ms. Gaither and I will not be able to have her help me vote as a result." *Id.*

And Individual Plaintiffs' discovery responses indicate that they have not been denied assistance to vote in any 2026 election either by a member of a nursing center or by an election official in South Carolina. *See* Pl. Bell Resp. to Def. Wilson's First Requests for Admission, at 5; Pl. Caldwell Resp. to Def. Wilson's First Requests for Admission, at 5; Pl. Jenkins Resp. to Def. Wilson's First Requests for Admission, at 5. In fact, none of them have even *asked* for assistance in an election this year. Pl. Amend. Resp. to State Election Commission Defendants' First Set of Int. at 3. Their claims rely on a "highly attenuated chain of possibilities," which does not reflect a concrete or particularized injury that is "certainly impending" and does not satisfy Article III's injury requirement. *See Clapper*, 568 U.S. at 410; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (rejecting standing based on a speculative chain of possibilities).

16

Even if Individual Plaintiffs showed that third parties declined to serve as assistors, that would be traceable to the decisions of third parties rather than South Carolina law. And standing is "substantially more difficult to establish" in situations where a "causal relation between injury and challenged action depends upon the decision of an independent third party." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation modified). These "decision[s]" of "independent third part[ies]" are fatal to Plaintiffs' ability to demonstrate traceability. *Id*. And there is no reason to suggest that the requested assistors are acting in "a predictable way[]" because of the clarity of the statutory language and the apparent absence of any threatened enforcement against them as individual assistors. *See Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024) (citation modified) (describing standing requirements in cases involving the actions of independent decisionmakers).

For similar reasons, Plaintiffs face a redressability problem. *See All. for Hippocratic Med*., 602 U.S. at 380 (describing causation and redressability as "flip sides of the same coin"). Given the limited scope of relief to the individual parties present in this suit, *see Trump v. CASA*, 606 U.S. 831, 837 (2025), there is no guarantee that the requested assistors would actually choose to provide the requested assistance even if Plaintiffs are successful here. *See Citizens for Resp. & Ethics in Washington v. U.S. Dep't of the Treasury, Internal Revenue Serv.*, 21 F. Supp. 3d 25, 36 (D.D.C. 2014) (collecting authorities for the proposition that there is no redressability where the court order would not bind the decisions of third parties necessary for the requested relief).

Finally, Plaintiffs cannot cure these jurisdictional defects by resort to the concept of a "chill" to their protected rights. *See La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 286 (5th Cir. 2025) (rejecting a "chill" argument in the context of a preemption challenge).

### D. NAACP-SC Lacks Standing

Plaintiff NAACP-SC could establish standing in two ways. First, in what is sometimes

17

called organizational standing, Plaintiff NAACP-SC could argue that the conference has "suffered an injury in its own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Second, in what is often called associational standing, Plaintiff NAACP-SC could attempt to establish "standing solely as the representative of its members." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Both theories of standing fail in this case.

### a. Organizational Standing

Plaintiff NAACP-SC does not appear to allege that the conference itself, as an organization, has standing. To establish organizational standing, Plaintiff NAACP-SC would have to show that the conference itself has suffered a "concrete and demonstrable injury" beyond a mere "setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In the context of the statute at issue in this case, such a showing is made all the more difficult by the simple fact that people—not organizations—vote. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("The plaintiffs are organizations and cannot vote; instead they assert the right to vote of individuals not even presently identifiable.").

### b. Associational Standing

Plaintiff NAACP-SC also lacks associational standing. To establish associational standing, Plaintiff NAACP-SC must show that: (1) the organization's members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief request requires the participation of individual members of the organization in the lawsuit. *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (citation modified).

On the first prong, to survive a summary judgment motion, NAACP-SC must "submit affidavits or other evidence showing, through specific facts" that "one or more of [its] members"

18

would be "directly affected" by government activity "apart from their special interest in th[e] subject." *Lujan*, 504 U.S. at 563 (citation modified). Plaintiff Caldwell is the only individual plaintiff who purports to be a member of NAACP-SC. (ECF No. 1 at 5, ¶ 21). And as shown above, he does not have standing.

