**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| NAACP SOUTH CAROLINA STATE CONFERENCE; ROBERT CALDWELL; JONATHAN BELL; SHERRY JENKINS,<br><br>Plaintiffs,<br><br>v.<br><br>ALAN WILSON, in his official capacity as the South Carolina Attorney General; JENNY WOOTEN, in her official capacity as Interim Executive Director of the State Election Commission; DENNIS W. SHEDD, in his official capacity as Chairman of the State Election Commission; JOANNE DAY, CLIFFORD J. ELDER, LINDA McCALL, and SCOTT MOSELEY in their official capacities as members of the State Election Commission,<br><br>Defendants. | C/A No. 3:25-cv-13754-MGL |

**Memorandum in Support of Motion for Summary Judgment**

The State Election Commission Defendants (SEC) are entitled to summary judgment. First, Plaintiffs lack standing to maintain this action against the SEC. Second, the state election statutes challenged by Plaintiffs are not preempted by federal law because the statutes are applied the same and because any differences between state and federal law do not unduly burden Plaintiffs' right to help in requesting, completing, or returning an absentee ballot under state law. There is no dispute of material fact and the SEC is entitled to judgment as a matter of law.

**Introduction**

The NAACP South Carolina State Conference (NAACP), and three individual plaintiffs, Robert Caldwell, Jonathan Bell, and Sherry Jenkins (Individual Plaintiffs) have sued the SEC and

the South Carolina Attorney General, complaining that they are harmed by various state election statutes (Challenged Statutes). Those Challenged Statutes include the following sections of the South Carolina Code:

(1) § 7-13-780, setting forth who is entitled to receive voting assistance;

(2) §§ 7-15-310(7), 7-15-330(A), (C), or 7-15-385(A)(3), proscribing who may request and return an absentee ballot on behalf of a voter qualified to receive assistance; and

(3) §§ 7-15-330(B)(4) and 7-15-385(G), imposing a five-voter limit on a person requesting and returning absentee ballots on behalf of a voter qualified to receive assistance.[1]

Plaintiffs request that this Court grant (1) a declaration that the Challenged Statutes conflict with and are therefore preempted by Section 208 of the Voting Rights Act, 52 U.S.C.A. § 10508, and (2) an injunction barring the implementation and enforcement of those statutes.

Plaintiffs' request should be denied. First, the Court lacks subject matter jurisdiction and should grant judgment to the SEC as a matter of law under Federal Rule of Civil Procedure 56 or, alternatively, dismiss the case under Federal Rule of Civil Procedure 12(b)(1).[2] Plaintiffs do not have Article III standing to bring this action because they have not sufficiently alleged that the Challenged Statutes harm or threaten to harm the Individual Plaintiffs in any way. Rather, the purported harms hinge on speculation, conjecture, and strained interpretations of how statutes might be applied to third parties not before the Court. As for the NAACP, it cannot have organizational standing because it alleges no harm to itself as an organization, and it cannot have

---

[1] As set forth below, Plaintiffs characterized the Challenged Statutes in three ways: (1) "Limits on Voting Assistance Eligibility", (2) "Limits on Possible Assistors", and (3) "Five-Voter Limits" statutes. As explained more fully below, the SEC rejects Plaintiffs' claims that these statutes unduly limit their rights to help in voting.

[2] The Court could instead grant the pending motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).

2

associational standing because it has not identified an NAACP member with standing in their own right. Finally, no Plaintiff has a redressable right to the injunctive relief requested.

Second, the Court should grant judgment as a matter of law to the SEC because Section 208 does not preempt the Challenged Statutes. Specifically, there is no conflict between Section 208 and S.C. Code Ann. § 7-13-780 because the two statutes are interpreted and applied identically. Furthermore, neither the state law restrictions on who may request and return an absentee ballot on behalf of a voter nor the five-voter limit on a person requesting and returning such ballots are preempted because Section 208 and those statutes can work together. As a result, those statutes do not place an "undue burden" on Plaintiffs' Section 208 rights.

<b>Relevant Background and Allegations</b>

**1.      Section 208 of the Voting Rights Act**

Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C.A. § 10508. Plaintiffs allege that Section 208 preempts the Challenged Statutes.

**2.      Factual allegations**

Principally, the allegations in the Complaint are directed at the so-called "Five-Voter Limits" statutes, S.C. Code Ann. § 7-15-330(B)(4) ("A person ***must not request*** absentee applications for more than five qualified electors per election, in addition to himself.") (emphasis added), and § 7-15-385(G) ("***It is unlawful for a person to return*** more than five return-addressed envelopes in an election, in addition to his own.") (emphasis added).[3]

---

[3]   As discussed in detail *infra*, and reflected in the emphasized language above, §§ 7-15-330(B)(4) and 7-15-385(G) only cover situations where a voter is ***requesting*** or ***returning*** absentee ballots.

3

The principal pertinent factual allegations are as follows:

(1)    The NAACP is an organization which has members. Compl. ¶ 17.

(2)    Each of the Individual Plaintiffs resides in a long-term care facility. Mr. Caldwell currently resides at MUSC Health Chester Nursing Center (MUSC Chester), Compl. ¶ 21, while Mr. Bell and Ms. Jenkins reside at Union Post Acute. Compl. ¶¶ 25, 27.

(3)    Mr. Caldwell is a member of the NAACP. Compl. ¶ 21. Plaintiffs do not allege that Mr. Bell or Ms. Jenkins are members of the NAACP.

(4)    Each of the Individual Plaintiffs is physically disabled. Compl. ¶¶ 22, 25, 28. Ms. Jenkins has a nonphysical and physical disability. Compl. ¶ 28.[4] "Mr. Caldwell and Mr. Bell . . . have physical disabilities that they do not believe render them completely physically incapacitated from voting." Compl. ¶ 55.

(5)    Each of the Individual Plaintiffs is legally entitled to assistance in the voting process because of his or her respective disability. Compl. ¶ 22 ("Because of his disability, Mr. Caldwell is afforded an assistor of choice throughout the voting process under Section 208 of the VRA."); Compl. ¶ 26 ("Under Section 208 of the VRA, Mr. Bell is entitled to vote with assistance . . . ."); Compl. ¶ 29 (Ms. Jenkins "is afforded an assistor of choice throughout the voting process under Section 208 of the VRA.").

(6)    Each of the Individual Plaintiffs intends to vote by mail in the 2026 primary and general elections. Compl. ¶¶ 24, 26, 30.

---

The statutes do not place a numerical limit on other acts of assisting disabled people in the voting process.

[4]    In Plaintiffs' discovery responses, they made clear that neither Mr. Caldwell nor Mr. Bell contend that they have "any non-physical impairments for which they need assistance in preparing a ballot or voting." Ex. A., Pls.' Resp. to Interrog. No. 10.

4

(7)     Each of the Individual Plaintiffs has identified a specific person to assist them in the voting process. Compl. ¶¶ 24, 26, 30.

(8)     Mr. Caldwell's assistor of choice is Barvette Gaither, a Social Worker at MUSC Chester. Compl. ¶ 24. He specifically "wants assistance [from Ms. Gaither] with requesting and returning his absentee ballot." Compl. ¶ 24.

(9)     At MUSC Chester,

> all voting assistance used to be arranged and provided by . . . [Ms.] Gaither. Both when new residents arrive at the facility and prior to upcoming elections, Ms. Gaither confirms with residents whether they are registered to vote and asks them if they need assistance with the voting process. If residents need assistance, Ms. Gaither asks from whom they would like to receive assistance.

Compl. ¶ 70.

