# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

**Case No. 3:25-cv-13754-MGL**

|  |  |
|---|---|
| NAACP SOUTH CAROLINA STATE CONFERENCE, ROBERT CALDWELL; JONATHAN BELL; SHERRY JENKINS, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALAN WILSON, in his official capacity as South Carolina Attorney General; JENNY WOOTEN, in her official capacity as Interim Executive Director of the State Election Commission; ROBERT BOLCHOZ, in his official capacity as Chairman of the State Election Commission; JOANNE DAY, CLIFFORD ELDER, ANGELA STRINGER, and SCOTT MOSELEY, in their official capacities as members of the State Election Commission, <br><br> *Defendants*. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

    I.    Section 208 of the Voting Rights Act ................................................................ 2

    II.    South Carolina's Absentee Voting Process ........................................................ 3

    III.    The Challenged Restrictions on Voting Assistance ............................................ 4

    IV.    The Individual Plaintiffs are disabled voters who require assistance to vote. ................... 6

    V.    The South Carolina NAACP's members include many voters with disabilities who require assistance to vote. .............................................................................. 10

    VI.    Defendants enforce and carry out the Voting Restrictions. ................................ 11

LEGAL STANDARD ........................................................................................................... 12

ARGUMENT ...................................................................................................................... 13

    I.    Section 208 of the VRA preempts the Voting Restrictions. ............................... 13

        A.    The Limits on Voting Assistance Eligibility conflict with Section 208 and are preempted. ................................................................................. 14

        B.    The Limits on Possible Assistors and Five-Voter Limits conflict with Section 208 and are preempted. ................................................................. 16

    II.    The remaining permanent injunction factors also support equitable relief. ........ 21

        A.    The Voting Restrictions cause Plaintiffs irreparable harm. ........................ 21

        B.    The equities and public interest support a permanent injunction. .............. 25

    III.    Plaintiffs have Article III standing. ................................................................. 27

        A.    Individual Plaintiffs have standing. .......................................................... 27

        B.    South Carolina NAACP has standing. ...................................................... 29

    IV.    The Voting Restrictions are void as a matter of law and thus cannot be enforced. .......... 31

        A.    Complete relief for Individual Plaintiffs and South Carolina NAACP's members requires enjoining the Voting Restrictions beyond the named Plaintiffs. ................... 31

B.    The Voting Restrictions are null and void because federal law preempts them. ........ 34

CONCLUSION ................................................................................................................... 35

## TABLE OF AUTHORITIES

**CASES**                                                                                                                  **PAGE(S)**

*Alabama Legislative Black Caucus v. Alabama*,
    575 U.S. 254 (2015)................................................................................................29, 30

*Alabama State Conference of the NAACP v. Marshall*,
    746 F. Supp. 3d 1203 (N.D. Ala. 2024)................................................................15

*Alabama State Conference of the NAACP v. Marshall*,
    No. 2:24-cv-00420-RDP, 2024 WL 4282082 (N.D. Ala. Sept. 24, 2024) ............18, 22, 26, 33

*Alabama State Conference of the NAACP v. Marshall*,
    No. 2:24-cv-00420-RDP, 2024 WL 4448841 (N.D. Ala. Oct. 4, 2024)................................21

*American Bus Association v. Slater*,
    231 F.3d 1 (D.C. Cir. 2000) ................................................................................17

*Anderson v. Diamondback Investment Group, LLC*,
    117 F.4th 165 (4th Cir. 2024) ............................................................................12

*Arizona v. United States*,
    567 U.S. 387 (2012)............................................................................................13

*Arkansas United v. Thurston*,
    626 F. Supp. 3d 1064 (W.D. Ark. 2022)................................................20, 21, 33

*Armstrong v. Exceptional Child Center., Inc.*,
    575 U.S. 320 (2015)............................................................................................31, 34

*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................................................................28

*BP America Production Co. v. Burton*,
    549 U.S. 84 (2006)..............................................................................................15

*Campos-Hernandez v. Sessions*,
    889 F.3d 564 (9th Cir. 2018) ............................................................................17

*Carey v. Wisconsin Elections Commission*,
    624 F. Supp. 3d 1020 (W.D. Wis. 2022) ................................................14, 19, 22, 29

*Centro Tepeyac v. Montgomery County*,
    722 F.3d 184 (4th Cir. 2013) ............................................................................25, 26

*Chicago Women in Trades v. Trump*,
No. 25 C 2005, 2025 WL 3034056 (N.D. Ill. Oct. 30, 2025) ....................................32, 33, 34

*Democracy North Carolina v. North Carolina State Board of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) ............................................................... passim

*Disability Rights Mississippi v. Fitch*,
684 F. Supp. 3d 517 (S.D. Miss. 2023)..................................................................33

*Disability Rights North Carolina v. North Carolina State Board of Elections*,
602 F. Supp. 3d 872 (E.D.N.C. 2022)................................................................ passim

*Disability Rights North Carolina v. North Carolina State Board of Elections*,
No. 5:21-cv-36, 2022 WL 2678884 (E.D.N.C. July 11, 2022)....................................... passim

*Espinal-Andrades v. Holder*,
777 F.3d 163 (4th Cir. 2015) ...........................................................................17

*Ex parte Young*,
209 U.S. 123 (1908).....................................................................................35

*Free Speech Coalition, Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) ...........................................................................25

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) ...........................................................................28

*Gibbons v. Gibbs*,
99 F.4th 211 (4th Cir. 2024) ...........................................................................12

*Gibbons v. Ogden*,
22 U.S. 1 (1824)........................................................................................35

*Greater Birmingham Ministries v. Secretary of State for Alabama*,
992 F.3d 1299 (11th Cir. 2021) ......................................................................30, 31

*Guthrie v. PHH Mortgage Corp.*,
79 F.4th 328 (4th Cir. 2023) ..........................................................................1, 13

*Haaland v. Brackeen*,
599 U.S. 255 (2023).....................................................................................34

*Hillman v. Maretta*,
569 U.S. 483 (2013).....................................................................................18

*Kenny v. Wilson*,
885 F.3d 280 (4th Cir. 2018) ...........................................................................29

iv

*Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
984 F.3d 329 (4th Cir. 2021) .......................................................................................13

*Los Angeles Press Club v. City of Los Angeles*,
799 F. Supp. 3d 1007 (C.D. Cal. 2025) ...............................................................32, 33

*League of United Latin American Citizens v. Executive Office of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025)........................................................................32, 33

*League of Women Voters of North Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ...............................................................................21, 25, 26

*League of Women Voters of Ohio v. LaRose*,
741 F. Supp. 3d 694 (N.D. Ohio 2024)........................................................... passim

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)......................................................................................................27

*M'Culloch v. Maryland*,
17 U.S. 316 (1819)........................................................................................................25

*Maryland v. Louisiana*,
451 U.S. 725 (1981)......................................................................................................25

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)......................................................................................................13

*Miller's Apple Valley Chevrolet Olds-Geo, Inc. v. Goodwin*,
177 F.3d 232 (4th Cir. 1999) .......................................................................................17

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) .......................................................................................13

*Monsanto Co. v. Geerston Seed Farms*,
561 U.S. 139 (2010)................................................................................................13, 21

*Murphy v. National Collegiate Athletic Association*,
584 U.S. 453 (2018)......................................................................................................34

*Nick v. Bethel*,
No. 3:07-CV-0098, 2008 WL 11456134 (D. Alaska July 30, 2008).....................22

*Nken v. Holder*,
556 U.S. 418 (2009)......................................................................................................13

*Obama for America v. Husted*,
697 F.3d 423 (6th Cir. 2012) .................................................................................21, 26

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ...................................................................................14, 18, 28

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006)..................................................................................................................26

*Retail Industry Leaders Association v. Fielder*,
   475 F.3d 180 (4th Cir. 2007) ...........................................................................................30, 31

*Reynolds v. Sims*,
   377 U.S. 533 (1964)................................................................................................................2

*South Carolina State Conference of the NAACP v. Alexander*,
   No. 3:21-cv-3302-JMC-RMG-TJH, 2022 WL 453533 (D.S.C. Feb. 14, 2022).....................30

*Shaw v. Smith*,
   166 F.4th 61 (10th Cir. 2026) ................................................................................31, 32, 33, 35

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998).................................................................................................................28

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)...............................................................................................................29

*Thornburg v. Gingles*,
   478 U.S. 30 (1986).................................................................................................................19

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025)................................................................................................31, 34, 35

*United States v. Alabama*,
   778 F.3d 926 (11th Cir. 2015) ...............................................................................................17

*United States v. Hendrickson*,
   949 F.3d 95 (3d Cir. 2020)......................................................................................................17

*United States v. Lierman*,
   151 F.4th 530 (4th Cir. 2025) .................................................................................................33

*United States v. Naranjo*,
   259 F.3d 379 (5th Cir. 2001) ..................................................................................................17

*Vitkus v. Blinken*,
   79 F.4th 352 (4th Cir. 2023) ...................................................................................................25

*Warth v. Seldin*,
   422 U.S. 490 (1975)................................................................................................................28

vi

*Westchester Disabled on the Move, Inc. v. County of Westchester*,
    346 F. Supp. 2d 473 (S.D.N.Y. 2004)................................................................22, 23

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022) .........................................................................16

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886)......................................................................................2

**STATUTES**

29 U.S.C. § 705......................................................................................15, 16

42 U.S.C. § 423..........................................................................................15

42 U.S.C. § 1382.........................................................................................15

42 U.S.C. § 3602.....................................................................................15, 16

42 U.S.C. § 12102....................................................................................15, 16

49 U.S.C. § 41705........................................................................................16

52 U.S.C. § 10310....................................................................................1, 3, 14

52 U.S.C. § 10508................................................................................. passim

S.C. Const. Article V § 24 ..........................................................................12, 28

S.C. Code § 7-1-20........................................................................................5

S.C. Code § 7-3-10...................................................................................12, 29

S.C. Code § 7-3-20...................................................................................12, 29

S.C. Code § 7-13-780...........................................................................1, 5, 15, 22

S.C. Code § 7-15-10..................................................................................12, 29

S.C. Code § 7-15-310............................................................................... passim

S.C. Code § 7-15-320................................................................................3, 23

S.C. Code § 7-15-330............................................................................... passim

S.C. Code § 7-15-380......................................................................................4

S.C. Code § 7-15-385............................................................................... passim

S.C. Code § 7-25-170.................................................................................................12, 28

S.C. Code § 7-25-190.............................................................................................12, 28, 32

**OTHER AUTHORITIES**

Fed. R. Civ. P. 25(d) ..................................................................................................11, 12

S.108, 124th Gen. Assemb., Reg. Sess. (S.C. 2022)....................................................4, 5

S. Rep. 97-417......................................................................................................... passim

## INTRODUCTION

Federal law unequivocally guarantees disabled voters including Plaintiffs and their members the right to assistance in all aspects of voting from "a person of [their] choice." 52 U.S.C. § 10508. South Carolina law denies them that right. It restricts who they may rely on for assistance and bars some from receiving any assistance at all. These state restrictions are preempted by federal law and must be enjoined.