Plaintiffs also fail to demonstrate through "affidavits or other evidence showing, through specific facts," that other individual members (1) are entitled to voting assistance under Section 208, and (2) have been denied the protections of Section 208 by South Carolina law. *Lujan*, 504 U.S. at 563. To the extent Plaintiff NAACP-SC seeks to rely on statistical evidence to bolster its standing argument, such a strategy is plainly insufficient for Article III purposes. *Summers*, 555 U.S. at 498–99 ("This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity.") (emphasis in original).

As for the third prong, it considers whether "there is complete identity between the interests of the consortium and those of its member[s] ... and the necessary proof could be presented 'in a group context.'" *Ass'n for Accessible Medicines v. Bonta*, 766 F. Supp. 3d 1020, 1027 (E.D. Cal. 2025) (quoting *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 10 n.4 (1988)). "An organization does not have associational standing when its claims require an ad hoc factual inquiry for each member represented by the association." *Ass'n for Accessible Medicines*, 766 F. Supp. 3d at 1028 (citation modified). And suits to invalidate statutory provisions traditionally require some degree of individualized inquiry to assess their merits. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (a "statute may be invalid as applied to one state of facts and yet valid as applied to another") (citation modified).

Here, NAACP-SC's claims require the individual participation of its members. NAACP-

19

SC hasn't shown that its membership is composed of disabled voters. And even if NAACP-SC only represented disabled voters (which it doesn't), a fact-specific inquiry would still be required to determine which members are entitled to relief. That's because not all disabilities require assistance to vote under Section 208. So a fact-specific inquiry is required to determine which members would be eligible for the relief sought in this suit. NAACP-SC seeks to enjoin South Carolina election laws that apply to all disabled voters who require assistance statewide, yet it's likely that only a minority of its membership would actually benefit from such relief.

As such, NAACP-SC has failed to put forth the necessary proof of its membership's collective entitlement to relief that could be presented in a group context. Because NAACP-SC's "claims require an ad hoc factual inquiry for each member represented by the association," *Ass'n for Accessible Medicines*, 766 F. Supp. 3d at 1028 (citation modified), NAACP-SC fails to demonstrate associational standing.

### E. Redressability as to All Plaintiffs

A final point on standing. Even if Plaintiffs could show they are entitled to voting assistance under Section 208 and that South Carolina obstructs that voting assistance, they still suffer a glaring traceability problem. None of them possesses a private right of action under Section 208 to bring this suit in the first place, so this Court cannot provide Plaintiffs the relief they seek.

To establish redressability, "the alleged injury must be legally and judicially cognizable." *United States v. Texas*, 599 U.S. 670, 676 (2023) (citation modified). "That requires, among other things, that the dispute is traditionally thought to be capable of resolution through the judicial process—in other words, that the asserted injury is traditionally redressable in federal court." *Id.* (citation modified). "In adhering to that core principle, the [Supreme] Court has examined history and tradition, among other things, as a meaningful guide to the types of cases that Article III

empowers federal courts to consider." *Id.* at 676–77 (citation modified).

As the 8th Circuit recently concluded, Section 208 "itself contains no private enforcement mechanism." *Arkansas United v. Thurston*, 146 F.4th 673, 677 (8th Cir. 2025) (citation modified). "Congress ... knows how to create a cause of action, and it did not do so here." *Id.* at 678. To conclude otherwise would require courts to "conclude that Congress hid the proverbial elephant in a mousehole." *Id.* (citation modified). Instead, "Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties." *Id.* at 678 (citation modified). Because Section 208 doesn't have a private enforcement mechanism, the private claims asserted in this case under Section 208 aren't judicially redressable.