(10)    "[M]any [MUSC Chester] residents ask that [Ms. Gaither] assist them with voting. Prior to the effective date of S.C. Code §§ 7-15-330(B)(4) and -385(G), Ms. Gaither assisted approximately 10 to 25 voters per election." Compl. ¶ 71.

(11)    Because of the "Five-Voter Limits" statutes, Ms. Gaither

> does her best to make arrangements for the other residents to receive assistance from family, friends, or other staff members. This burdens Ms. Gaither, other staff, and the residents, who aren't sure who will be available to help them. Except for the five voters she assists, every resident who would choose to rely on Ms. Gaither is denied the assistance of the person of their choice.

Compl. ¶ 72.

(12)    Mr. Bell's and Ms. Jenkins' assistor of choice is Deborah Allen, the Activities Director at Union Post Acute. Compl. ¶ 26, 30.

(13)    At Union Post Acute, "[Ms.] Allen is the person who coordinates voting assistance for the facility's approximately 25 residents who vote. Ms. Allen has been helping Union Post Acute residents vote for more than two decades. Because of the Five-

5

Voter Limits, Ms. Allen is now severely constrained in her ability to assist voters who rely on her help." Compl. ¶ 74.

(14)    Ms. Jenkins "wants assistance [from Ms. Allen] with requesting, filling out, and returning her absentee ballot." Compl. ¶ 30. Additionally, "Ms. Jenkins has not voted in a while and is new to voting absentee. She wants Ms. Allen to help her vote because she deeply trusts Ms. Allen and because Ms. Allen is familiar with and can help Ms. Jenkins understand the multi-step absentee registration and voting process." Compl. ¶ 75.

(15)    Mr. Bell generally desires assistance from Ms. Allen with absentee voting and indicates he "wants help from Ms. Allen to vote." Compl. ¶¶ 26, 76. Additionally, "[a]lthough Mr. Bell has family members who have helped him vote in the past, he doesn't want to burden them when it is more convenient for Ms. Allen to help him. He also knows that Ms. Allen is reliable and will make sure his ballot gets counted." Compl. ¶ 76.

(16)    Mr. Bell also claims that "[b]ecause [he] has available family members, he will not be prioritized as one of the five voters for Ms. Allen to help in the 2026 elections. But he cannot be sure that his family members will help him fill out his forms and ballot properly and return his ballot on time." Compl. ¶ 76.

**3.    Statutory allegations.**

**A.    "Limits on Voting Assistance Eligibility"**

In the First Cause of Action, Plaintiffs claim that § 7-13-780 is preempted by Section 208. Section 7-13-780 provides that "[o]nly those persons who are unable to read or write or who are physically unable or incapacitated from preparing a ballot or voting shall be entitled to receive

6

assistance of any kind in voting." In addition to the relevant allegations above, the specific allegations with respect to this challenge are:

(1) The state statutory restriction that only "those persons who are unable to read or write or who are physically unable or incapacitated from preparing a ballot or voting," conflicts with Section 208, because "disability" under federal law was intended to include voters with non-physical impairments or disabilities. Compl. ¶¶ 6, 53, 83, 84.

(2) Ms. Jenkins has a nonphysical disability in addition to her physical disability. Compl. ¶ 28.

(3) "Even voters who have physical disabilities but who are not 'physically unable or incapacitated from preparing a ballot or voting' are barred from receiving any assistance under South Carolina law, including Mr. Caldwell and Mr. Bell . . . have physical disabilities that they do not believe render them completely physically incapacitated from voting." Compl. ¶ 55.

**B.    "Limits on Possible Assistors"**

In the Second Claim for Relief, Plaintiffs contend that certain state statutes regarding who can help voters are preempted because Section 208 only excluded two groups of individuals: (1) a voter's employer or agent of that employer; and (2) an officer or agent of the voter's union, from providing assistance. Compl. ¶ 57. Plaintiffs contend that §§ 7-15-310(7), 7-15-330(A), (C), (F), and 7-15-385(A)(3), (G) are preempted because they further limit the possible assistors beyond those two groups specified in federal law. Compl. ¶¶ 57, 58, 62, 63.

Plaintiffs further allege that many South Carolina voters needing assistance wish to rely on a person outside their "immediate family" to request or return their absentee ballot, but South

Carolina law prevents this by criminalizing such assistance in some instances. Compl. ¶¶ 60–61 (citing S.C. Code Ann. §§ 7-15-330(A), (C); 7-15-385(A)(3).

Plaintiffs also claim that, under § 7-15-310(7),

> [v]oters with disabilities can [only] rely on an 'authorized representative' for assistance requesting or returning their absentee ballot only if they: (a) are confined to a hospital, nursing home, residence, or somewhere similar, (b) have a physical disability which renders transportation to a polling place impossible, or (c) are physically incapable of accessing voting spaces because of architectural barriers.

Compl. ¶ 62.

Plaintiffs also protest that an "authorized representative" must be registered to vote in South Carolina under §§ 7-15-310(7), § 7-1-20(14), because some individuals who need voter assistance would prefer to rely on are not those who are not registered to vote in South Carolina. Compl. ¶¶ 63, 64.

## C.     "Five-Voter Limits"

Finally, Plaintiffs contend that certain state statutes impede or deny altogether the Individual Plaintiffs' right to rely on the assistor of their choice and, thus, are preempted by Section 208. *See*, *e.g.*, Compl. ¶ 24 ("Because many residents at MUSC Chester seek to rely on Ms. Gaither for voting assistance, the Five-Voter Limits impede Mr. Caldwell's ability to rely on the assistor of his choice to vote in the 2026 elections."); Compl. ¶ 73 ("Because of South Carolina's Five-Voter Limits, [Mr. Caldwell] will likely instead receive assistance from another person (or from no one at all."); Compl. ¶ 77 (alleging that the Individual Plaintiffs "will be denied voting assistance from the person of their choice unless South Carolina's Five-Voter Limits are preempted by Section 208 and declared void."); Compl. ¶ 98 ("[B]ecause there are many more Union Post Acute residents seeking voting assistance than staff who are knowledgeable about providing assistance, residents like Mr. Bell and Ms. Jenkins are denied assistance by a person of the voter's choice . . . .") (internal citations and quotation marks omitted).

8

**4.      Discovery Responses**

On March 25, 2026, Plaintiffs served their Amended Objections and Responses to the SEC Defendants' First Set of Interrogatories (attached as **Exhibit A)**. Most pertinently, these Responses state the following:

(1)     Mr. Caldwell, Mr. Bell, and Ms. Jenkins have "not requested assistance to vote in 2026 yet." Ex. A., Pls.' Resp. to Interrog. No. 1.

(2)     Because neither Mr. Caldwell, Mr. Bell, nor Ms. Jenkins have yet requested assistance to vote in 2026, no "staff members at [their] nursing facility refused to provide them with assistance in voting in the 2026 primary or general election in South Carolina." *Id.*, No. 2.

(3)     When asked to "[e]xplain with specificity the basis for the allegation that [they] will be denied voting assistance from [their preferred assistor]," Mr. Caldwell, Mr. Bell, nor Ms. Jenkins each indicated they were "worried that [the preferred assistor] will not be able to assist [them] with absentee voting because [they are] aware that under South Carolina law, she is only able to assist five people with requesting and returning their absentee ballot." *Id.*, Nos. 3 & 4.

(4)     When Mr. Caldwell was asked to "[e]xplain with specificity the basis for the allegation in paragraph 71 of the Complaint that 'Ms. Gaither assisted approximately 10 to 25 voters per election," he responded that he "know[s] Ms. Gaither has assisted many other residents to vote in previous elections." *Id.*, No. 11.