Congress added Section 208 to the Voting Rights Act ("VRA") in 1982 to address the problem that blind, disabled, and limited literacy voters too often "forfeit their right to vote" without "assistance of a person of their own choice." S. Rep. 97-417, at 62 (1982). Section 208 broadly guarantees "[a]ny voter" with a disability "assistance by a person of the voter's choice" with two discrete exceptions related to a voter's union or employer. 52 U.S.C. § 10508. This federal right to assistance applies to all parts of the voting process, including requesting and returning an absentee ballot. *Id.* § 10310(c)(1).

Plaintiffs are three individual voters with disabilities who require assistance to vote and the South Carolina State Conference of the NAACP ("South Carolina NAACP"), whose members across the State likewise include voters with disabilities reliant on assistance to vote. They challenge several South Carolina laws that impede Plaintiffs' federal right to voting assistance. These laws impede that right by (1) restricting who can receive assistance to vote, precluding some Plaintiffs and South Carolina NAACP members from receiving "assistance of any kind in voting," S.C. Code § 7-13-780; and (2) preventing Plaintiffs and their members from relying on entire categories of assistors beyond Congress's two union- and employer-related exceptions under Section 208, *see id.* §§ 7-15-310(7), 7-15-330(A), (B)(4), (C), 7-15-385(A)(3), (G) (collectively, the "Voting Restrictions").

Section 208 preempts the Voting Restrictions. The Voting Restrictions conflict with and "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Guthrie v. PHH Mortgage Corp.*, 79 F.4th 328, 336–37 (4th Cir. 2023) (citation

1

omitted), and are akin to other states' laws enjoined under Section 208. Plaintiffs' unrebutted evidence proves that the Voting Restrictions, by unlawfully narrowing which disabled voters can rely on assistance, prevent some Plaintiffs from relying on assistance at all. The Voting Restrictions also prevent Plaintiffs from selecting the person of their choice to assist them in voting. The Voting Restrictions do so by limiting the number of voters any person can assist in requesting or returning their absentee ballot applications and ballots. Further, they only allow Plaintiffs to receive assistance to vote absentee from family members or, in some circumstances, other South Carolina registered voters. These restrictions violate Plaintiffs' right to assistance under Section 208 and their "fundamental political right" to vote, which is "preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). This irreparable harm to Plaintiffs' right to vote far outweighs any interests Defendants might set out.

Swift injunctive and declaratory relief is necessary to safeguard Plaintiffs' and their members' right to choose the person they trust to help them vote in the upcoming midterm elections. Allowing the Voting Restrictions to remain in effect would deprive Plaintiffs of the right to vote with privacy, dignity, and autonomy and, as Congress recognized, "deny [them] the same opportunity to vote enjoyed by all citizens." S. Rep. 97-417, at 62.

STATEMENT OF FACTS

I.     **Section 208 of the Voting Rights Act**

In 1982, Congress amended the VRA to add Section 208 to lower barriers to voting for individuals who require assistance due to disability, blindness, or an inability to read or write. *See* S. Rep. 97-417, at 62. Section 208 of the VRA grants disabled voters the broad right to assistance in voting and the right to choose nearly anyone as their assistor, with two specific, narrow exceptions. *See* 52 U.S.C. § 10508. Its text provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given

2

assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." *Id.*

Section 208's right to assistance applies to all parts of the voting process: "[t]he terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to . . . having such ballot counted properly." 52 U.S.C. § 10310(c)(1).

Congress explained that it added Section 208 to the VRA "[t]o limit the risks of discrimination against voters in these specified groups and avoid denial or infringement of their right to vote." S. Rep. 97-417, at 62. In passing Section 208, Congress understood that because "[c]ertain discrete groups of citizens," including "disabled [voters]," are "unable to exercise their rights to vote without obtaining assistance in voting," guaranteeing a broad right to assistance was "the only way to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter." *Id.* "To do otherwise would deny these voters the same opportunity to vote enjoyed by all citizens." *Id.* At bottom, Congress found "the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, is to permit them to [rely on] a person whom the voter trusts and who cannot intimidate him." *Id.*

## II.     South Carolina's Absentee Voting Process

South Carolina limits who may vote by absentee ballot "regardless of whether the elector is able to vote during early voting . . . [or] on election day" to four categories of voters: (1) "physically disabled persons," (2) voters 65 or older, (3) military servicemembers, their spouses, and dependents, and (4) people admitted to hospitals on emergency basis within 4 days of the election. S.C. Code § 7-15-320(B). The absentee balloting process involves at least three discrete steps, and even more if the voter requires assistance in voting.

*First*, an individual seeking to vote by absentee ballot must request an absentee ballot application. *See* S.C. Code § 7-15-330. If the individual voter or their immediate family member is the one making the request, they may do so on the phone, by mail, or in person. *See* S.C. Code

3

§ 7-15-330(A)(1). But if a voter's "authorized representative" makes the request, they may only do so by mail or in person, must provide additional information about themselves, and sign an oath attesting to their eligibility, including that the authorized representative is a South Carolina registered voter. *See* S.C. Code §§ 7-15-330(A)(2), B(2).[1]

*Second*, the voter must fill out and return the application no less than 11 days before the election. S.C. Code § 7-15-330(C). The voter may return the ballot application by mail or in person, but anyone returning the application on behalf of the voter may only do so in person. *Id*. The same identification and attestation requirements for an assistor apply here as for the application request. *See supra* n.1.

*Third*, the voter must fill out and submit their absentee ballot. The voter may return their absentee ballot in person or by mail, but someone else returning the ballot on behalf of the voter may only do so in person. S.C. Code § 7-15-385(A). The voter and a witness who is at least 18 years of age must sign an oath on the ballot envelope along with the name and address of the witness. S.C. Code § 7-15-380(A). The oath includes an affirmation that "I have received no assistance in voting my ballot that I would not have been entitled to receive had I voted in person at my voting precinct." *Id.* Anyone returning the ballot in person must present qualifying photo identification. S.C. Code § 7-15-385(D)(1). If an authorized representative or immediate family member is returning a ballot on behalf of a voter, that individual must also fill out and provide an authorization form. S.C. Code § 7-15-385(B).

### III.     The Challenged Restrictions on Voting Assistance

In 2022, South Carolina enacted legislation that imposed new restrictions on the right of disabled voters to receive assistance from the person of their choice. S.108, 124th Gen. Assemb.,

---

[1] *See also* S.C. Election Comm'n, *Authorized Representative Form: Absentee Ballot Application Request/Return*, https://scvotes.gov/wp-content/uploads/2022/09/SEC-FRM-1055-202205-Authorized-Rep-App-Request-Return.pdf [https://perma.cc/BY94-M9NX] (last visited Apr. 3, 2026).

Reg. Sess. (S.C. 2022)[2]; *see* S.C. Code §§ 7-15-310(7), 7-15-330(A), (B)(4), (C), 7-15-385(A)(3), (G). Even before these new limits, South Carolina law restricted which disabled citizens could receive voting assistance, S.C. Code § 7-13-780. Plaintiffs refer to the challenged restrictions on voting assistance collectively as the "Voting Restrictions." The Voting Restrictions impose barriers to voting assistance in two main ways: by (1) limiting who may *receive* assistance to vote, and (2) limiting who may *provide* such assistance.

In terms of the former, the Voting Restrictions prohibit "assistance of any kind in voting," except for "those persons who are unable to read or write or who are *physically unable or incapacitated* from preparing a ballot or voting." S.C. Code § 7-13-780 (the "Limits on Voting Assistance Eligibility") (emphasis added).

In terms of the latter, even if a voter qualifies for assistance, the Voting Restrictions further demand that only an "immediate family" member or an "authorized representative" can provide such assistance. S.C. Code §§ 7-15-330(A), (C), 7-15-385(A)(3). Under the statute, an "[i]mmediate family" member only includes the voter's "spouse, parents, children, brothers, sisters, grandparents, grandchildren, and mothers-in-law, fathers-in-law, brothers-in-law, sisters-in-law, sons-in-law, and daughters-in-law," but not an aunt or uncle, cousin, or unmarried partner. S.C. Code § 7-15-310(8). Eligibility to serve as an "authorized representative" is further constrained. An "authorized representative" must be a "registered elector," S.C. Code § 7-15-310(7), which South Carolina law defines as "a person whose name is contained on the active roster of voters maintained by the State Election Commission," S.C. Code § 7-1-20(14). An authorized representative cannot be "a candidate, a member of a candidate's paid campaign staff, or a campaign volunteer." S.C. Code § 7-15-310(7). Additionally, some voters are prohibited from using an "authorized representative" at all. Unless a voter is "unable to go to the

---

[2] Available at https://www.scstatehouse.gov/sess124_2021-2022/bills/108.htm [https://perma.cc/TS9Y-U4U7] (last visited Apr. 3, 2026).

5

polls because of illness or disability resulting in his confinement in a hospital, . . . nursing home, or place of residence, or a voter unable because of a physical handicap to go to his polling place or because of a handicap is unable to vote at his polling place due to existing architectural barriers that deny him physical access," the voter may only receive assistance from an "immediate family" member. *Id.* Plaintiffs refer to these provisions as the "Limits on Possible Assistors."

The Voting Restrictions impose another limit on who can provide assistance: all assistors are prohibited from helping more than five voters per election by requesting or returning an absentee ballot, under threat of felony charges. S.C. Code §§ 7-15-330(B)(4), 7-15-385(G) (the "Five-Voter Limits"); *see id.* § 7-15-330(F) (felony criminal penalties).