## II.     Plaintiffs' Claims Are Not Ripe

Plaintiffs worry they won't receive voting assistance this year due to various provisions of South Carolina's voting laws. (ECF No. 1 at 5–6). But even if Plaintiffs had standing to challenge the laws in question, their claims suffer from yet another justiciability deficiency: lack of ripeness.

"A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 294 (4th Cir. 2022) (citation modified). And "[w]here an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Id.* (citation modified). "To be sure, ripeness can rest on anticipated future injury. But as discussed, the future injury cannot be wholly speculative or rest upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 295 (citation modified).

"The doctrine of ripeness arises from the case or controversy requirement of Article III." *Id.* at 293 (citation modified). "The plaintiff bears the burden of establishing ripeness." *Id.* (citation modified). "While standing involves the question of *who* may sue, ripeness involves *when* they

21

may sue." *Id.* (citation modified) (emphasis in original). "[B]ecause ripeness is peculiarly a question of timing," courts "may look to factual developments that occurred after the complaint was filed to determine whether the plaintiff's claims were ripe for review at the time of the district court's judgment." *Id.* (citation modified). Courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id. at* 294 (citation modified).

In responding to discovery, Plaintiffs admit that no one has refused to provide them with voting assistance for any 2026 election in South Carolina. Pl. Amend. Resp. to State Election Commission Defendants' First Set of Int. at 3. What's more, Plaintiffs *have not even requested assistance to vote* in a 2026 election in South Carolina. *Id.* And it would be no hardship for them to simply ask; it would certainly be less of a hardship than hiring lawyers and litigating this issue in federal court. As such, the legal issues arising in this case not are not fit for judicial decision because Plaintiffs "ha[v] not yet suffered injury and any future impact remains wholly speculative." *Wild Virginia*, 56 F.4th at 294 (citation modified). Even if Plaintiffs' legal arguments were sound, Plaintiffs' alleged injuries are "contingent upon a decision to be made by a third party that has not yet acted," and therefore are "not ripe as the subject of decision in a federal court." *Id.* at 294 (citation modified).

### III.    Plaintiffs' Preemption Claims Fail as a Matter of Law.

#### A.  Conflict Preemption Generally

Plaintiffs rely on a theory of conflict preemption. Conflict preemption "occurs [1] when compliance with both federal and state regulations is impossible or [2] when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (citation modified). The first category is

called direct conflict preemption or impossibility preemption. *See N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025) (discussing categories of conflict preemption). The second category is called obstacle preemption. *Id*.

To assess a conflict preemption claim, a court engaged in a "two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict." *Id*. (citation modified).

When engaging in this analysis, a court is guided by various tools of statutory construction, including substantive canons that are unique to a preemption analysis.

First is the "presumption against pre-emption." *Hillman*, 569 U.S. at 490 (citation modified). In all preemption cases, "federalism principles baked into the Constitution" require a court to begin its analysis with "the basic assumption that Congress did not intend to displace state law." *N. Va. Hemp*, 125 F.4th at 492 (citation modified). In other words, "a federal statute is *presumed not to preempt* a state provision." *Id*. (emphasis added). Although this presumption can be overcome, "courts should not seek out conflicts where none clearly exist." *Id*. at 493.

This assumption is at its "strongest" when Congress legislates in an area the States have traditionally occupied. *See S. Blasting Servs., Inc. v. Wilkes Cnty., NC*, 288 F.3d 584, 590 (4th Cir. 2002) (citation modified). This strengthened presumption requires a plaintiff to show that the challenged law does "major damage" to "clear and substantial" federal interests. *Hillman*, 569 U.S. at 491 (citation modified). When the presumption applies, "if there is any ambiguity as to whether the local and federal laws can coexist, [a court] must uphold the ordinance." *U.S. Smokeless Tobacco Mfg. LLC v. City of New York*, 708 F.3d 428, 433 (2d Cir. 2013).

Second, and somewhat related to the presumption against preemption, is the clear-statement rule. That canon requires Congress to speak "clearly" when it alters the traditional balance

23

between federal and state power. *See Torcasio v. Murray*, 57 F.3d 1340, 1346 (4th Cir. 1995).