(5)     When Mr. Bell was asked to explain with specificity the basis for the allegation in paragraph 76 of the Complaint that [he] "cannot be sure that his family members

66809677 v1

will help him fill out his forms and ballot properly and return his ballot on time,"

he states:

[His] brother lives in Chester and needs to drive to get here. It is about a 45-minute drive each way. He works well over 40 hours per week working two jobs to support a family. He has children and grandchildren to take care of, and he is a very busy man. [Mr. Bell does] not want to have to rely on him to make sure [his] mail-in ballot request form and mail-in ballot are submitted on time.

*Id.*, No. 6.

(6)     When Mr. Bell and Mr. Caldwell were asked to "[e]xplain with specificity the basis for the allegation in paragraph 83 of the Complaint, and the similar allegation in paragraph 55, that [they] "have physical disabilities but [] do not believe they are 'incapacitated' from voting,'" Mr. Caldwell and Mr. Bell each responded that

[They are] not incapacitated from voting because [they are] physically able to move around in a wheelchair. [They do] not have any mental or cognitive disabilities. [They are] able to read and fill out a ballot.

Mr. Caldwell further responded that

[He] require[s] assistance in requesting and returning an absentee ballot because [he] suffered a stroke which caused [him] to largely lose the use of [his] legs. It is also difficult for [him] to get around because [he] require[s] the assistance of an oxygen tank due to Chronic Obstructive Pulmonary Disease (COPD). [His] COPD makes it difficult to get around because [he does] not have a portable oxygen tank, which makes it particularly difficult to get around outside of MUSC Chester. [He] also wear[s] a walking boot on [his] right foot because the bones in [his] ankle have shattered. The bones shattered due to pressure on pins in [his] ankle that were first put there to fix an ankle injury [he] suffered playing high school football. While it is challenging for [him] to get around, because [he] can move around in a wheelchair with my oxygen tank and fill out a ballot, [he does] not believe [he is] incapacitated from voting.

And Mr. Bell further responded that

[He is] not incapacitated from voting because [he is] physically able to move around with a wheelchair or walker and [he does] not have any mental or cognitive disabilities. [He is] able to read and fill out a ballot. [He] require[s] assistance in requesting and returning a mail ballot. [He is]

10

66809677 v1

recovering from multiple back surgeries, and while the recovery process is long and hard, [he has] noticed improvements in [his] condition over time. Given these improvements, [his] ability to move around in a wheelchair, and [his] ability to fill out a ballot on [his] own, [he does] not believe [he is] incapacitated from voting.

*Id.*, No. 7; *see also id.*, No. 13, Ex. A (similar question and response).

(7)     When Mr. Caldwell was asked to "[e]xplain with specificity the basis for the allegation in paragraph 73 of the Complaint that it is 'likely' that Ms. Gaither will not assist [him] with voting in the 2026 primary and general elections," he responded

[He is] worried that [he] will not be able to rely on Ms. Gaither to vote absentee. [He is] aware that under South Carolina law, Ms. Gaither can only help five people with requesting and returning their absentee ballot. There are many people who live at MUSC Chester and before the South Carolina law limiting Ms. Gaither to returning only five absentee ballots in an election was passed, Ms. Gaither helped many MUSC Chester residents vote, including [him]. [He] believe[s] Ms. Gaither is knowledgeable and cares about assisting residents with voting. [He is] concerned that five or more other residents will request assistance from Ms. Gaither and [he] will not be able to have her help [him] vote as a result.

*Id.*, No. 12.

(8)     Paragraph 65 of the Complaint alleges that "[s]ome individuals who covered voters would prefer to rely on are not" registered voters in South Carolina. When asked to provide specificity on these allegations, Plaintiffs could not identify any residential care facility staff who were not registered to vote. *Id.*, No. 14.

**Argument**

1.      **Plaintiffs lack Article III standing to bring this action and the SEC is entitled to judgment as a matter of law.**

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) "For a case or controversy to exist, the plaintiff must have a personal stake in the case—in other

11

words, standing." *Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 299 (4th Cir. 2024) (citing *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021)). The Article III standing requirement "prevent[s] the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). It means "to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *Hippocratic Med.*, 602 U.S.at 379 (quoting *TransUnion,* 594 U.S. at 423). A plaintiff "must be able to sufficiently answer the question: 'What's it to you?'" *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 420 (4th Cir. 2025) (citing *TransUnion*, 594 U.S. at 423).

"To establish standing, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Hippocratic Med.*, 602 U.S. at 380. Each of these three elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992). "At the summary judgment stage, . . . mere allegations will not suffice. A plaintiff must put forward evidence of 'specific facts' to support its theory of standing." *Pub. Int. Legal Found., Inc. v. Wooten*, 164 F.4th 362, 366 (4th Cir. 2026).

Additionally, "standing is not dispensed in gross." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). This means that "*plaintiffs must demonstrate standing for each claim* that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion,* 594 U.S. at 431 (emphasis added) (internal citation omitted). Thus, where there are multiple

66809677 v1

plaintiffs, "at least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (cleaned up).

## A.      The NAACP lacks standing.

An organizational plaintiff with members like the NAACP can demonstrate Article III standing in two ways: "either in [its] own right or as a representative of [its] members." *Md. Election Integrity, LLC v. Md. State Bd. of Elections*, 127 F.4th 534, 538 (4th Cir. 2025) (cleaned up). It has done neither.

### i.      The NAACP has neither alleged nor presented evidence that would support organizational standing.

"Organizations can [ ] sue on their own behalf by satisfying the usual standards for injury in fact, causation, and redressability that apply to individuals." *D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.*, No. 23-1854, 2026 WL 772353, at *6 (4th Cir. Mar. 19, 2026). Here, Plaintiffs have neither alleged nor presented any evidence the NAACP has suffered any organizational injuries because of application or enforcement of any of the Challenged Statutes.[5] Thus, the NAACP cannot possibly have organizational standing. *See Md. Election Integrity,* 127 F.4th at 537 (holding "Plaintiffs could not seek relief for injuries to themselves as organizations because they did not allege any injury to their organizational activities").

### ii.      The NAACP does not have associational standing.

Because it does not have organizational standing, the NAACP is left to rely on associational standing by demonstrating, *inter alia*, that "its members would otherwise have standing to sue in

---

[5]   The Complaint makes several allegations describing the NAACP's branches and membership in South Carolina, Compl. ¶¶ 17-18, its organizational goals, Compl. ¶ 19, and a generalized description of injuries purportedly sustained by its members. Compl. ¶ 20. The SEC Defendants and the Attorney General raised the issue of organizational standing in their Motions to Dismiss [ECF Nos. 13, 15], and Plaintiffs' opposition to those motions did not make an argument on this point [ECF No. 28].

66809677 v1

their own right." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). "[T]o show that its members would have standing, an organization must make specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (cleaned up).[6] While three Individual Plaintiffs are parties to this action, Plaintiffs have only identified Mr. Caldwell as a member of the NAACP. *See* Compl. ¶ 21. Thus, the NAACP's ability to show associational standing hinges on whether Mr. Caldwell has standing. *See Lane*, 703 F.3d at 674 ("Because [the identified members of the organization] do not have standing to sue, it follows that [the organization] does not have associational standing"). But because Mr. Caldwell does not have standing, *see* discussion *infra*, the NAACP lacks associational standing.