**IV.    The Individual Plaintiffs are disabled voters who require assistance to vote.**

Robert Caldwell, Sherry Jenkins, and Jonathan Bell (the "Individual Plaintiffs") are all South Carolinians who intend to vote absentee in the 2026 elections. Ex. A, Decl. of Robert Caldwell ("Caldwell Decl.") ¶ 15; Ex. B, Decl. of Sherry Jenkins ("Jenkins Decl.") ¶ 6; Ex. C, Decl. of Jonathan Bell ("Bell Decl.") ¶ 8. The Individual Plaintiffs want to ensure their voices are heard in the coming elections. Caldwell Decl. ¶¶ 7–12; Jenkins Decl. ¶ 8; Bell Decl. ¶ 4. Each resides in a congregate care facility and needs assistance with voting absentee due to their disabilities. Caldwell Decl. ¶¶ 3, 12, 16, 18–19; Jenkins ¶¶ 3, 6–7; Bell Decl. ¶¶ 3, 7–10. And each wants the assistance of a specific staff member at their facility who, under the Voting Restrictions, will likely be barred from assisting the Individual Plaintiffs with requesting and returning their absentee ballot applications and ballots. Caldwell Decl. ¶¶ 18–19; Jenkins Decl. ¶¶ 9–12; Bell Decl. ¶¶ 9–11; *see also* Ex. D, Decl. of Deborah Allen ("Allen Decl.") ¶¶ 6–7, 13–15; Ex. E, Decl. of Robin Miller ("Miller Decl.") ¶¶ 6–7.

Robert Caldwell, a South Carolina NAACP member, is 75 years old and was born and raised in Chester, South Carolina. Caldwell Decl. ¶ 3. He still lives there today, residing at Medical University of South Carolina, Chester Nursing Center ("MUSC Chester"). *Id.* In 2015,

6

Mr. Caldwell suffered a stroke and mostly lost the use of his legs. *Id.* ¶ 9. These mobility limitations are compounded by his Chronic Obstructive Pulmonary Disease ("COPD"), which requires him to use an oxygen tank. *Id.* These and other health challenges make it difficult for Mr. Caldwell to get around without a wheelchair. *Id.*

Voting is extremely important to Mr. Caldwell. *Id.* ¶¶ 5, 12, 18. Growing up, he and his family experienced the violent discrimination of Jim Crow segregation. *Id.* ¶ 5. He spent many days picking cotton alongside his mother and father, sharecroppers on a farm owned by a white family. *Id.* ¶¶ 5–6. At times, he would need to remain indoors as the Ku Klux Klan marched nearby in its attempts to intimidate Black families into subservience. *Id.* ¶ 6. Because of the severe racial discrimination they faced, his parents could not vote for most of their lives. *Id.* ¶ 5. Mr. Caldwell registered to vote when he turned 18 and joined the NAACP to ensure that his voice is heard and this country never returns to a time of racialized terror and political subjugation. *Id.* ¶¶ 4–8.

Mr. Caldwell spent decades encouraging and supporting others to vote. *See* Caldwell Decl. ¶ 12. For instance, in the 1970s, as a member of the South Carolina NAACP, Mr. Caldwell would drive with voters to the polls on Election Day. *Id.* ¶ 4. More recently, as President of the Residents' Council at MUSC Chester, Mr. Caldwell has worked to make sure his fellow residents are able to register to vote and exercise that right if they so choose. *Id.* ¶¶ 3, 12, 14, 18. As a result, Mr. Caldwell "know[s] almost every resident at MUSC Chester personally." *Id.* ¶ 14.

Mr. Caldwell's disabilities make it challenging for him to get around, particularly outside of MUSC Chester. But because he can move around in his wheelchair some distance with his oxygen tank and fill out a ballot, he is not physically unable to vote. *Id.* ¶¶ 11–13; *see* Ex. F, Caldwell Objs. & Resps. to Def. Wilson's First Reqs. for Admis. at 7 (Mr. Caldwell's disabilities "do[] not prevent [him] from reading, understanding, and completing a ballot."). Nor does he believe that he is "incapacitated" from doing so. Caldwell Decl. ¶¶ 11–13; *see* Ex. G, Pls.' Am. Objs. & Resps. to Comm'n Defs.' First Interrogs. ("Pls.' Interrog. Resps.") at 6–7, 11.

7

Mr. Caldwell wants the assistance of his trusted friend Barvette Gaither, a social worker at MUSC Chester, with voting in 2026. Caldwell Decl. ¶ 16. From his "experience encouraging residents to vote and talking with them, [he] know[s] how much other residents trust Ms. Gaither" and "will want Ms. Gaither's help voting in the 2026 elections" just as in past elections. Caldwell Decl. ¶ 18; *see* Pls.' Interrog. Resps. at 9–10. As with many other residents, Mr. Caldwell trusts Ms. Gaither to help him vote because she is caring and reliable and has a long history of helping him vote absentee. Caldwell Decl. ¶¶ 14, 17–19; Pls.' Interrog. Resps. at 8–10. But because Ms. Gaither can only assist five individuals under threat of felony charges, S.C. Code §§ 7-15-330(B)(4), 7-15-385(G), Mr. Caldwell and other MUSC Chester residents will likely be denied assistance from the person of their choice. Caldwell Decl. ¶¶ 18–19; Pls.' Interrog. Resps. at 5, 9–10. Indeed, Ms. Gaither tried to return residents' ballots in a recent election and was prevented from doing so, because of the Five-Voter Limits. Caldwell Decl. ¶ 17.

Sherry Jenkins is 75 years old. Jenkins Decl. ¶ 3. She lives at Union Post Acute, a nursing home and post-acute care facility in Union, South Carolina. *Id.* She has optic nerve impairment and macular degeneration that render her legally blind in one eye, and osteoporosis, arthritis, scoliosis, and chronic back pain that require her to use a wheelchair to get around. *Id.* ¶ 4.

Ms. Jenkins is registered to vote in South Carolina. *Id.* ¶ 3. She intends to vote in the 2026 elections to ensure her voice is heard in selecting the candidate who will best represent her in office. *Id.* ¶¶ 6, 8–9. Due to her disabilities, Ms. Jenkins will need assistance voting absentee. *Id.* ¶¶ 6–7. She wants to get voting assistance from her friend and trusted caretaker, Deborah Allen, a social worker at Union Post Acute. *Id.* ¶ 9. But many people at Union Post Acute trust Ms. Allen and want her assistance voting. Allen Decl. ¶¶ 4, 7–8; *see* Jenkins Decl. ¶ 12. Before South Carolina passed the Voting Restrictions in 2022, Ms. Allen would help about 25 Union Post Acute residents vote every election by requesting and returning their absentee ballots. Allen Decl. ¶ 7. As a result, she has become very familiar with the process. *Id.* ¶ 8; Miller Decl. ¶ 5.

8

Ms. Allen is so well-regarded and trusted among Union Post Acute residents that she is in high demand for ballot assistance; in recent elections, she has even had to forego helping her own family members with their absentee ballots to ensure she could assist five Union Post Acute residents. Allen Decl. ¶ 14. Because of the Five-Voter Limits, it is likely that she will not be able to assist Ms. Jenkins or other residents at Union Post Acute who want her assistance. Jenkins Decl. ¶ 12; Allen Decl. ¶¶ 9, 15–16; Miller Decl. ¶¶ 6–7. And without that assistance, "it will be harder or impossible" for residents including Ms. Jenkins to vote. Miller Decl. ¶ 7; *see* Jenkins Decl. ¶¶ 6–7.

Jonathan Bell is 61 years old. Bell Decl. ¶ 3. He is a lifelong resident of South Carolina, currently living at Union Post Acute. *Id.* ¶ 3. He has been registered to vote since he was first eligible and has voted in Chester County for the past four decades. *Id.* ¶ 4. Mr. Bell did not have a physical disability for most of his life. At some point, he developed sciatica, which eventually required surgery. *Id.* ¶ 5. Unfortunately, a subsequent infection required another surgery, and now, Mr. Bell primarily uses a wheelchair to get around. *Id.* He currently cannot walk more than a few steps without a wheelchair or walker. *Id.* These mobility limitations are compounded by Mr. Bell's reliance on dialysis, which often leaves him feeling fatigued. *Id.*

Mr. Bell's physical limitations make it difficult for him to travel outside of Union Post Acute. He is no longer able to drive on his own, and he requires assistance getting into and out of a car. *Id.* For these reasons, Mr. Bell has relied on assistance to vote absentee since his first back surgery. *Id.* ¶ 7. His disabilities do not render him physically unable to vote or "incapacitated" from voting; he can move some distance in his wheelchair or with a walker, and can fill out his ballot on his own. Bell Decl. ¶¶ 5–7; Pls.' Interrog. Resps. at 7. Mr. Bell has a brother in South Carolina, but his brother works two jobs, takes care of his children and grandchildren, and lives about 45 minutes away from Union Post Acute. Bell Decl. ¶ 9; Pls.' Interrog. Resps. at 6. Accordingly, Mr. Bell does not want to rely on him for assistance in the upcoming election. Bell Decl. ¶ 9; Pls.' Interrog. Resps. at 6.

Instead, Mr. Bell would choose to rely on Deborah Allen to assist him with voting in 2026. *Id.* ¶ 8. Like many other residents at Union Post Acute, Mr. Bell "trust[s] her most to help [him] through the process and vote." Bell Decl. ¶¶ 8, 10; *see* Jenkins Decl. ¶¶ 9–12; Miller Decl. ¶¶ 4–5; Allen Decl. ¶ 8. But because more than five residents will ask for Ms. Allen's assistance and Mr. Bell has family nearby, the Five-Voter Limits will preclude him from receiving assistance from Ms. Allen; instead, Ms. Allen will "explain the process to [his] family members" and hope that they can help him. Allen Decl. ¶ 9. As Ms. Allen explains, "because there are more than five residents each election who want [her] help voting and do not have family who are willing to help them," she "cannot request or return the absentee ballots" for residents with family nearby. *Id.* ¶ 9. This is true even though Ms. Allen is aware of the unfortunate reality that "some family members who say they will help residents do not follow through." *Id.* ¶ 10.