All these tools are shaped by vertical separation-of-powers principles, which seek to respect our Constitution's unique system of federalism.

Horizonal separation-of-powers principles also provide the basis for a separate tool of construction. These principles require plaintiffs to clear a "high threshold" to establish that "a state law is preempted for conflicting with the purposes of a federal Act." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation modified). This threshold is imposed because it is ultimately "Congress rather than the courts" that preempts state law. *Id*. (citation modified).

Finally, there is the more generally applicable canon of constitutional avoidance, which instructs courts to construe a statute to avoid any constitutional problems. *See United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) (describing constitutional avoidance); *see also Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) (describing constitutional avoidance as the "elementary rule" that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.") (citation modified). Courts have applied this canon to preemption cases. *See Torres v. Precision Indus.*, 938 F.3d 752, 755 (6th Cir. 2019) ("For good reason, then, many of our sister circuits have applied avoidance principles to questions of preemption."); *see also Bell Atl. Md., Inc. v. Prince George's Cnty.*, 212 F.3d 863, 865–66 (4th Cir. 2000) (applying avoidance principle to avoid preemption analysis).

**B. Section 208 Does Not Preempt the South Carolina Laws at Issue**

All the tools mentioned above are relevant to Plaintiffs' preemption claims, as Plaintiffs ask this Court to intrude upon an area traditionally occupied by the State and to alter the balance of federal and state power. *See Abbott*, 151 F.4th at 291 (applying presumption against preemption in a Section 208 case).

24

If the Court applies these tools here as a part of the "two-step process" of analyzing a conflict preemption claim, Plaintiffs' preemption claims must fail as a matter of law.

### a. Step One: Construction of the Two Statutes

Start with the first step of the analysis: ascertaining the construction of the two statutes. Section 208 is not nearly as broad as Plaintiffs assert. The full text of Section 208 provides the following: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

Even without the tools mentioned above, the text of Section 208 suggests a modest congressional purpose. Section 208 merely seeks to ensure that any voter "who requires assistance by reason of blindness, disability, or inability to read or write" may receive such assistance from "a person of the voter's choice." *Id*.

As other courts have concluded, the use of the indefinite article "a" in describing "a person of the voter's choice" is significant and reveals a more flexible—and modest—approach by Congress, that voters are entitled to assistance in voting but not from *the* singular person of their choice. *See Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020), *rev'd and remanded on other grounds*, 860 F. App'x 419 (6th Cir. 2021) ("[Section 208] employs the indefinite article 'a' which by its very term is non-specific and non-limiting, as opposed to the definite article 'the,' which by its terms is specific and limiting.").

And the Michigan court's decision isn't an outlier. The Supreme Court and the Fourth Circuit have long viewed the distinction between definite and indefinite articles as salient in statutory analyses in a variety of contexts. *See McFadden v. United States*, 576 U.S. 186, 191 (2015) ("When used as an indefinite article, 'a' means '[s]ome undetermined or unspecified particular.'") (quoting

25

Webster's New International Dictionary 1 (2d ed. 1954)); *see also United States v. McCauley*, 983 F.3d 690, 695 (4th Cir. 2020) ("Distinguishing between 'the' and 'a' is not picking at the district court's instruction in this instance—here, there is a fundamental difference between the definite and indefinite article."); *Indem. Ins. of N. Am. v. United States*, 569 F.3d 175, 181 (4th Cir. 2009) ("Second, the use of the indefinite article 'a' at the beginning of the sentence upon which Plaintiffs seize means that such sentence does not specify a particular stability proof test.").

Other portions of the text of Section 208 also point to a more limited view of its scope. Section 208's exclusion of certain assistors, "the voter's employer or agent of that employer or officer or agent of the voter's union," necessarily suggest that Congress did not intend for Section 208 to create some unlimited right to assistance. And nothing in the text suggests those exclusions were meant to constitute an exhaustive list of the only individuals who may be excluded from providing assistance. *See Abbott*, 151 F.4th at 294 ("The far more sensible inference from Section 208 is that Congress specified two groups who, it feared, might influence vulnerable voters—without implying any judgment about other circumstances that might bear on voter assistance.").