**B.     None of the Individual Plaintiffs have standing to bring their claims.**

**i.     The Individual Plaintiffs do not have a legally cognizable injury in fact.**

Injury in fact is the "first and foremost" of Article III's standing requirements. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998) (cleaned up). An Article III injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

As a first point, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 489 (4th Cir. 2025); *see also United States v. South Carolina*, 906 F. Supp. 2d 463, 473 (D.S.C. 2012), ("Although some of the private Plaintiffs may

---

[6]     *See also S.C. State Conf. v. Georgetown Cnty.*, No. 2:22-CV-04077-BHH, 2025 WL 3719614, at *3 (D.S.C. Dec. 23, 2025) ("Associational standing requires the NAACP Plaintiffs to identify a specific member who 'would otherwise have standing to sue in [his] own right.'") (*quoting Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

14

be unlawfully present in the United States, none has pleaded a realistic danger of sustaining injury through the application of Section 7(E)") *aff'd,* 720 F.3d 518 (4th Cir. 2013).

Second, to support standing, an alleged "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Hippocratic Med.*, 602 U.S. at 381. "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017). Moreover, the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409.

Plaintiffs have neither pled nor presented evidence demonstrating that Mr. Caldwell, Mr. Bell, or Ms. Jenkins face a "realistic danger" they will be injured in the future if the Challenged Statutes are in place, *see N. Va. Hemp*, 125 F.4th at 489, nor that any of them have a "certainly impending" future injury, *see Clapper*, 568 U.S. at 409. The only allegations within the "Limits on Voting Assistance Eligibility" or "Limits on Possible Assistors" statutes which are even connected to Individual Plaintiffs are the "Limits on Voting Assistance Eligibility" allegations that (1) "Mr. Caldwell and Mr. Bell . . . have physical disabilities that they do not believe render them completely physically incapacitated from voting," *see* Compl. ¶ 55; and that (2) Ms. Jenkins has a nonphysical disability, in addition to her physical disability. *See* Compl. ¶ 28.

Notably, as reflected in the SEC's Poll Managers Handbook, and in the Affidavit of SEC Executive Director Conway Belangia (attached as **Exhibit B**), the SEC does not interpret § 7-13-780 to deny *anyone* with physical disability an assistor of their choice. *See Poll Managers Handbook* 65 (Sept. 2024) (attached as **Ex. 1** to Belangia Aff.) ("[A]ny voter who requires

15

assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officers or agent of the voter's union (§7-13-780, Section 208 of the 1965 Voting Rights Act). *See* Ex. B, Belangia Aff. ¶ 9 & Ex. 1. In South Carolina, it has long been the guidance to poll managers that when voters request assistance and say they are disabled, the voter is allowed voting assistance without further inquiry, provided the assistor is "not the voter's employer, agent of that employer, or officer (or agent) of the voter's union." Ex. B., Belangia Aff. ¶¶ 10-13. And the same is true if the voter is voting absentee. *See* Ex. B., Belangia Aff. ¶¶ 14-15.

In sum, the SEC does not interpret § 7-13-780 to say anything different than Section 208. In this case, because Mr. Caldwell, Mr. Bell, and Ms. Jenkins have alleged they are disabled, *see* Compl. ¶¶ 22, 25, 28 they have a right to voter assistance under the SEC's interpretation of § 7-13-780. Thus, even if the Plaintiffs are arguing that the statute might hypothetically be interpreted in a way contrary to the SEC's interpretation, they cannot "demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" under these circumstances. *See N. Va. Hemp*, 125 F.4th at 489. Moreover, Article III does not permit Plaintiffs to manufacture a controversy in this way. *See Murthy*, 603 U.S. at 73 ("[P]laintiffs cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.") (cleaned up).

Other than the allegations just discussed, none of allegations in the "Limits on Voting Assistance Eligibility" or "Limits on Possible Assistors" categories implicate the rights of any Individual Plaintiff:

(1)     The Complaint alleges that § 7-13-780 bars voting assistance to "voters with non-physical impairments" and "[v]oters who do not have physical disabilities but have other forms of

16

disabilities who rely on assistance to vote." *See* Compl. ¶¶ 53, 54. But these Individual Plaintiffs allege they are physically disabled. *See* Compl. ¶¶ 22, 25, 28. Even assuming Ms. Jenkins also has a nonphysical disability, *see* Compl. ¶ 28, no plaintiff in this case alleges (nor presents evidence to show) that they have "other forms of disabilities" but not "physical disabilities." In other words, no Individual Plaintiff can say that this statute affects their eligibility for voting assistance at all.

(2)     The Complaint alleges "[t]he limited class of people with acute physical disabilities legally permitted to request an absentee application face a gauntlet of legal restrictions on who they may choose as an assistor to request," citing to various statutes. *See* Compl. ¶ 58. However, these Individual Plaintiffs have each named specific persons (Ms. Gaither and Ms. Allen) to assist them in voting. There is no allegation that Mr. Caldwell is restricted from choosing Ms. Gaither as an assistor, nor that Mr. Bell or Ms. Jenkins are restricted from choosing Ms. Allen as an assistor, because of the implementation or enforcement of any of the Challenged Statutes.

(3)     The Complaint protests generally about statutes which require an "immediate family" member to assist a voter in voting when they would rather be helped by a non-family member. Compl. ¶¶ 60-64. But the Individual Plaintiffs here have each named specific non-family members (Ms. Gaither and Ms. Allen)[7] as their preferred assistors, and as stated above they have alleged they are disabled and are therefore entitled to voting assistance.

(4)     The Complaint complains generally about the definition of "authorized representative" in § 7-15-310(7), even though neither of the alleged problems with this definition apply to the Individual Plaintiffs.

---

[7]   The Complaint does not allege that Ms. Gaither or Ms. Allen are immediate family members of any of the Individual Plaintiffs.

66809677 v1

(5)     The Complaint complains generally that an "authorized representative" must be registered to vote in South Carolina. Compl. ¶¶ 64-65. There are no allegations that this is an issue for Ms. Gaither and Ms. Allen. Moreover, in their discovery responses, no Plaintiff was able to identify any residential care facility staff who was not registered to vote. Ex. A., Pls.' Resp. to Interrog. No. 14.

(6)     The Complaint also alleges that "[v]oters with disabilities can rely on an 'authorized representative' for assistance requesting or returning their absentee ballot only if they fit into three categories, including that they "(a) are confined to a hospital, nursing home, residence, or somewhere similar." Compl. ¶ 62. Beyond question, based on their allegations, the Individual Plaintiffs "are confined to a hospital, nursing home, residence, or somewhere similar." *See* Compl. ¶¶ 24, 25, 27.

As a matter of law, none of the above allegations are in any way aimed at vindicating the rights of the Individual Plaintiffs; rather, these allegations are intended to help individuals who are not parties in this action and not before the Court. However, "Article III does not give federal courts the power to order relief to any uninjured plaintiff . . . ." *TransUnion*, 594 U.S. at 431; *see also Maryland v. U.S.D.A.*, 151 F.4th 197, 210 (4th Cir. 2025) (holding that "an uninjured plaintiff may not bypass the standing requirement to ensure a defendant's compliance with regulatory law") (cleaned up). Rather, "[t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 585 U.S. 48, 72 (2018). For these reasons, the "Limits on Voting Assistance Eligibility" or "Limits on Possible Assistors" allegations cannot support Plaintiffs' standing.