## V.     The South Carolina NAACP's members include many voters with disabilities who require assistance to vote.

The South Carolina NAACP is a nonprofit, nonpartisan membership organization and the oldest civil rights group in the State. Ex. H, Decl. of President Brenda Murphy ("Murphy Decl.") ¶ 3. Many of its over 13,000 members have physical and nonphysical disabilities that cause them to need absentee voting assistance. *Id.* ¶¶ 5–6. "Consistent with the NAACP's mission to achieve equity and advance the political rights of Black people and all persons of color, South Carolina NAACP's goals include eliminating barriers to the franchise for [its] members and all South Carolinians." *Id.* ¶ 5.

One of those members is Mr. Caldwell, who along with other South Carolina NAACP members face the situation where the "one staff member [who] would help many patients vote" is now prohibited from helping more than five by the Five-Voter limits. *See id.* ¶ 8.

Mr. Caldwell is not the only South Carolina NAACP member impacted by the Voting Restrictions. For example, former Greenville NAACP Branch President, Reverend J.M. Flemming, assisted members with disabilities for years by returning their absentee ballots each

10

election. Ex. I, Decl. of Rev. J.M. Flemming ("Flemming Decl.") ¶ 5. After witnessing the racial subjugation of Black people in his childhood, he "dedicated [his] life to fighting for the rights of Black people to have equal justice under law," including helping register and encourage others to vote. *Id.* ¶¶ 3–4. Many Greenville Branch NAACP members "trust him as a faith leader and an upstanding member of the community, and he is someone they have known for decades who cares about their right to vote." Murphy Decl. ¶ 11. Before the enactment of the Five-Voter Limits, Rev. Flemming provided voting assistance to many "Greenville NAACP Branch members who are elderly veterans with disabilities who cannot get to the polls on their own." Flemming Decl. ¶ 5. When the limits went into effect, those NAACP members were forced to look elsewhere for assistance. *Id.* ¶¶ 7–8. Each election, Rev. Flemming helped his brother and nephew, who relied on him because of disabilities limiting their access to in-person voting. *Id.* ¶ 7. That left him with only three other people who he could help by returning their ballot. *Id.* As a result, he "could not return the absentee ballots of most Greenville NAACP Branch members with disabilities who wanted [him] to do so." *Id.* ¶ 7.

The Greenville NAACP Branch also encourages civic engagement from youth members, many of whom help elderly, disabled members vote absentee once they turn 18. *Id.* ¶ 8; Murphy Decl. ¶ 13. "[S]everal NAACP members with disabilities . . . would like to rely on youth members who are under 18 to return their absentee ballot." Flemming Decl. ¶ 8. But those members are barred from relying on their chosen assistors because the Limits on Possible Assistors require any assistor be a registered voter, and some of those youth members are not the immediate family of the disabled member seeking assistance. *Id.* Other members are prevented entirely from relying on an "authorized representative" because they are not homebound, instead preferring to vote by mail. *Id.* ¶ 6.

## VI.     Defendants enforce and carry out the Voting Restrictions.

Plaintiffs sued Defendants Attorney General Wilson, State Election Commission Interim Executive Director Wooten, Commission Chair Bolchoz, and the Commissioners in their official

capacities.[3] *See Gibbons v. Gibbs*, 99 F.4th 211, 214 (4th Cir. 2024) (it is "well-settled" that *Ex parte Young* "allows suits 'for declaratory or injunctive relief against state officers in their official capacities.'") (citation omitted).

Attorney General Wilson is "the chief prosecuting officer of the State with the authority to supervise the prosecution of all criminal cases in courts of record." S.C. Const. art. V § 24. This includes enforcement of criminal penalties for violating the Voting Restrictions, S.C. Code §§ 7-15-330(F), 7-15-385(G), 7-25-170, 7-25-190.

South Carolina law commands the State Election Commission to "promulgate regulations to establish standardized processes for the administration of elections and voter registration" and ensure "county boards of voter registration and elections comply with applicable state and federal law." *Id.* §§ 7-3-10(F)–(G). Interim Executive Director Wooten is "the chief administrative officer for the State Election Commission" and in that role must "direct and supervise" the implementation of election regulations and county boards' compliance with state and federal law. *Id.* §§ 7-3-20(A), (D)(1)–(3). Her duties also include publishing "each change to voting procedures" on the Commission's website. *Id.* § 7-3-20(E).

### LEGAL STANDARD

"Summary judgment is appropriate if, 'viewing the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party,' 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 173 (4th Cir. 2024) (citations omitted). Plaintiffs seeking a permanent injunction must demonstrate: (1) irreparable injury; (2) remedies available at law are inadequate; (3) when balancing the hardships between parties, an equitable remedy is warranted; and (4) the public interest would not be disserved by a permanent

---

[3] Pursuant to Rule 25(d), State Election Commission Chair Robert Bolchoz is automatically substituted for former Chair Dennis Shedd, and Commissioner Angela Stringer for former Commissioner Linda McCall. *See* Fed. R. Civ. P. 25(d).

injunction. *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156–57 (2010). The balancing of the equities and public interest "merge when the Government is an opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**ARGUMENT**

**I.    Section 208 of the VRA preempts the Voting Restrictions.**

Federal preemption claims are "question[s] of law," *Knight v. Boehringer Ingelheim Pharms., Inc.*, 984 F.3d 329, 337 (4th Cir. 2021), and Defendants cannot rebut the material facts Plaintiffs have shown that prove the Voting Restrictions violate Section 208 of the Voting Rights Act and are thus preempted and void. The Court should grant summary judgment to Plaintiffs.

The Supremacy Clause confers on Congress the "power to preempt state law" *Arizona v. United States*, 567 U.S. 387, 399 (2012), when it conflicts with state law, *Guthrie*, 79 F.4th at 336. Conflict preemption occurs either when "compliance with both federal and state regulations may be a physical impossibility" or when "state law may stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 336–37 (citation modified). All three of the challenged Voting Restrictions conflict with Section 208 of the VRA and are therefore preempted by federal law.

The Court's "analysis of the scope of the pre-emption statute must begin with its text." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996). The plain text of Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance *by a person of the voter's choice*, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508 (emphasis added). The VRA defines "vote" or "voting" as including "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration," or any "other action required by law prerequisite to voting, casting a ballot, and

13

having such ballot counted properly and included in the appropriate totals of votes cast." 52 U.S.C. § 10310(c)(1).

The "broad language chosen by Congress" shows that Section 208 protects the right to assistance for persons with disabilities in requesting and returning absentee ballots. *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 711 (N.D. Ohio 2024) ("the statutory language encapsulates absentee voting since it refers to 'all action necessary to make a vote effective'") (quotation omitted); *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 614–15 (5th Cir. 2017) (VRA's definition of "vote" "plainly contemplates more than the mechanical act of filling out the ballot sheet."); *Carey v. Wis. Elections Comm'n*, 624 F. Supp. 3d 1020, 1032–33 (W.D. Wis. 2022); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 234–35 (M.D.N.C. 2020).[4] "In the context of assisting voters in congregate settings like nursing homes, 'voting' includes the delivery of an absentee ballot to a county board of elections as an action 'necessary to make a vote effective.'" *Disability Rts. N.C. v. N.C. State Bd. of Elections*, 602 F. Supp. 3d 872, 877 (E.D.N.C. 2022) (quoting *Democracy N.C.*, 476 F. Supp. 3d at 234–35) (citation modified).

Broadly speaking, the Voting Restrictions are preempted because they obstruct the fulfillment of rights set out in Section 208, both by (1) barring some South Carolina voters with disabilities from receiving any assistance to vote; and by (2) limiting the pool of assistors from whom South Carolina voters are entitled to receive absentee ballot assistance.

### A. The Limits on Voting Assistance Eligibility conflict with Section 208 and are preempted.

The Limits on Voting Assistance Eligibility prevent certain South Carolina voters who are eligible for ballot assistance under Section 208 of the VRA from receiving that assistance,

---

[4] The VRA's definition of the word "vote" as "all action necessary to make a vote effective," 52 U.S.C. § 10310(c)(1), and the long line of cases interpreting that language, together foreclose the argument the Attorney General has made previously in this litigation that Section 208 does not cover "the requesting and returning of ballots." Def. Wilson's Mot. to Dismiss at 13, Dkt. 13.

14

thereby obstructing the objectives of Congress. The Limits on Voting Assistance Eligibility prohibit assistance "of any kind" unless voters are "physically unable or incapacitated from preparing a ballot or voting." S.C. Code § 7-13-780. The Attorney General described this statute as applicable "to all elections" and "specif[ying] who is eligible for assistance in voting," Def. Wilson's Mot. to Dismiss at 2, Dkt. 13. This conflicts with the plain text of Section 208, which guarantees assistance to "[a]ny voter who requires assistance to vote by reason of blindness [or] disability," 52 U.S.C. § 10508, not just voters who lack any physical capacity to cast a ballot, *see Ala. State Conf. of the NAACP v. Marshall*, 746 F. Supp. 3d 1203, 1243 (N.D. Ala. 2024) ("[T]he VRA directs that *any* voter with a disability or who lacks literacy may have assistance from a person of their choice") (citation omitted), *stay denied sub nom.*, *Ala. State Conf. of the NAACP v. Att'y Gen., Ala.*, No. 24-13111, 2024 WL 4481489 (11th Cir. Oct. 11, 2024), *questions certified*, 161 F.4th 1286 (11th Cir. 2025); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1301 (N.D. Ga. 2020) ("[T]he VRA promises freedom of choice for voters with disabilities").

The VRA does not separately define "disability," but federal law and contemporaneous definitions confirm that the ordinary meaning of "disability" (1) includes both physical and mental impairments, and (2) does not require complete "incapacity." *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.") (citation omitted). Congress always uses "disability" to include both physical and mental impairments. *See, e.g.*, 29 U.S.C. § 705(9) (Rehabilitation Act of 1973) (defining disability to include a "physical or mental impairment"); 42 U.S.C. § 3602(h) (Fair Housing Act) (same); 42 U.S.C. § 12102 (Americans with Disabilities Act) (same); 42 U.S.C. §§ 423, 1382 (Social Security Act) (same). That comports with the ordinary meaning found in dictionary sources. *See, e.g.*, *Disability*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/disability [https://perma.cc/K88D-BVL7] (last visited Apr. 3, 2026) ("a physical, mental, cognitive, or developmental condition that

15

impairs, interferes with, or limits a person's ability to engage in certain tasks or actions or participate in typical daily activities and interactions"). Likewise, the term "disability" does not require incapacitation. The ADA, for example, "defines the term 'disability' broadly to include 'a physical or mental impairment that substantially limits one or more major life activities of such individual.'" *Williams v. Kincaid*, 45 F.4th 759, 766 (4th Cir. 2022) (quoting 42 U.S.C. § 12102(1)(A)). Congress employed similar approaches in the Rehabilitation Act, 29 U.S.C. § 705; Fair Housing Act, 42 U.S.C. § 3602; and the Air Carrier Access Act, 49 U.S.C. § 41705. Together, these definitions make clear that "disability" does not require incapacitation.