To the extent that the Court finds some ambiguity in the text, legislative history favors the more modest view of Section 208. A Senate Report explained that Section 208 would preempt state election laws "only to the extent that they unduly burden the right recognized in [Section 208], with that determination being a practical one dependent upon the facts." S. Rep. 97-417, 63 (1982); *see also Ray v. Texas*, No. CIV.A.2-06-CV-385TJW, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008) ("The legislative history evidences an intent to allow the voter to choose *a* person whom the voter trusts to provide assistance. It does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals.") (emphasis in original).

But if this Court is not persuaded by this textual analysis alone, the tools of statutory

26

construction firmly put a finger on the scale in favor of a more modest view of the scope of the statute. The presumption against preemption, the clear statement rule, and the canon of constitutional avoidance all favor a more limited reading of Section 208. *See*, *e.g.*, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("Even if [the plaintiff] had offered us a plausible alternative reading of [the federal statute that allegedly preempts state law]—indeed, even if its alternative were just as plausible as our reading of that text—we would nevertheless have a duty to accept the reading that disfavors pre-emption.").

Moving to the South Carolina laws at issue, all three challenged provisions allow voters with disabilities various forms of assistance in voting. And more precisely for purposes of this preemption analysis, these provisions allow the individual Plaintiffs assistance in voting, to the extent they are entitled to receive it. *See United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 669 (4th Cir. 1996) ("And '[t]he existence of a hypothetical or potential conflict is insufficient to warrant [] preemption.") (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982)).

Start with Plaintiffs' Voting Assistance Eligibility claim. The relevant state law provides the following: "Only those persons who are unable to read or write or who are physically unable or incapacitated from preparing a ballot or voting shall be entitled to receive assistance of any kind in voting." S.C. Code Ann. § 7-13-780.

Although the state law does not track Section 208 on a word-for-word basis, the ordinary meaning of the state law aligns with Section 208. *Cf*. S.C. Code Ann. § 7-13-780 (providing assistance to those unable to read or write and to those "who are physically unable or incapacitated from preparing a ballot or voting"); *with* 52 U.S.C. § 10508 (providing assistance to those who require assistance "by reason of blindness, disability, or inability to read or write").

Further, the State Election Commission, which administers the statute, interprets the state

27

law to have the same meaning as Section 208. *See* SOUTH CAROLINA ELECTION COMMISSION, *Poll Managers Handbook* at 65 (Sept. 2024) ("[A]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officers or agent of the voter's union.") (https://tinyurl.com/k7f7pfzr) (accessed Apr. 6, 2026). This interpretation of state law is entitled to deference under South Carolina law. *See Dunton v. S.C. Bd. of Exam'rs In Optometry*, 291 S.C. 221, 223, 353 S.E.2d 132, 133 (1987) ("The construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons.").[4]

Turning to Plaintiffs' Limits on Possible Assistors and Five-Voter Limits claims, a few provisions of South Carolina law are relevant. First, S.C. Code Ann. § 7-15-330 generally outlines the process for requesting and returning an absentee ballot in South Carolina. Under subsections (A) and (C), only a voter, a member of his or her immediate family, or in certain circumstances, an authorized representative, may request and return an absentee ballot for a voter. *See* S.C. Code Ann. §§ 7-15-330(A) and (C). Pursuant to S.C. Code Ann. § 7-15-310, a voter may rely on an authorized representative to request and return an absentee ballot if the voter is "unable to go to the polls because of illness or disability resulting in his confinement in a hospital, sanatorium, nursing home, or place of residence, or a voter unable because of a physical handicap to go to his polling place or because of a handicap is unable to vote at his polling place due to existing architectural barriers that deny him physical access to the polling place, voting booth, or voting apparatus or machinery." S.C. Code Ann. § 7-15-310(7). South Carolina law places few limitations on

---

[4] While deference to federal agency interpretation of federal law has been undercut in recent years, *see Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024), state agency interpretation of state law has not met that same fate in South Carolina.

who may serve as an authorized representative, requiring the representative to be a registered voter and forbidding a candidate, a member of a candidate's paid campaign staff, or a campaign volunteer from serving as such. *Id*.