Nor do the allegations regarding the so-called "Five-Voter Limits" meet the threshold for standing. To start, the term "Five-Voter Limits" is a misnomer that does not recognize the narrow

18

66809677 v1

reach of §§ 7-15-330(B)(4) and 7-15-385(G). A close review of each of these statutes shows that the numerical limitation on assistance only relates to the ***requesting*** or ***returning*** of an absentee ballot, not to assistance with the voting process in general. This narrower reading of the statutes is also supported by the Title of the Act of the South Carolina General Assembly enacting these statutes, which states these provisions were

> [R]ELATING TO THE TIME OF APPLICATION FOR ABSENTEE BALLOTS AND APPLICATION IN PERSON, SO AS TO DEFINE THE PARAMETERS BY WHICH A PERSON MAY ***REQUEST*** AN APPLICATION TO VOTE BY ABSENTEE BALLOT FOR HIMSELF OR OTHERS, TO PROVIDE FOR VERIFICATION OF THE INFORMATION REGARDING THE ELECTOR, TO PROVIDE THAT NO MORE THAN FIVE APPLICATIONS MAY BE ***REQUESTED*** IN ADDITION TO THE REQUESTOR HIMSELF, AND TO PROVIDE THE TIMEFRAME THAT THE APPLICATIONS MUST BE ***RETURNED*** BY. . . .; [and]

> [R]ELATING TO THE MARKING ***AND RETURN OF ABSENTEE BALLOTS***, SO AS TO REQUIRE AN AUTHORIZED ***RETURNEE*** TO PRODUCE A CURRENT AND VALID FORM OF GOVERNMENT-ISSUED PHOTO IDENTIFICATION AND TO PROVIDE IT IS UNLAWFUL FOR A PERSON ***TO RETURN*** MORE THAN FIVE ENVELOPES IN AN ELECTION IN ADDITION TO HIS OWN AND PROVIDE A PENALTY . . . ."

2022 Act No. 150 (S.108), §§ 5, 7 (effective May 13, 2022) (emphasis added).[8] Even if these statutes were ambiguous, which they are not, the title of a legislative enactment can reflect on legislative intent. *Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004). Here, the South Carolina General Assembly directed these provisions toward ***requesting*** or ***returning*** an absentee ballot.

Accordingly, allegations such as those related to Mr. Bell that there are only "five voters for Ms. Allen to help in the 2026 elections," Compl. ¶ 76, or that "Ms. Gaither is prohibited by South Carolina law from helping more than five residents per election," Compl. ¶ 72, are

---

[8]    *See* https://www.scstatehouse.gov/sess124_2021-2022/bills/108.htm (accessed Apr. 6, 2026). The Court can take judicial notice of this legislative enactment. *See Abie State Bank v. Weaver*, 282 U.S. 765, 777 (1931).

insufficiently specific and not plausible given the limited scope of the statute. Allegations such as the one that Ms. Jenkins "wants assistance with . . . filling out . . . her absentee ballot," Compl. ¶ 30, simply do not fit the statute at all. [9] And the same is true of the allegations which conflate the broad concept of "voting assistance" with the narrow acts of "requesting" or "returning" absentee ballots. *See*, *e.g.*, Compl. ¶ 9 (alleging the Five-Voter Limits "prevent Plaintiffs and other voters from relying on ***voting assistance*** from the person of their choice, such as staff at nursing homes and other congregate care facilities.") (emphasis added); Compl. ¶ 24 (alleging Mr. Caldwell wants assistance with ***requesting and returning his absentee ballot,***" but then claiming harm from the Five-Voter Limits because "***many residents*** at MUSC Chester ***seek to rely on Ms. Gaither for voting assistance*** . . . .") (emphasis added); *see also* Compl. ¶ 26 (making similar allegations for Mr. Bell); Compl. ¶ 30 (making similar allegations for Ms. Jenkins).

The "Five-Voter Limits" claims truly fall apart when moving past the allegations and examining the actual evidence, as the Court is required to do at the summary judgment stage. *See Wooten*, 164 F.4th at 366 (4th Cir. 2026) (holding "mere allegations will not suffice" at the summary judgment stage and "specific facts" to support standing is required) (internal citation omitted). As discussed *supra*, none of the Individual Plaintiffs have even requested assistance to vote, Ex. A., Pls.' Resp. to Interrog. No. 1, thus no one at their facilities has refused to provide them voting assistance. *Id.* They express only generalized "worr[y]" or "concern" that their preferred assistor will not be available, *id.*, Nos. 3, 4, 12, without giving any specificity about the reasons for these fears. *Id.*, Nos. 3, 4, 11, 12.

---

[9]  Mr. Caldwell specifically desires assistance from Ms. Gaither with "requesting and returning his absentee ballot." Compl. ¶ 24. However, Ms. Jenkins "wants assistance with requesting, ***filling out***, and returning her absentee ballot," Compl. ¶ 30 (emphasis added), and the scope of Mr. Bell's desired assistance is stated more generally. Compl. ¶¶ 26, 76.

66809677 v1

Particularly in light of the narrow scope of the "Five-Voter Limit" statutes, none of this is evidence of a harm that is "concrete." *See TransUnion*, 549 U.S. at 442 ("No concrete harm, no standing"); *Dreher v. Experian Info. Sols., Inc.,* 856 F.3d 337, 344 (4th Cir. 2017) (A "concrete injury is 'de facto,' meaning that 'it must actually exist' and is 'real, and not abstract.'") (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), *as revised* (May 24, 2016)). Rather, the Individual Plaintiffs' claims rest on the same type of "speculative chain of possibilities," which the Supreme Court has repeatedly held is insufficient to show standing. *See Clapper*, 568 U.S. at 414 (rejecting standing theory premised on a "speculative chain of possibilities [which] does not establish" an alleged future injury is "certainly impending."); *Murthy*, 603 U.S. at 70 (same); *see also Hippocratic Med.*, 602 U.S. at 390 (rejecting claimed injury as "too speculative or otherwise too attenuated to establish standing.").[10]

Additionally, the Individual Plaintiffs' claims are not particularized, as they show "merely a claim of 'the right, possessed by every citizen, to require that the Government be administered according to law . . . .'" *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) (quoting *Baker v. Carr,* 369 U.S. 186, 208 (1962)). "This type of abstract, generalized interest clearly fails to meet the requirement that an injury be concrete and particularized." *Id.*

In sum, Plaintiffs present no credible evidence the "Five Voter Limit" statute will operate to their disadvantage, or any evidence of any injury particularized to them. Accordingly, the Court should find as a matter of law that the Individual Plaintiffs lack standing.

---

[10] Without question, "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Md. Election Integrity*, 127 F.4th at 539 (quoting *Gill*, 585 U.S. at 65). But here, no evidence has been shown that the Five-Voter Limit jeopardizes any Individual Plaintiff's right to exercise the franchise, or even their right to have an assistor help them in the voting process.

66809677 v1

### ii.        Plaintiffs have not alleged a redressable right to seek declaratory or injunctive relief.

Plaintiffs also lack standing because they cannot establish "a non-speculative likelihood that the [alleged] injury would be redressed by a favorable decision." *Justice 360 v. Stirling*, 42 F.4th 450, 459 (4th Cir. 2022) (alteration in original). "Under black-letter standing doctrine, a plaintiff must demonstrate 'that [its] injury likely would be redressed by the requested judicial relief.'" *U.S.D.A.*, 151 F.4th at 211 (quoting *Hippocratic Med.*, 602 U.S. at 380).

Here, none of the Plaintiffs are entitled to the declaratory or injunctive relief, which are both forms of forward-seeking relief. Whenever a plaintiff seeks "forward-looking relief, they must face a real and immediate threat of repeated injury." *Murthy*, 603 U.S. at 44 (cleaned up); *see also Hippocratic Med.,* 602 U.S. at 381 ("[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury"); *U.S.D.A.*, 151 F.4th at 209 ("Prospective relief must instead be justified by prospective injury.")