The Limits on Voting Assistance Eligibility prohibit certain voters with disabilities—such as Mr. Caldwell and Mr. Bell—from exercising their federal right to absentee ballot assistance under Section 208 merely because they have physical disabilities that do not render them completely physically incapacitated from voting. *See infra* Arg. Section II.A. Because South Carolina law permits a narrower class of voters to receive voting assistance than does Section 208, it is preempted. *See Disability Rights N.C.*, 602 F. Supp. 3d at 878 ("Federal courts have shown little tolerance for any narrowing of the Section 208 right to assistance with the voting process").

### B. The Limits on Possible Assistors and Five-Voter Limits conflict with Section 208 and are preempted.

The next two Voting Restrictions—the Limits on Possible Assistors and Five-Voter Limits—violate Section 208 of the VRA because they unlawfully restrict who may provide voting assistance to South Carolina voters with disabilities. Section 208 guarantees to qualified voters the right to "assistance *by a person of the voter's choice*, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508 (emphasis added). Section 208 guarantees covered voters the choice of *any* person not specifically excluded by Congress. This straightforward interpretation of the plain text is confirmed by ordinary usage, precedent, statutory construction, and legislative intent.

16

*First*, precedent and common usage confirm that "*a* person of the voter's choice" means "*any* person of the voter's choice" and not "that disabled voters are limited to 'a person of the voter's choice *from a list to be determined by the several states.*'" *League of Women Voters of Ohio*, 741 F. Supp. 3d at 714. "The indefinite article has a 'generalizing force' on the noun that follows it"—here, "person." *United States v. Hendrickson*, 949 F.3d 95, 98 (3d Cir. 2020) (quoting *Campos-Hernandez v. Sessions*, 889 F.3d 564, 570 (9th Cir. 2018)). This contrasts with typical use of "the definite article 'the' before 'person,'" which "defines 'person' to be a particular person and not any person." *Miller's Apple Valley Chevrolet Olds-Geo, Inc. v. Goodwin*, 177 F.3d 232, 234 (4th Cir. 1999); *see also Am. Bus Ass'n v. Slater*, 231 F.3d 1, 5 (D.C. Cir. 2000) (in statutory construction, "definite article 'the' particularizes the subject which it precedes and is word of limitation as opposed to indefinite or generalizing force 'a' or 'an'"); *United States v. Naranjo*, 259 F.3d 379, 382 (5th Cir. 2001) ("'Such *a* violation' . . . refers to, or references, *any* violation") (emphases in original). In *United States v. Alabama*, 778 F.3d 926 (11th Cir. 2015), for example, the Eleventh Circuit held that the "plain meaning of the term 'an election,'" using the indefinite article, means "any election." *Id.* at 932.

*Second*, courts "must try to give every word in the statute meaning to avoid rendering its terms superfluous." *Espinal-Andrades v. Holder*, 777 F.3d 163, 168 (4th Cir. 2015) (citation omitted). But "[i]f a state can limit who 'a person' is, . . . then the statutory phrase 'of the voter's choice' is either superfluous or loses all meaning." *League of Women Voters of Ohio*, 741 F. Supp. 3d at 713. Recent guidance from the U.S. Department of Justice confirms this: "Section 208 allows voters to choose *any* assistor who is available and willing. State and local authorities may not impose further restrictions on a voter's choice of assistor."[5] Indeed, the South Carolina State Election Commission's Handbook instructs poll managers to allow covered voters to:

---

[5] U.S. Dep't of Just., *Voting Rights Fact Sheet* (Sept. 2024), https://www.justice.gov/crt/media/1366636/dl [https://perma.cc/GTW4-AW2W] (emphasis added).

"choose *anyone* [they] wish to assist [them] in casting [their] ballot except for [their] employer, an agent of [their] employer, an officer of [their] union, or an agent of [their] union."[6]

*Third*, "where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (citation modified). In Section 208, Congress excluded only two categories of individuals from assistance. If Congress had wanted "to allow states to exclude more categories" beyond the two exceptions explicitly enumerated in Section 208, "it could have said so." *Disability Rights N.C.*, 602 F. Supp. 3d at 878. Put differently, "[t]he express exclusion of *only* two groups is significant, because it implies that all other categories of assisters are permitted." *Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-cv-36, 2022 WL 2678884, at *4 (E.D.N.C. July 11, 2022) (emphasis added). Accordingly, the overwhelming majority of courts have held that Section 208 does not permit states to further restrict voters' choice of assistor beyond the categories enumerated in Section 208 itself. *See, e.g.*, *OCA-Greater Houston*, 867 F.3d at 615 ("the limitation on voter choice expressed in [Texas law] impermissibly narrows the right guaranteed by Section 208 of the VRA."); *Ala. State Conf. of the NAACP v. Marshall*, No. 2:24-cv-00420-RDP, 2024 WL 4282082, at *2 (N.D. Ala. Sept. 24, 2024) (Section 208 allows covered "voters to make a choice about who may assist them in obtaining and returning an absentee ballot"); *League of Women Voters of Ohio*, 741 F. Supp. 3d at 719 (holding Ohio law that restricted assistance only to postal

---

[6] S.C. Election Comm'n, *Poll Managers Handbook: September 2024 Edition*, available at https://scvotes.gov/wp-content/uploads/2024/10/scec_11854_24_2024-Poll-Managers-Handbook_Web_06.pdf [https://perma.cc/ML3W-VCZC] (last visited Apr. 4, 2026) (emphasis added); *see also* S.C. Election Comm'n, *Voters with Disabilities*, https://scvotes.gov/voters/voters-with-disabilities/ [https://perma.cc/S89P-3AMJ] (last visited Apr. 4, 2026) ("Voters with disabilities . . . may choose *anyone* to assist in casting [their] ballot except [exceptions enumerated by Section 208]") (emphasis added). To be sure, the Commission's guidance doesn't cure the harms of the Voting Restrictions to Plaintiffs. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss at 12–13, Dkt. 21. But it confirms that "a person" can only be understood to mean "any" or "anyone."

carriers or "authorized" relatives violated Section 208); *Disability Rts. N.C.*, 602 F. Supp. 3d at 878 (holding North Carolina statute restricting absentee ballot assistance to "near relative or verifiable legal guardian" "appears to conflict with Section 208"); *Carey*, 624 F. Supp. 3d at 1033 (holding Section 208 preempts Wisconsin law restricting absentee ballot assistance because "the VRA requires that plaintiffs be allowed to choose a person to assist them with mailing or delivering their absentee ballot"); *Democracy N.C.*, 476 F. Supp. 3d at 234–35 (holding North Carolina law restricting absentee ballot assistance to "a voter's near relative, legal guardian, or a member of a [multipartisan assistance team]" "impermissibly narrow[ed] Section 208's dictate that a voter may be assisted by a person of the voter's choice") (citation modified). Because of the VRA's clear text, "[f]ederal courts have shown little tolerance for any narrowing of the Section 208 right to assistance with the voting process." *Disability Rts. N.C.*, 602 F. Supp. 3d at 878.

Fourth, "Congress' clear intent" was "allowing disabled voters to choose for themselves a person to assist them with voting." *League of Women Voters of Ohio*, 741 F. Supp. 3d at 717. The Senate Report accompanying the 1982 amendments to the VRA—which the Supreme Court has "repeatedly recognized [is] the authoritative source for legislative intent" for the statute, *Thornburg v. Gingles*, 478 U.S. 30, 43 n.7 (1986)—states that Congress enacted Section 208 because voters with disabilities "must be permitted to have the assistance of a person of their own choice" principally "[t]o limit the risks of discrimination against voters in these specified groups and avoid denial or infringement of their right to vote." S. Rep. 97-417, at 62. As the Senate Report explains, "it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." *Id.* Section 208 ensures that these voters will not be "forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote." *Id.* This history confirms what is clear from Section 208's text:

19

"Congress' intent in enacting Section 208 was to protect the choice of vulnerable citizens and give them meaningful access to the vote." *Disability Rts. N.C.*, 602 F. Supp. 3d at 880.

Because "[t]he purpose of Section 208 was to give voters with disabilities unrestricted choice in their right to assistance, . . . it cannot have been Congress's intent to permit state voting laws to directly restrict that right." *Disability Rts. N.C.*, 2022 WL 2678884, at *5. Yet this is precisely the effect of South Carolina's latter two Voting Restrictions.

The Limits on Possible Assistors mandate that voters with disabilities may, for purposes of ballot assistance, rely only on an "immediate family" member unless the disabled voter is (a) "confine[d] in a hospital, sanatorium, nursing home, or place of residence," (b) has a physical disability which renders transportation to a polling place impossible, or (c) is physically incapable of accessing voting spaces because of architectural barriers. S.C. Code § 7-15-310(7). It also forbids all voters covered by Section 208 from receiving assistance from individuals who are not South Carolina registered voters or who are candidates or a candidate's staff or volunteers. *Id.* This statute dramatically restricts the choice of assistors for voters with disabilities, ignoring Section 208's plain language and broad scope.