Finally, S.C. Code Ann. §§ 7-15-330(B)(4) and -385(G) preclude a person from requesting and returning more than five absentee ballots in an election, in addition to their own.

### b.  Step Two: Whether the Two Statutes Conflict

Moving to the second step of the analysis, the Court must determine the constitutional question of whether the federal and state statutes in question conflict. A proper construction of the statutes, using all available tools of statutory construction, shows that Section 208 and South Carolina law do not conflict.

This Court's conflict preemption analysis is guided by a variety of tools, which generally provide the following: (1) there is a baseline assumption that Congress did not intend to displace state law; (2) because Plaintiffs allege preemption in a field traditionally occupied by the States, a stronger "presumption against preemption" applies; (3) because Plaintiffs invoke conflict preemption, they must clear a "high threshold"; and (4) this Court should strive to interpret a statute to avoid any constitutional problems. *See Supra*, III.A; *see also Abbott*, 151 F.4th at 292 ("Recall, moreover, that we are reading the phrase, not in the abstract, but in the context of a preemption claim that faces steep odds.").

Applying these tools here, Plaintiffs have not cleared their high threshold. Both South Carolina law and Section 208 can readily be interpreted to avoid a conflict. Section 208 merely guarantees qualifying individuals the opportunity to receive assistance from a person in voting.

South Carolina law does not deprive them of this right. Under South Carolina law, to the extent any of the individual Plaintiffs are entitled to assistance in voting, they may seek assistance

29

from a wide range of individuals in requesting, filling out, and returning their absentee ballot.

What's more, this Court is not being asked to plow new ground in reaching the conclusion that Section 208 does not preempt state election law. Other courts from around the country have rejected similar preemption arguments about state absentee voting laws.

Just last year, the Fifth Circuit rejected the argument that Section 208 preempted a Texas law that generally prohibited a person from serving as an assistor if he or she received compensation for those services. *See Abbott*, 151 F.4th at 295 (concluding that district court erred in ruling that Section 208 preempts Texas law). In doing so, the Fifth Circuit adopted a more restrained view of Section 208, rejecting the district court's "breathtakingly broad" view that Section 208 preempts any state law that "restrict[s] the class of people who are eligible to provide voting assistance beyond the categories of prohibited individuals identified in the text of [Section 208]." *Id*. at 292 (citation modified). According to the Fifth Circuit, "nothing" compelled it to read Section 208 in a "maximalist way that erases swaths of state election laws." *Id*. Instead, both "[c]ontext and common sense counsel a more restrained reading—one guaranteeing eligible voters help from 'a person' of their choice, while allowing states to superintend voter assistance." *Id*.

Elsewhere, a district court in Michigan reached a similar conclusion, holding that Section 208 did not preempt Michigan's absentee-ballot law, which imposed limitations on who may return a voter's absentee ballot. *See Nessel*, 628 F. Supp. 3d at 731 ("Even if Plaintiffs had established standing, the claim would have still failed because the VRA does not preempt the absentee-ballot law. "). In that case, the plaintiffs advanced the same arguments the Plaintiffs do here, arguing that the state "absentee-ballot law unlawfully limits the rights afforded to voters by Section 208 by prohibiting voters who need help returning their absentee ballot applications from receiving assistance from the person of their choice." *Id*. at 732 (citation modified).