For the reasons discussed *supra*, Plaintiffs have not established a sufficient likelihood that Plaintiffs will sustain a future injury. Additionally, both of these statutes have been in place since May 2022 and, thus, effective for the primaries and general elections in 2022 and 2024,[11] yet the Individual Plaintiffs cannot even demonstrate having had issues in the past with the Five-Voter Limits statutes in the past. *See Wells v. Johnson*, 150 F.4th 289, 300 (4th Cir. 2025) ("A plaintiff may use past injury to justify forward-looking relief, but forward-looking relief remedies only future or ongoing injuries."). For this additional reason, Plaintiffs do not have standing.[12]

---

[11]    *See* https://www.scstatehouse.gov/sess124_2021-2022/bills/108.htm (accessed Apr. 6, 2026).

[12]    Although it is not the situation here, "'[r]edressability can still pose an independent bar' even where 'the defendant has directly injured the plaintiff.'" *Id.* (quoting *Hippocratic Med.*, 602 U.S. at 381 n.1).

22

**2.      Section 208 does not preempt the Challenged Statutes, either because there is no actual conflict or because the state statutes do not unduly burden Plaintiffs' Section 208 rights.**

Plaintiffs contend that the Challenged Statutes are preempted by Section 208 of the Voting Rights Act, 52 U.S.C.A. § 10508. Section 208, enacted in 1982, provides as follows:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

*Id.* Specifically, the Individual Plaintiffs complain that the Challenged Statutes prevent them from receiving the help guaranteed by Section 208 in requesting, completing, and returning their absentee ballots. For the reasons that follow, however, they may receive help from any person they choose in completing their absentee ballots (except their employer or employer's agent and union or union officer or agent) and S.C. Code § 7-13-780 is therefore not preempted. Further, the restrictions on who may request and return an absentee ballot on behalf of a voter, §§ 7-15-310(7), 7-15-330(A), (C), or 7-15-385(A)(3), and the "five-voter limit" for requesting and returning ballots, §§ 7-15-330(B)(4) and 7-15-385(G), are not preempted because Section 208 and those statutes can work together and those statutes due not place an "undue burden" on Plaintiffs' Section 208 rights.

**A.      In evaluating whether Section 208 preempts certain of the Challenged Statutes, the Court must determine the intent of Congress.**

In analyzing preemption, Courts "are guided first and foremost by the maxim that 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Am. Petroleum Inst. v. Cooper*, 718 F.3d 347, 354 (4th Cir. 2013) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); *see also New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("Pre-emption claims turn on Congress's intent."). A second guiding principle for courts is that there is a general presumption against preemption "unless that was the clear and

23

manifest purpose of Congress." *Wyeth*, 555 U.S. at 565. Among other reasons why, "[t]he preemption of state laws represents a serious intrusion into state sovereignty." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (plurality opinion) (cleaned up); *see also Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 336 (4th Cir. 2023) ("But we must not presume federal law preempts state law. In fact, any analysis of preemption begins 'with the basic assumption that Congress did not intend to displace state law.'") (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)), *cert. denied*, 144 S. Ct. 1458 (2024); *Fitts v. Kolb*, 779 F. Supp. 1502, 1513 (D.S.C. 1991) (noting that the presumption a state statute is constitutional "will prevail unless there is a clear showing that the statute transgresses constitutional limitations" (cleaned up)).

**B.     Field and express preemption are inapplicable in this case, leaving Plaintiffs with claiming that there is conflict preemption.**

Congress can preempt state law in three ways: express preemption, field preemption, and conflict preemption. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 477 (2018). Because Congress has not clearly expressed an intention to do so, *see H & R Block E. Enterprises, Inc. v. Raskin*, 591 F.3d 718, 723 n.9 (4th Cir. 2010), Section 208 does not expressly preempt state law. And Congress has never regulated the entire field of elections. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Young v. Fordice*, 520 U.S. 273, 286 (1997). Thus, the Court must evaluate whether the Challenged Statutes conflict with Section 208.

**C.     There is no conflict preemption because Section 208 and the Challenged Statutes can work together and because Congress sought to preempt state statutes only when the statutes place an "undue burden" on the protections of Section 208.**

Conflict preemption only applies when state law "actually conflicts" with federal law. *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996). Conflict preemption can be either "direct conflict preemption" or "obstacle preemption." *N. Va. Hemp & Agric., LLC*, 125 F.4th at 493 (citation omitted). Obstacle preemption occurs when a state law stands as an obstacle

24

to the accomplishment and execution of the full purposes of the federal law. *Id.*; *see also Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 594 (4th Cir. 2017), *aff'd*, 587 U.S. 761 (2019) (plurality opinion). Determining whether a state law stands as an obstacle to federal law is a two-step process. First, courts determine the "significant objective" of Congress by "examination of the regulation, including its history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the regulations pre-emptive effect." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011). Courts "then turn to whether the state law stands 'as an obstacle to the accomplishment of a significant federal regulatory objective.'" *Va. Uranium*, 848 F.3d at 599 (quoting *Williamson*, 562 U.S. at 330).

"But a court should not find conflict preemption unless preemption was 'the clear and manifest purpose of Congress.'" *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th at 493 (citation omitted). "In [preemption analysis], as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium*, 587 U.S. at 765 (plurality opinion). "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Id.* at 767 (plurality opinion) (quoting *Puerto Rico Dep't of Consumer Affs. v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)).

Significantly, Congress expressed its intention to limit the extent of Section 208's preemptive effect:

> The Committee intends that voter assistance procedures, including measures to assure privacy for the voter and the secrecy of his vote be established in a manner which encourages greater participation in our electoral process. The Committee recognizes the legitimate right of any State to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters.

25

*State provisions would be preempted only to the extent that they unduly burden the right recognized in this section, with that determination being a practical one dependent upon the facts.* Thus, for example, a procedure could not deny the assistance at some stages of the voting process during which assistance was needed, nor could it provide that a person could be denied assistance solely because he could read or write his own name.

By including the blind, disabled, and persons unable to read or write under this provision, the Committee does not require that each group of individuals be treated identically for purposes of voter assistance procedures. States, for example, might have reason to authorize different kinds of assistance for the blind as opposed to the illiterate. The Committee has simply concluded that, at the least, members of each group are entitled to assistance from a person of their own choice.

S. Rep. 97-417, 63, 1982 U.S.C.C.A.N. 177, 241 (emphasis added). Thus, states are permitted to legislate with respect to voting assistance so long as the legislation does not unduly burden an eligible voter's Section 208 protections (i.e., his or her right to a helper of their choice in completing a ballot).

**D.    Section 208 does not preempt S.C. Code § 7-13-780 because the state statute has not been interpreted to deny anyone with a physical disability an assistor of their choice.**

Section 7-13-780 provides that only "those persons who are unable to read or write or who are physically unable or incapacitated from preparing a ballot or voting shall be entitled to receive assistance of any kind in voting." As an initial matter, this language largely tracks Section 208, which is directed to voters needing help due to "blindness, disability, or inability to read or write." This conclusion is supported by the fact that the SEC does not interpret § 7-13-780 to deny anyone with any physical disability (whether it inhibits one's ability to voting or not) a helper of their choice. *See* Ex. B, Belangia Aff. Ex. 1, *Poll Managers Handbook* 65 (Sept. 2024) ("[A]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officers or agent of the voter's union (§ 7-13-780, Section 208 of the 1965 Voting Rights Act)."). And the Attorney General, as the state's chief legal officer, does not dispute this

26

66809677 v1

conclusion. *See* Wilson Mot. Dismiss 10 (denying that Mr. Bell and Mr. Caldwell have an Article III injury because the SEC "has consistently interpreted the state assistance provision to be coterminous with Section 208").