Further, South Carolina's Five-Voter Limits make it a felony for any individual to assist more than five voters per election with requesting or returning absentee ballots. S.C. Code §§ 7-15-330(B)(4), 7-15-385(G). In effect, the Five-Voter Limits deny voters with disabilities the assistor of their choice when that individual has already assisted five other people. This impedes voters' choice of their preferred assistor, including voters like Individual Plaintiffs who live in congregate care facilities where there are many residents who want to rely on the same employee as their preferred assistor, and other South Carolina NAACP members who consistently relied on a trusted community leader who is now prevented from helping them. *See supra* Statement of Facts Sections IV–V; *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1085 (W.D. Ark. 2022), *rev'd on other grounds* 146 F.4th 673 (8th Cir. 2025) (enjoining a similar six-voter limit because "if the person of a voter's choice had already assisted six voters, the voter could not be assisted

20

by that person, and the voter would not be getting the assistor of their choice. The six-voter limit is therefore more restrictive than § 208 and makes 'compliance with both ... impossible.'") (citation omitted). The Voting Restrictions force Plaintiffs and other covered voters to choose between relying on someone not of their choice for assistance "or forfeiting their right to vote." S. Rep. 97-417, at 62. This is the same unconscionable choice that Section 208 was passed to remedy. *Id.*

The VRA's plain text, the overwhelming weight of authority, and clear evidence of legislative intent, confirm that the Limits on Possible Assistors and the Five-Voter Limits are preempted by Section 208 as a matter of law. Summary judgment is warranted for Plaintiffs.

**II.     The remaining permanent injunction factors also support equitable relief.**

To obtain a permanent injunction, Plaintiffs must show they suffer irreparable harm, remedies at law are inadequate, and the balance of hardships and public interest support an injunction. *Monsanto Co.*, 561 U.S. at 156. Each of these factors supports a permanent injunction against the Voting Restrictions.

*A.  The Voting Restrictions cause Plaintiffs irreparable harm.*

Plaintiffs have suffered and will continue to suffer irreparable harm from the Voting Restrictions absent a permanent injunction.

It is well settled that any restriction on fundamental voting rights constitutes "irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citing cases); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (when voting rights "are threatened or impaired, irreparable injury is presumed."). Applying this principle, courts enjoining similar restrictions on voting assistance have concluded that "[d]enial of the right to choose their assistors would work irreparable harm" on disabled voters "who have a greater need for assistance than other voters," *Ala. State Conf. of the NAACP v. Marshall*, No. 2:24-cv-00420-RDP, 2024 WL 4448841, at *4 (N.D. Ala. Oct. 4, 2024), and "the continued deprivation of [Plaintiffs'] rights under Section 208" constitutes "irreparable harm." *Disability*

21

*Rts. N.C.*, 2022 WL 2678884, at \*7; *see also, e.g.*, *Democracy N.C.*, 476 F. Supp. 3d at 236–37; *League of Women Voters of Ohio*, 741 F. Supp. 3d at 721; *Carey*, 624 F. Supp. 3d at 1034; *Nick v. Bethel*, No. 3:07-CV-0098, 2008 WL 11456134, at \*3 (D. Alaska July 30, 2008).

The same is true here. South Carolina's limits on who may *receive* assistance (the Limits on Voting Assistance Eligibility), and limits on who voters may receive assistance *from* (the Limits on Possible Assistors and Five-Voter Limits) cause irreparable harm to Plaintiffs and South Carolina NAACP members.

### 1. Limits on Voting Assistance Eligibility

The Limits on Voting Assistance Eligibility irreparably harm Plaintiffs Bell, Caldwell, and other South Carolina NAACP members by preventing them from receiving the assistance to which they are entitled under Section 208. Plaintiffs Bell and Caldwell and other South Carolina NAACP members have disabilities that cause them to need assistance to vote, but they are not "physically unable or incapacitated from preparing a ballot or voting," S.C. Code § 7-13-780; *see supra* Statement of Facts Sections IV–V. So, although Section 208 affords Plaintiffs Bell and Caldwell a federal right to assistance by a person of their choice, they are nonetheless prevented from receiving "assistance of any kind in voting" under South Carolina's Limits on Voting Assistance Eligibility, under threat of criminal penalties. S.C. Code § 7-13-780. Plaintiffs Caldwell, Bell, and other disabled but not incapacitated South Carolina NAACP members suffer irreparable harm. *Disability Rts. N.C.*, 2022 WL 2678884, at \*7; *Carey*, 624 F. Supp. 3d at 1034.

### 2. Limits on Possible Assistors and Five-Voter Limits

Plaintiffs also suffer similar irreparable harm from the Limits on Possible Assistors and Five-Voter Limits: "the continued deprivation of [Plaintiffs'] rights under Section 208," *Disability Rts. N.C.*, 2022 WL 2678884, at \*7 (citing cases), and Plaintiffs' resulting "risk [of] losing their right to vote," *Carey*, 624 F. Supp. 3d at 1034. As Congress and many courts have recognized, "[d]isabled, blind, or illiterate voters may be unable to secure an absentee ballot, and therefore unable to vote, without obtaining assistance of a person of their choice." *Ala. State*

22

*Conf. of the NAACP*, 2024 WL 4282082, at *3; *see also Westchester Disabled on the Move, Inc. v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 477 (S.D.N.Y. 2004) ("irreparable harm has occurred" where the strictures of state law make voting inaccessible to disabled voters who, as a result, "may be dissuaded from attempting to vote at all").

*League of Women Voters of Ohio* is instructive. There, the court found "[p]laintiffs would suffer irreparable injury" absent an injunction because Ohio's restriction on who voters could rely on to return their absentee ballot infringed on the individual plaintiff's "federally guaranteed rights [under Section 208], which in turn infringe[d] on [plaintiff's] fundamental right to vote." 741 F. Supp. 3d at 721. The Limits on Possible Assistors and Five-Voter Limits do just that, by preventing Plaintiffs and other South Carolina NAACP members from relying on the assistor of their choice, inflicting irreparable harm.

As described *supra*, each of the Individual Plaintiffs seeks to rely on one staff member who is trusted and relied on by many other residents at their facilities for voting assistance. Although the specific type of assistance they require varies, all seek to rely on either Barvette Gaither at MUSC Chester or Deborah Allen at Union Post Acute for assistance requesting and returning their absentee ballots. For Individual Plaintiffs, the law doubly frustrates their ability to rely on those assistors.

First, Individual Plaintiffs are harmed by the limits on who may receive assistance from an "authorized representative." Although the Limits on Possible Assistors permit use of an "authorized representative" for voters "confine[d] in a hospital, . . . nursing home, or place of residence," S.C. Code § 7-15-310(7), Individual Plaintiffs do not allege that they are 'confined'—*i.e.*, "unable to leave"—their facilities. *See Confined*, Dictionary.com, https://www.dictionary.com/browse/confined [https://perma.cc/2WSG-GPG7] (last visited Apr. 5, 2026); *cf.* S.C. Code § 7-15-320(A)(3) (permitting absentee voting for "persons *confined* to a jail or pretrial facility" (emphasis added)). Thus, because neither Ms. Gaither nor Ms. Allen are Individual Plaintiffs' "immediate family members," the Limits on Possible Assistors, S.C. Code

23

§§ 7-15-310(7), 7-15-330(A), (C), 7-15-385(A)(3), irreparably harm their rights under Section 208.

Second, even if South Carolina law permitted Individual Plaintiffs to obtain assistance through an "authorized representative," they would be thwarted by the Five-Voter Limits. *See id.* §§ 7-15-330(B)(4), 7-15-385(G). Both Ms. Gaither and Ms. Allen have helped residents vote for years and many more than five South Carolina voters regularly rely on them for absentee ballot assistance. The record demonstrates the harms that the Five-Voter Limits have already caused Plaintiffs and other South Carolina voters. For example, Ms. Allen asked Mr. Bell's family to assist him in the last election because she was already helping five voters, Bell Decl. ¶ 7; Allen Decl. ¶ 9. And Mr. Caldwell knows that some residents' ballots were recently rejected by a county election official because of the Five-Voter Limits. Caldwell Decl. ¶ 17.

South Carolina NAACP, as "a 'voting-rights organization is also irreparably harmed'" when, as here, its members' "right to vote is wrongfully denied or abridged.'" *Democracy N.C.*, 476 F. Supp. 3d at 236–37 (citation omitted). The Five-Voter Limits deprive other South Carolina NAACP members of their right to their chosen assistor, as described by Rev. Flemming and President Murphy, *see supra* Statement of Facts Section V. And the Limits on Possible Assistors prevent South Carolina NAACP members with disabilities from relying on their chosen assistor. For example, in Greenville, youth members who had previously assisted disabled voters with voting are no longer able to because they are not a family member and do not satisfy the requirement that every "authorized representative" be a registered voter, *see* Flemming Decl. ¶ 8; S.C. Code § 7-15-310(7). Still other members are not permitted to rely on an "authorized representative" at all because they don't meet the statutory requirements. An "authorized representative" is available only to voters who are "*unable* to go to the polls" because of confinement, disability, or architectural inaccessibility of the polls. S.C. Code § 7-15-310(7) (emphasis added). But some of the members who need help voting absentee are not homebound: they "can make it out of the house occasionally to go to church or other community events, but

24

they prefer to vote by mail." Flemming Decl. ¶ 6. Those members cannot rely on an "authorized representative" to vote absentee.

Just as in any action challenging an infringement on the right to vote, remedies at law such as damages are inadequate to redress Plaintiffs' injuries here. *See, e.g.*, *Disability Rts. N.C.*, 2022 WL 2678884, at *7 ("the harm to DRNC and its constituents cannot be remedied with monetary damages, as it relates to the fundamental right to vote"); *League of Women Voters of Ohio*, 741 F. Supp. 3d at 721 ("no adequate remedy at law" to redress Plaintiffs' Section 208 irreparable injuries); *see also generally League of Women Voters of N.C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress," meaning "[t]he injury to these voters is real and completely irreparable if nothing is done to enjoin this law.").

### B. The equities and public interest support a permanent injunction.

The balance of the equities and public interest far outweigh any meager interests the State might set out, thus requiring an injunction.

To start, Defendants have no interest in enforcing a law that conflicts with federal law. "[T]he government of the Union, though limited in its powers, is supreme within its sphere of action." *M'Culloch v. Maryland*, 17 U.S. 316, 405 (1819). Thus, "a state statute is void to the extent it conflicts with a federal statute." *Maryland v. Louisiana*, 451 U.S. 725, 747 (1981).