As should be done here, the district court in *Nessel* rejected the plaintiffs' reading of Section 208 as "too broad[]," concluding that "Section 208's natural effect allows some wiggle room: a voter may select 'a person' to assist them, but not *the* person of their choice." *Id*. at 732–33 (quoting 52 U.S.C. § 10508) (emphasis in original). As a result, the court concluded that the federal and state laws were "harmonious" and "VRA does not preempt the absentee-ballot law." *Id*. at 732.

A district court in Texas reached a similar conclusion, holding that the "language of Section 208 allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make that choice without limitation." *Ray*, 2008 WL 3457021, at *7. The court concluded that the legislative history of Section 208 supported its conclusion, observing that it "evidences an intent to allow the voter to choose *a* person whom the voter trusts to provide assistance. It does not preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals." *Id*. (emphasis in original).

In support of its holding, the Texas district court cited two separate state court decisions that reached similar conclusions. *See Qualkinbush v. Skubisz*, 357 Ill. App. 3d 594, 610, 826 N.E.2d 1181, 1196 (2004) ("[E]ven in light of the federal provisions, states may impose restrictions on those individuals who return a disabled voter's absentee ballot, and [] such restrictions may be above and beyond those set forth in the Voting Rights Act."); *see also DiPietrae v. City of Philadelphia*, 666 A.2d 1132, 1133 (Pa. Commw. Ct. 1995) (upholding a Pennsylvania statute limiting the persons for whom individuals may act as agents to obtain absentee ballot applications, deliver absentee ballot applications, obtain absentee ballots, or deliver completed absentee ballots).

True, courts have found Section 208 preempts some state election laws, but those cases are distinguishable from this one. For example, a district court in Wisconsin concluded a state law was preempted where it allowed disabled voters no assistance in returning their absentee ballots. *Carey*

31

*v. Wis. Elections Comm'n*, 624 F. Supp. 3d 1020, 1023 (W.D. Wis. 2022). And a district court in North Carolina concluded a state law was preempted where it barred disabled voters in nursing homes from receiving voting assistance from nursing home staff during COVID lockdowns. *See Democracy N. Carolina v. N. Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 235 (M.D.N.C. 2020) ("In the present circumstances, many nursing homes are locked down and will likely continue to have restricted access for the or the foreseeable future; 208-voters in these type of adult care facilities may only come into contact with an owner, manager, director, or employee of their residence and therefore may not have any options for assistance.") (citation modified).

## C. South Carolina's Election Laws Advance Vital Government Interests

Finally, to the extent it's relevant to this Court's analysis, the challenged laws advance vital government interests. As the Supreme Court has recognized, States have a "strong and entirely legitimate interest" in the "prevention of fraud" in voting, which can "undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Brnovich*, 594 U.S. at 672. And States have a "valid and important" interest in ensuring "that every vote is cast freely, without intimidation or undue influence." *Id*.

The right to vote has clear limits. *See, e.g.*, *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) ("The right to vote, *per se*, is not a constitutionally protected right.") (citation modified). And this right does not guarantee voters the right to vote "in any manner" they please. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

For example, the Supreme Court has declined to conclude that the right to vote includes a right to vote by mail. *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809 n.7 (1969). Given States' power to regulate the "Times, Places, and Manner" of federal elections, U.S. Const. art. I, § 4, cl. 1, courts must avoid treating the right to vote as an invitation "to rewrite state

32

electoral codes." *Clingman*, 544 U.S. at 593. "[D]etailed judicial supervision of the election process would flout the Constitution's express commitment of the task to the States." *Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment); *see also Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring in denial of application to vacate stay) (concluding that legislatures are in a better position than courts to "make policy and bring to bear the collective wisdom of the whole people when they do," and they "enjoy far greater resources for research and factfinding."); *see also Rucho v. Common Cause*, 588 U.S. 684, 704 (2019) ("With uncertain limits, intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust.") (citation modified).

The right to vote is the right to "participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). States have great authority to regulate elections within those bounds. *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50 (1959) ("States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns.") (citation modified). And for good reason.