The Court should interpret § 7-13-780 in accordance with the interpretation applied by the SEC. Federal courts must apply state substantive law when interpreting the meaning of a state statute. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that there "is no federal general common law" and that a federal court must apply state substantive law). Here, *Erie* and its progeny require evaluating how the statute would be interpreted in state court. *See Est. of Dancy v. Comm'r*, 872 F.2d 84, 85 (4th Cir. 1989) ("It is our duty in determining state law to attempt diligently to ascertain it from "all available data. Federal courts must employ the materials for decision at hand. In the absence of judicial and legislative guidance, diligent inquiry should include a review of applicable administrative determinations." (cleaned up)). In this context, the South Carolina Supreme Court would most likely defer to the State Election Commission's interpretation of § 7-13-780. *Cf. Kiawah Dev. Partners, II v. S.C. Dep't of Health & Env't Control*, 411 S.C. 16, 34, 766 S.E.2d 707, 718 (2014) ("Accordingly, the deference doctrine properly stated provides that where an agency charged with administering a statute or regulation has interpreted the statute or regulation, courts, including the ALC, will defer to the agency's interpretation absent compelling reasons. We defer to an agency interpretation unless it is arbitrary, capricious, or manifestly contrary to the statute." (cleaned up)).

In sum, based on the language of the statute and the interpretations adopted by the agency responsible for interpreting the statute, there is no difference between the application of Section 208 and § 7-13-780 and, thus, the state law does not stand as an "obstacle" to enforcement of the federal law. Therefore, contrary to Plaintiffs' assertions, § 7-13-780 would not prohibit them from

66809677 v1

receiving assistance in voting regardless of whether they "do not believe they are 'incapacitated' from voting." *See* Compl. ¶ 83. Nor would § 7-13-780 limit persons with "non-physical disabilities," *id.*, from receiving any assistance to which they are otherwise entitled by virtue of Section 208. Consequently, there is no conflict between Section 208 and § 7-13-780 based on application of the governing statutory interpretation to Plaintiffs' allegations. For that reason, their first cause of action should be denied and dismissed.

**E.      Section 208 does not preempt S.C. Code §§ 7-15-310(7), 7-15-330(A), (C), or 7-15-385(A)(3) because those statutes address only who may request or return an absentee ballot on behalf of a voter and, thus, do not place an undue burden on the Individual Plaintiffs' Section 208 rights.**

All of the state statutes challenged by Plaintiffs with respect to voter assistance are directed specifically to requesting and returning ballots and not completing the ballot itself:

- § 7-15-310(7) simply defines an "authorized representative" as a

   registered elector who, with the voter's permission, acts on behalf of a voter unable to go to the polls because of illness or disability resulting in his confinement in a hospital, sanatorium, nursing home, or place of residence, or a voter unable because of a physical handicap to go to his polling place or because of a handicap is unable to vote at his polling place due to existing architectural barriers that deny him physical access to the polling place, voting booth, or voting apparatus or machinery. Under no circumstance shall a candidate, a member of a candidates paid campaign staff, or a campaign volunteer be considered an "authorized representative" of an elector desiring to vote by absentee ballot.

- § 7-15-330(A)(1) provides that,

   [t]o vote by absentee ballot[,] . . . [a] person *requesting* an application for a qualified elector as the qualified elector's authorized representative must *request* an application to vote by absentee ballot in person or by mail only and must himself be a registered voter and must sign an oath to the effect that he fits the statutory definition of an authorized representative. The signed oath must be kept on file with the county board of voter registration and elections until the end of the calendar year or until all contests concerning a particular election have been finally determined, whichever is later. A candidate, a member of a candidate's paid campaign staff, or a campaign volunteer, is not allowed to *request* applications for absentee

28

voting for any person designated in this section unless the person is a member of the immediate family.

(Emphasis added).

- § 7-15-330(C) states in pertinent part that

> [c]ompleted applications must be *returned* in person, by . . . the elector's authorized representative, or by mail, by the elector, to the county board of voter registration and elections no later than 5:00 p.m. on the eleventh day before the day of the election to vote by absentee ballot.

(Emphasis added).

- § 7-15-385(A)(3) states that,

> [u]pon receipt of the ballot or ballots, the absentee ballot applicant must mark each ballot on which he wishes to vote and place each ballot in the single envelope marked 'Ballot Herein' which in turn must be placed in the return-addressed envelope. The applicant must return the return-addressed envelope only by . . . authorizing a member of the applicant's immediate family, as defined in Section 7-15-310(8), or an authorized representative, to *return* the return-addressed envelope for him to an election official during office hours at the main office of the county board of voter registration and elections or to an election official during office hours at an early voting center.

(Emphasis added).

Thus, reading the plain language, the statutory provisions challenged by Plaintiffs govern only who may request or return an absentee ballot on behalf of a voter and do not place any restrictions on who may assist the voter in marking the ballot. This assessment is fully illustrated by the fact that the first sentence of § 7-15-385(A)(3) does not apply or reference the defined term "authorized representative" regarding the marking of the ballot but does so in the second part regarding the return of a marked and sealed ballot.

Plaintiffs contend that Section 208 applies to all parts of the voting process. While that is true as far as it goes, *see* 52 U.S.C.A. § 10310(c), §§ 7-15-310(7), 7-15-330(A), (C), and 7-15-385(A)(3) do not unduly burden Individual Plaintiffs' Section 208 rights because those

29

66809677 v1

statutes do not limit whom they can ask to help them complete and seal the ballot; rather, the statutes provide minimal restrictions only on who may request and return the ballots. The Individual Plaintiffs have not established that family members cannot help them ask for or return the ballot. For example, Mr. Bell only references the difficulties his brother would experience in helping him but notes that his brother also has children and grandchildren and says simply "I do not want to have to rely on him to make sure my mail-in ballot request form and mail-in ballot are submitted on time." Ex. A., Pls.' Resp. to Interrog. No. 6. And all Individual Plaintiffs state that they have not yet asked for help in voting in the 2026 primary or general elections. *Id.*, Nos. 1, 2. They also cannot state affirmatively that they are unable to receive help from the person of their choice. *See id.*, No 3 (Mr. Bell and Ms. Jenkins say only that they are "worried that Ms. Allen will not be able to assist me with voting by mail"); *id.*, No. 4 (Mr. Caldwell says only that he is "worried that Ms. Gaither will not be able to assist me with absentee voting"); *id.*, No. 12 (Mr. Caldwell says only that he is "worried that [he] will not be able to rely on Ms. Gaither to vote absentee"). And, again, none of the Individual Plaintiffs have yet asked for help in voting in 2026, so they cannot say affirmatively that they cannot get help from the person of their choice. *See id.*, No. 8 (Mr. Caldwell says only that he knows other residents trust Ms. Gaither; Mr. Bell says only that he "expect[s]" that other residents depend on Ms. Allen; Ms. Jenkins merely says that "I want Ms. Allen's help to vote by mail this year."). And although Plaintiffs allege that Ms. Gaither assisted approximately 10 to 25 voters per election," *see* Compl. ¶ 71, they have identified no evidence to support that allegation, *see* Ex. A., Pls' Resp. to Interrog. No. 11 (Mr. Caldwell merely states that "I know Ms. Gaither has assisted many other residents to vote in previous elections.").

The Individual Plaintiffs also have not established that that the facilities in which they reside cannot assist them in arranging for sufficient persons to request and return ballots on their

30

behalf regardless of who actually helps them complete the ballot. For instance, Mr. Bell and Ms. Jenkins stated only that they are "worried that Ms. Allen will not be able to assist me with voting by mail." *Id.*, No. 3.

Whatever burden Individual Plaintiffs experience as a result of these state statutes, it is not an undue burden, especially when compared to the State's interest in combatting fraud. As the Supreme Court recently opined in *Brnovich v. Democratic National Committee*:

> One strong and entirely legitimate state interest is the prevention of fraud. Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome.