Even outside the preemption context, it is firmly settled that "the government suffers no injury when a court prevents it from enforcing an unlawful law." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024), *aff'd on other grounds*, 606 U.S. 461 (2025); *see also Disability Rts. N.C.*, 2022 WL 2678884, at *7 ("requiring a state to comply with the law is not a burden"); *League of Women Voters of Ohio*, 741 F. Supp. 3d at 722 ("the clear violation of a federally guaranteed right in this case outweighs any harm State Defendants . . . may suffer"); *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) ("[T]he public undoubtedly has an interest in seeing its governmental institutions follow the law.") (internal quotation marks omitted); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (Fourth Circuit "precedent

25

counsels that a state is in no way harmed by" an injunction that "prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.") (internal quotation marks omitted).

To the extent Defendants complain that implementation of an injunction issued by this Court would be onerous or time-consuming—which the factual record belies, *see* Ex. J, Comm'n Defs.' Answers to Pls.' First Interrogs. at 3–7—courts in this Circuit have recognized that where previous "systems have existed" and "simply need to be resurrected," the State's interest in maintaining an unlawful voting restriction carries even less weight. *League of Women Voters of N.C.*, 769 F.3d at 248. This is especially so when the Court's decision "acts as a safety net," *id.* at 248 n.8, meaning voters and assistors who misapprehend the law will no longer be subject to prosecution even if they believe themselves to be exposed to criminal penalties for unlawful assistance. Regardless, states may not "sacrifice[e] voter enfranchisement at" a bureaucratic altar "for administrative ease." *Id.* at 244. And in any event, "[i]ssuance of the contemplated injunction would not require the Attorney General to do anything." *Ala. State Conf. of the NAACP*, 2024 WL 4282082, at *4.

On the other side of the ledger, the public interest weighs strongly in favor of an injunction. "By definition, 'the public interest favors permitting as many qualified voters to vote as possible.'" *League of Women Voters of N.C.*, 769 F.3d at 247–48 (quoting *Husted*, 697 F.3d at 437) (citation modified). Plaintiffs—indeed, all voters—have a "strong interest in exercising the 'fundamental political right' to vote," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted). More specifically, "[t]he public interest is served by protecting federally guaranteed voting rights" under Section 208. *Disability Rts. N.C.*, 2022 WL 2678884, at *7.

As in similar Section 208 cases, here "the requested injunction will serve to ensure certain disabled, blind, and illiterate voters are not disenfranchised," which is definitionally in the public interest. *Ala. State Conf. of the NAACP*, 2024 WL 4282082, at *3. An injunction against the Voting Restrictions "would not cause substantial harm to others *and* it would serve

the public interest" because enjoining their enforcement "would restore rights to disabled voters . . . that Congress guaranteed them." *League of Women Voters of Ohio*, 741 F. Supp. 3d at 721.

In sum, the balancing is straightforward: "the infringement of the fundamental right to vote poses a far greater risk" to the public interest than any justification that Defendants might trot out to support South Carolina's unlawful Voting Restrictions. *Democracy N.C.*, 476 F. Supp. 3d at 237.

### III.     Plaintiffs have Article III standing.

#### A.  Individual Plaintiffs have standing.

Plaintiffs' unrebutted evidence far exceeds what is required to prove the three elements comprising "the irreducible constitutional minimum of standing": (1) a concrete, particularized, actual or imminent injury, (2) traceable to Defendants, which is (3) redressable by favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

*First*, the summary-judgment record demonstrates South Carolina's Voting Restrictions impede Plaintiffs' ability to rely on the assistor of their choice—and for some, to rely on any assistance at all. As other courts have held, a plaintiff articulates "sufficient injuries" for standing in a Section 208 case at the summary-judgment stage by demonstrating she was "deprived of her federally protected rights." *League of Women Voters of Ohio*, 741 F. Supp. 3d at 706; *see also Democracy N.C.*, 476 F. Supp. 3d at 188 (plaintiff, "as a person covered by Section 208, has standing, given the conflict between Section 208 and the North Carolina laws concerning who may assist [him] in requesting . . . and returning his absentee ballot, thus directly implicating his rights under Section 208"). The deprivation of Plaintiffs' right to rely on a person of their choice for assistance is more than sufficient to satisfy the Article III requirement of a concrete, particularized, and actual or imminent injury.

*Second*, Plaintiffs' harm is traceable to, and would be remediated by, an injunction prohibiting Defendants' enforcement of the Voting Restrictions, thereby satisfying the

27

traceability and redressability prongs of standing.[7] The traceability "requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct," but is "not equivalent to a requirement of tort causation." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (citation modified). Traceability does not require a plaintiff's injury to arise *directly* from the defendant's conduct; rather, traceability may be satisfied by an "injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). The requirement of redressability merely "ensures that a plaintiff 'personally would benefit in a tangible way from the court's intervention,'" shown by "'alleg[ing] a continuing violation or the imminence of a future violation' of the statute at issue." *Friends of the Earth, Inc.*, 204 F.3d at 162 (first quoting *Warth v. Seldin,* 422 U.S. 490, 508 (1975); then quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

Here, the analysis is simple: Plaintiffs' "injury was—and is—caused by the State Defendants . . . enforcing the Challenged [Voting Restrictions]. And the relief sought in this Court—if successful—would redress [Plaintiffs'] injuries by allowing [them] an assistor of [their] choice consistent with federal law." *League of Women Voters of Ohio*, 741 F. Supp. 3d at 706; *see also OCA-Greater Houston*, 867 F.3d at 613 (election statute's invalidity was "without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the chief election officer of the state") (internal quotation marks omitted). The Attorney General supervises the enforcement of the Voting Restrictions through prosecution of alleged violators under the South Carolina Constitution. S.C. Const. art. V, § 24; *see* S.C. Code §§ 7-15-330(F), 7-15-385(G), 7-25-170, 7-25-190 (criminal penalties for violating restrictions on

---

[7] Commission Defendants challenged neither traceability nor redressability at the motion-to-dismiss stage; Attorney General Wilson argued only that Plaintiffs' injuries stemming from the Five-Voter Limits are not traceable to him. *See* Pls.' Opp'n to Defs.' Mots. to Dismiss at 17–18, Dkt. 21; Def. Wilson's Mot. to Dismiss at 13, Dkt. 13.

assistance). And the Executive Director, Chair, and Commissioners of the State Election Commission are responsible for promulgating election regulations and ensuring county boards of election comply with federal and state law. S.C. Code §§ 7-3-10, -20, 7-15-10. By requiring that county boards of election follow the Voting Restrictions, Commission Defendants impede Plaintiffs' right to an assistor of their choice under Section 208.

The "credible threat of prosecution" facing Plaintiffs and the assistors on whom they rely for violation of the Voting Restrictions constitutes another, standalone traceable injury-in-fact. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted). If Plaintiffs or their preferred assistors violate the Voting Restrictions, they are subject to steep felony criminal penalties. Here, the Attorney General has not "disavowed enforcement" of these criminal penalties, and this threat of prosecution is traceable to the Attorney General and would be remediated by an injunction. *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018); *see also League of Women Voters of Ohio*, 741 F. Supp. 3d at 707 (finding individual plaintiff had standing to challenge Ohio law restricting voting assistance based on "credible fear of prosecution" where the prosecuting authority "has not disavowed prosecuting violations"); *Carey*, 624 F. Supp. 3d at 1030 (finding, in the context of challenge to a law under Section 208 of the VRA, that "there is a credible threat of enforcement when the defendants don't expressly disavow enforcement of a law that clearly applies to the plaintiffs") (citation omitted).

### B. South Carolina NAACP has standing.

The undisputed record evidence confirms that the South Carolina NAACP satisfies the three requirements of associational standing: "its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Ala. Legislative Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 269 (2015) (citation modified).

*First*, South Carolina NAACP's members would have standing to sue as individuals. *See id.* at 269. As explained *supra* Arg. Section III.A., Mr. Caldwell, a member of the South Carolina

29

NAACP, has standing under Section 208 to challenge the Voting Restrictions. *See* Caldwell Decl. ¶ 4; Murphy Decl. ¶ 6. Other members of the South Carolina NAACP "include people with physical and nonphysical disabilities who rely on assistance to vote absentee" and therefore would have standing to sue in their own right. Murphy Decl. ¶ 6. As President Murphy and Rev. Flemming described, specific members of the Greenville NAACP Branch are deprived of the assistor of their choice by the Voting Restrictions. *See supra* Statement of Facts Section V. Some used to rely on Rev. Flemming but now cannot because of the Five-Voter Limits, while others would choose an assistor under 18, but are prevented from doing so by the Limits on Possible Assistors. Murphy Decl. ¶¶ 10–13; Flemming Decl. ¶¶ 5, 7–8. In sum, the Voting Restrictions "are preventing NAACP members with disabilities from getting the help they need from someone they trust to vote." Flemming Decl. ¶ 9. As cases involving similar challenges illustrate, the harm suffered by Mr. Caldwell and other South Carolina NAACP members far exceeds their required showing for suing as individuals. *See, e.g.*, *League of Women Voters of Ohio*, 741 F. Supp. 3d at 706; *Democracy N.C.*, 476 F. Supp. 3d at 188.

*Second*, the interests at stake here are indisputably germane to the South Carolina NAACP's purpose. *See ALBC*, 575 U.S. at 269. As the oldest civil rights organization in the State, safeguarding the fundamental right to vote of its members and all South Carolinians is at the heart of the South Carolina NAACP's purpose. Murphy Decl. ¶¶ 3, 5; *see, e.g.*, *S.C. State Conf. of the NAACP v. Alexander*, No. 3:21-cv-3302-JMC-RMG-TJH, 2022 WL 453533, at *2 (D.S.C. Feb. 14, 2022). It is no surprise, then, that Defendants did not dispute this associational-standing requirement at the motion-to-dismiss stage.

*Third*, as in other Section 208 cases, neither Plaintiffs' claims nor the relief requested here "require the participation of any one member." *Disability Rts. N.C.*, 2022 WL 2678884, at *2 (granting plaintiffs' motion for summary judgment). Because "this action seeks a declaratory judgment and injunctive relief, the type of relief for which associational standing was originally recognized," the South Carolina NAACP's members' participation is not required. *Retail Indus.*

30

*Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) ("constitutional and voting rights" claims seeking "declaratory or injunctive relief" do not "require the participation of the individual members" of organizational plaintiffs).