The virtues of state regulation of elections can be seen from the early days of the Republic, when polling places could be boisterous, even "chaotic," "akin to entering an open auction." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 7 (2018) (citation modified). Voters generally relied on ballots printed by parties rather than the government. *Id.* at 6. But by the late nineteenth century, States began "implementing reforms to address these vulnerabilities and improve the reliability of elections." *Id.* at 7. Those reforms are now taken for granted—voting in private using state-printed ballots instead of party-printed ballots. *Id.*

33

States like South Carolina continue to make efforts to prevent fraud in voting. While some may dismiss concerns about voter fraud or undue influence as unfounded, voter fraud has "been documented throughout this Nation's history by respected historians and journalists." *Crawford*, 553 U.S. at 195 (plurality opinion).

Absentee ballots in particular pose a risk for fraud and undue influence. *See Brnovich*, 594 U.S. at 686 ("For example, the North Carolina Board of Elections invalidated the results of a 2018 race for a seat in the House of Representatives for evidence of fraudulent mail-in ballots.").

And just two years ago in South Carolina, the South Carolina Legislative Audit Council found evidence of ballot harvesting in the 2022 election cycle in South Carolina. *See* LEGISLATIVE AUDIT COUNCIL, *A Review of the South Carolina Election Process* at 6 (Jan. 2024) (describing an instance of a person returning 12 absentee ballots during the 2022 primary election) (https://perma.cc/QUV3-VJL4) (accessed Apr. 6, 2026).

True, the benefits of regulation also come with burdens. But, as the Supreme Court determined in *Brnovich*, "mere inconvenience" is insufficient to "demonstrate a violation" of the right to vote. 594 U.S. at 669; *see id.* ("[B]ecause voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is 'equally open' and that furnishes equal 'opportunity' to cast a ballot must tolerate the 'usual burdens of voting.'") (citation modified). And Justice Alito, writing for three Justices, emphasized "[e]ven the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right." *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissental). Balancing the benefits and burdens of election regulation, the South Carolina General Assembly acted entirely appropriately to safeguard our state elections by imposing various safety protocols on absentee ballots.

Moreover, because each state "indisputably has a compelling interest in preserving the integrity of its election process," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*) (citation modified), the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell*, 549 U.S. at 1). Indeed, "[c]ourt orders affecting elections" can "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. "As an election draws closer, that risk will increase." *Id.* at 5.

Statewide primary elections in South Carolina are scheduled to take place on June 9, 2026. SOUTH CAROLINA ELECTION COMMISSION, *Statewide Primary* (https://tinyurl.com/5n8smk3s) (accessed Apr. 6, 2026). Plaintiffs have expressed their desire to enjoin enforcement of multiple provisions of South Carolina election law prior to those primary elections. (ECF No. 1 at 5–6, 20–21). But briefing on motions for summary judgment will not be complete until May 11, 2026, less than one month before the primaries. (ECF No. 31 at 2). And if a hearing is held on those motions in the weeks after briefing is completed, that pushes even closer to the primary elections. This Court should not accept Plaintiffs' invitation to "alter the election rules on the eve of an election" but should instead "avoid this kind of judicially created confusion." *Republican Nat'l Comm.*, 589 U.S. at 424–25.

## CONCLUSION

Section 208 contains important provision for those who need assistance in voting. South Carolina law does not conflict with it. More fundamentally, Plaintiffs lack standing to even argue that it does, and their claims are not ripe. As such, this Court should grant summary judgment in Attorney General Wilson's favor.

[Signature on following page]

Respectfully submitted,

s/ Joseph D. Spate
Alan Wilson
*Attorney General*
Thomas T. Hydrick
*Solicitor General*
Federal Bar No. 13322
Joseph D. Spate
*Deputy Solicitor General*
Federal Bar No. 13100

OFFICE OF THE SOUTH CAROLINA
ATTORNEY GENERAL
1000 Assembly St
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov
josephspate@scag.gov

*Counsel for Alan Wilson, in his official capacity as the South Carolina Attorney General*

April 6, 2026
Columbia, South Carolina

36