594 U.S. 647, 672 (2021). Significant to this controversy, the Court noted that "[f]raud is a real risk that accompanies mail-in voting." *Id.* at 686. Indeed, preventing voter fraud and ensuring the integrity of elections and the State's confidence in the election system is of paramount concern to the General Assembly. While South Carolina has not had significant numbers of cases of fraudulent voting, there have been some. *See United States v. Carmichael*, 685 F.2d 901 (4th Cir. 1982); South Carolina EXECUTIVE ORDER NO. 2007 07, https://www.scstatehouse.gov/Archives/Executive Orders/exor0707.htm. And although it is most difficult to commit voter fraud through in-person voting, absentee voting is the manner of voting that lends itself most readily to fraud, be it in the acquisition, distribution, harvesting, or returning of the ballots. In fact, the Supreme Court has recognized that a state has an interest in combatting fraud even if there is no evidence of the particular type of fraud addressed by a statute occurring in a state. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality opinion). Other courts have recognized the problems with election integrity presented by loosely regulated mail-in voting. *See, e.g.*, *DCCC v. Ziriax*, 487 F. Supp. 3d 1207, 1234 (N.D. Okla. 2020) ("Even if the Court were to assume that the requirements will burden some voters, the state has presented evidence that the provisions were

31

enacted on a non-discriminatory, bipartisan basis, in an effort to avoid the type of ballot harvesting and ballot payment scheme at issue in 2018 in North Carolina, which required a new election for a Congressional seat.").

Given the State's legitimate interest in combatting fraud and the unique threats posed by absentee voting, any burden imposed by §§ 7-15-310(7), 7-15-330(A), (C), and 7-15-385(A)(3) on Individual Plaintiffs' Section 208 rights is minimal and not unduly. Individual Plaintiffs can have anyone of their choosing help them in marking an absentee ballot and are subject only to reasonable restrictions on who may request or return those ballots. The fact is, there may be no difference for these Individual Plaintiffs in any of those persons. But even if there is, that burden is minimal and does not unduly impose upon their right to vote. Plaintiffs' Second Cause of Action should be denied.

**F.      Section 208 does not preempt S.C. Code §§ 7-15-330(B)(4) and 7-15-385(G) because the Five-Voter Limit applies only to requesting and returning absentee ballots and, thus, does not unduly burden Plaintiffs' Section 208 rights.**

Section 208 requires allowing any "voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" to be "given assistance by a person of the voter's choice." In turn, § 7-15-330(B)(4) simply provides that a "person must not *request* absentee applications for more than five qualified electors per election, in addition to himself." (Emphasis added). And § 7-15-385(G) makes it "unlawful for a person to *return* more than five return-addressed envelopes in an election, in addition to his own." (Emphasis added).

For several reasons, Section 208 does not preempt §§ 7-15-330(B)(4) or -385(G). First, the State's Five-Voter Limit applies only to requesting and returning absentee ballots—not marking the ballots. *See DSCC v. Simon*, 950 N.W.2d 280, 290 (Minn. 2020) (finding Section 208 did not preempt state statute imposing a three-voter limit on absentee-ballot collection and delivery); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1196 (Ill. App. 2004) (finding, even in light of Section

32

208, states may impose restrictions on those individuals who may return a disabled voter's absentee ballot); *DiPietrae v. City of Philadelphia*, 666 A.2d 1132 (Pa. Commw. Ct. 1995) (upholding the state's limitation on who may deliver an absentee voter's ballot).[13]

Second, in a similar vein, these state statutes are generally applicable laws regarding absentee voting whereas Section 208 addresses assistance in voting to persons with specified disabilities or language impairments. *See DSCC*, 950 N.W.2d at 290. There is no indication that Section 208 was intended to sweep so broadly, and, in fact, the legislative history suggests that Congress intended for Section 208's preemptive impact to be limited. *See* S. Rep. 97-417 at 63. That is especially so given that, when Section 208 was enacted in 1982, "[s]tates typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots." *Brnovich*, 594 U.S. at 669–70 ("[T]he degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982 is a relevant consideration.") (addressing same legislation adopting Section 208 and noting the "oft-cited Report of the Senate Judiciary Committee accompanying the 1982 amendment," S. Rep. 97-417). In fact, the pertinent discussion in the Committee Report addressed only helping voters in the voting booth:

> The Committee has concluded that the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, *is to permit them to bring into the voting booth a person whom the voter trusts* and who cannot intimidate him. *Since blind, disabled, or illiterate voters have the right to 'pull the lever of a voting machine,'* they have the right to do so without fear of intimidation or manipulation.

---

[13] *Cf. Ray v. Texas*, No. 2-06-CV-385, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008) (upholding a state statute requiring a voter applying for an early voting ballot to have a witness sign the application if the voter could not, and limiting the signer to doing so for only one voter).

S. Rep. 97-417, 62, 1982 U.S.C.C.A.N. 177, 241 (emphasis added). Reasonable, uniform restrictions on requesting and returning absentee ballots for more than five persons are not inconsistent with the intent behind Section 208 and, at a minimum, are not unduly burdensome.

Third, for the same reasons discussed more fully in Part 2.E, these state statutes, which were enacted to further the State's legitimate interest in combatting fraud, do not unduly burden the Individual Plaintiffs' Section 208 rights. Sections 7-15-330(B)(4) or -385(G) do not limit who may help them mark their absentee ballot. While the statutes do limit the number of ballots that any one person may request or return, that is not an undue burden and, thus, does not warrant a finding that Section 208 preempts §§ 7-15-330(B)(4) or -385(G). *Cf. Ziriax*, 487 F. Supp.3d at 1234 (finding that, "[u]nder a *Burdick-Anderson* balancing, the state's interests are weighty in comparison to any burden imposed upon a potential absentee voter's right to vote" based on statutes criminalizing requesting or returning absentee ballots for others).

Thus, §§ 7-15-330(B)(4) and -385(G) do not stand as an "obstacle" to the purposes of Congress in enacting Section 208. At a minimum, they do not impose an "undue burden" on the right of those voters with specified disabilities or language impairments to have assistance in voting by a person they choose. Those persons can still have the person of their choosing assist them in actually completing the absentee ballot and sealing it—the core of the voting process—regardless of who requests the ballot or returns it on their behalf. Consequently, Section 208 does not preempt §§ 7-15-330(B)(4) and -385(G).

## Conclusion

For the reasons discussed above, the SEC should be granted judgment as a matter of law. Because the Complaint fails to adequately allege an injury in fact or a redressable right to relief, the Individual Plaintiffs lack standing. And because the only member of the NAACP identified in the Complaint lacks standing, the NAACP lacks associational standing as well. And even if the

34

66809677 v1

Court should determine that one or more Plaintiffs have standing, the SEC is entitled to judgment

as a matter of law because none of the state statutes are preempted by Section 208 of the Voting

Rights Act.

Respectfully submitted,

*s/ Tracey C. Green*
Mary Elizabeth Crum (Fed. ID No. 372)
Tracey C. Green (Fed. ID No. 6644)
Michael R. Burchstead (Fed. ID No. 102967)
BURR & FORMAN LLP
PO Box 11390
Columbia, SC 29211
(803) 799-9800
lcrum@burr.com
tgreen@burr.com
mburchstead@burr.com

Thomas W. Nicholson (Fed. ID No. 12086)
STATE ELECTION COMMISSION
1122 Lady Street, Suite 500
Columbia, SC 29201
(803) 734-9063
tnicholson@elections.sc.gov

*Counsel for Defendants Jenny Wooten, Dennis W. Shedd, JoAnne Day, Clifford J. Edler, Linda McCall, and Scott Moseley*

April 6, 2026
Columbia, South Carolina

35

66809677 v1