**IV.     The Voting Restrictions are void as a matter of law and thus cannot be enforced.**

This Court should enjoin and declare null and void the Limits on Voting Assistance Eligibility and Five-Voter Limits, and, as to all South Carolina voters covered by Section 208, the Limits on Possible Assistors, for two independent reasons. First, the injuries that Plaintiffs and South Carolina NAACP members will suffer here are the type of "injuries for which it is all but impossible for courts to craft relief that is complete *and* benefits only the named plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 n.12 (2025). In other words, to afford complete relief to the parties, the injunction must necessarily benefit non-parties. This is true because there will necessarily be changes over time in who the different non-party assistors are, as well as which South Carolina NAACP members with disabilities need voting assistance. Second, longstanding principles of equity permit the Court to issue an injunction on federal preemption grounds to ensure that it does "not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (citation omitted). Thus, for both reasons independently, the Court should enjoin the Limits on Voting Assistance Eligibility and Five-Voter Limits in whole, and the Limits on Possible Assistors as to all South Carolina voters covered by Section 208—not just the named Plaintiffs.

### A. Complete relief for Individual Plaintiffs and South Carolina NAACP's members requires enjoining the Voting Restrictions beyond the named Plaintiffs.

"[C]ourts generally may administer complete relief *between the parties*," and in doing so, some injunctions may "incidentally" but necessarily benefit non-parties. *CASA*, 606 U.S. at 851 (citation omitted). This "complete-relief principle has deep roots in equity." *Id.* Because there are some "injuries for which it is all but impossible for courts to craft relief that is complete *and*

31

benefits only the named plaintiffs," *id.* at 852 n.12, "the Supreme Court left open for lower courts to determine the scope of 'complete relief' when granting injunctions," including by providing "an 'indivisible remedy' which incidentally benefits some third parties," *Shaw v. Smith*, 166 F.4th 61, 79 n.11 (10th Cir. 2026); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 84 (D.D.C. 2025); *L.A. Press Club v. City of Los Angeles*, 799 F. Supp. 3d 1007, 1033–34 (C.D. Cal. 2025); *Chi. Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 3034056, at *6 (N.D. Ill. Oct. 30, 2025). This is such a case for at least two reasons.

*First*, affording complete relief to the individual Plaintiffs requires protecting them so that they may exercise their right to vote with assistance from the assistors of their choice. But the Limits on Possible Assistors and Five-Voter Limits operate in a manner that prevents Plaintiffs from exercising that right by criminalizing the conduct of third parties who would provide such assistance. *See* S.C. Code §§ 7-15-385(G), 7-25-190. There are many reasons why potential assistors may not know whether the voter seeking assistance is a Plaintiff and therefore cannot confidently rely on the injunction before acting: because Plaintiffs choose different assistors in different elections, or Plaintiffs change their mind about their preferred assistor at some point before voting, or a Plaintiff requests assistance after a prospective assistor has already helped five voters. The threat of criminal liability assistors face for violation of the Voting Restrictions will chill them from providing assistance, thereby depriving Plaintiffs of the very relief the injunction is meant to secure. This is especially true for members of the South Carolina NAACP, who will not be listed by name in any injunction and some of whom may not yet have a qualifying disability, making it "unlikely to be able to determine whether an individual is a member" before county election officials reject ballots in accordance with Commission rules or prosecutors under supervision of the Attorney General prosecute assisters. *L.A. Press Club*, 799 F. Supp. 3d at 1033–34 (finding an "injunction applying to all journalists within the LAPD's purview is necessary to afford Plaintiffs complete relief"); *see also Chi.*

32

*Women in Trades*, 2025 WL 3034056, at *6 (the only "feasible option" to afford complete relief and avoid the chilling effect of deterring individuals from collaborating with the organization members is to "enjoin all enforcement" of the challenged provision).

It is not surprising then that courts entering injunctions based on Section 208 claims have consistently afforded complete relief by enjoining the defendants from enforcing the preempted state laws at least as to all voters covered by "Section 208 of the Voting Rights Act, who request assistance from a person of that voter's choice." *Ala. State Conf. of the NAACP*, 2024 WL 4282082, at *7; *see also Disability Rts. Miss. v. Fitch*, 684 F. Supp. 3d 517, 522 (S.D. Miss. 2023) (enjoining Defendants from applying the challenged law, *inter alia*, "in connection with the 2023 primary and/or general [] elections"), *appeal dismissed as moot by* No. 23-60463, 2024 WL 3843803 (5th Cir. Aug. 14, 2024); *League of Women Voters of Ohio*, 741 F. Supp. 3d at 726 (enjoining defendants from enforcing challenged laws "against any disabled voter or against any individual who assists any disabled voter with the return of the disabled voter's absentee ballot to the extent such enforcement contradicts Section 208 of the Voting Rights Act"); *Disability Rts. N.C.*, 2022 WL 2678884, at *7 ("Defendants are enjoined from enforcing such provisions against voters with disabilities in North Carolina"); *Ark. United*, 626 F. Supp. 3d at 1088 (enjoining defendants from enforcing challenged provisions "based on the number of voters any individual has assisted" and from enforcing "criminal penalties" relating to those provisions).

*Second*, the Fourth Circuit has recognized—in a case decided after the Supreme Court issued its decision in *CASA*—that where a plaintiff is an "association[ ] with many members," this can make "it hard to tell how far an injunction can sweep to give Plaintiffs 'complete relief.'" *United States v. Lierman*, 151 F.4th 530, 543 (4th Cir. 2025) (citation omitted); *see also League of United Latin Am. Citizens*, 808 F. Supp. 3d at 84 ("Enjoining the appropriate named Defendants from implementing" a portion of an Executive Order "is a party-specific remedy that is consistent with [*CASA*]" without which "Plaintiffs—including organizations that operate in every State and associations with members throughout the Nation—would be irreparably

33

harmed."); *Shaw*, 166 F.4th at 79 n.11; *L.A. Press Club*, 799 F. Supp. 3d at 1033–34; *Chi. Women in Trades*, 2025 WL 3034056, at *6. The Limits on Voting Assistance Eligibility and Five-Voter Limits require an injunction against all enforcement, and an injunction against the Limits on Voting Assistance Eligibility for voters covered by Section 208 is necessary to protect the rights of South Carolina NAACP members now and in the future. Without it, individuals protected by Section 208 would have to prove membership as a prerequisite to relying on an assistor, and assistors will be chilled from providing assistance.

### B. The Voting Restrictions are null and void because federal law preempts them.

As the Supreme Court has "long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 575 U.S. at 326 (citation omitted). As such, courts "must not give effect to state laws that conflict with federal laws." *Id.* at 324. The principle authorizing "court[s] of equity . . . [to] issue an antisuit injunction to prevent an officer from engaging in tortious conduct" predates even *Ex parte Young*, which itself "justifie[d] its holding by reference to a long line of cases authorizing suits against state officials in certain circumstances." *CASA*, 606 U.S. at 846 n.9. Thus, when "Congress enacts a valid statute pursuant to its Article I powers, state law is *naturally* preempted to the extent of any conflict with a federal statute. End of story." *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (citation modified) (emphasis added). This rule does not purport to expand the equitable powers of the Court in a manner that contradicts *CASA*—it "simply provides a rule of decision," specifying "that federal law is supreme in case of a conflict with state law." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (citation modified).

Here, it would be bizarre to declare that a "state law is naturally preempted to the extent of any conflict with a federal statute," *Haaland*, 599 U.S. at 287, and yet allow its continued operation except as to three individual plaintiffs or even as to members of a large, statewide organization such as the South Carolina NAACP. Looking to history and tradition, the Supreme

34

Court has not, for 200 years or more, cabined preemption remedies to named plaintiffs alone. *See, e.g.*, *Gibbons v. Ogden*, 22 U.S. 1 (1824). In *Gibbons*, for example, upon finding New York laws restricting navigation on certain rivers to certain vessels preempted under the Supremacy Clause, Chief Justice Marshall did not limit the remedy to only Mr. Gibbons and his boats but instead declared the law "repugnant to the said constitution, and void." *Id.* at 240.

Beyond preemption, *CASA* distinguished a "universal injunction," which "lacks a historical pedigree," 606 U.S. at 847, from the deep historical tradition by which "a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct." *Id.* at 846 n.9 (citation omitted). The Court explained that even *Ex parte Young* itself "justifies its holding by reference to a long line of cases authorizing suits against state officials in certain circumstances," *id.* at 846 n.9. In turn, *Ex parte Young*, 209 U.S. 123 (1908), held that state officials "who threaten and are about to commence proceedings . . . to enforce against parties affected an unconstitutional act, . . . may be enjoined by a Federal court of equity from such action." *Id.* at 155–56. Therefore, unlike the "universal injunction," the power to issue a limited injunction that protects some non-parties against illegal state action has deep historical roots. As the Tenth Circuit recently held, for example, *CASA* "does not preclude" an injunction against "one state agency that conducts law enforcement duties within the State . . . and protects only out-of-state drivers traveling in [the State]," as this is not the sort of overbroad injunction contemplated by *CASA*. *Shaw*, 166 F.4th at 79 n.11.

For all these reasons, injunctive and declaratory relief is necessary and appropriate against Defendants and not limited to the individual Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment, declare the Voting Restrictions null, and enjoin their enforcement.

35

Dated: April 6, 2026

Respectfully submitted,

*/s/ Allen Chaney*
Allen Chaney, Fed. ID 13181
AMERICAN CIVIL LIBERTIES UNION OF SOUTH
CAROLINA FOUNDATION
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org

Stephen D. Hibbard*
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
(310) 284-5622
shibbard@proskauer.com

Robert W. Pommer III*
Alexander B. Guzy-Sprague*
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 600 South
Washington, DC 20004-2533
(202) 416-6808
rpommer@proskauer.com
aguzy-sprague@proskauer.com

Bradley M. Presant*
Amy B. Gordon*
Michael Beckwith*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
(212) 969-3284
bpresant@proskauer.com
agordon@proskauer.com
mbeckwith@proskauer.com

*Attorneys for Plaintiffs*
*\* Motion for admission Pro Hac Vice forthcoming*
*\*\* Motion for admission Pro Hac Vice pending*

Clayton Pierce**
Davin Rosborough**
Jonathan Topaz**
Sophia Lin Lakin**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
cpierce@aclu.org
drosborough@aclu.org
jtopaz@aclu.org
slakin@aclu.org

Brian Dimmick**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW, 6th Floor
Washington, D.C. 20005
(202) 731-2395
bdimmick@aclu.org

36